ORIGINAL

FILED

JUL 1 1 2007

U.S. COURT OF FEDERAL CLAIMS

**UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| ERICKSON AIR-CRANE, INC., | ) | |
| Plaintiff, | ) | No. 07-519 C |
| v. | ) | Bid Protest |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS EMERGENCY REQUEST FOR DECLARATORY JUDGMENT, MOTION FOR A TEMPORARY RESTRAINING ORDER, AND MOTION FOR PRELIMINARY INJUNCTION**

Alan I. Saltman
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiff

OF COUNSEL:

Ruth G. Tiger
Eric J. Pohlner
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Dated: July 11, 2007

## TABLE OF CONTENTS


Table of Authorities .......... ii

I. Introduction .......... 1

II. Argument .......... 3

A. Jurisdiction And Standard Of Review .......... 3

B. Erickson Is Entitled To Declaratory Relief Because Defendant's Override Of The Automatic Stay Is Arbitrary, Capricious, An Abuse Of Discretion, And Otherwise Contrary To Applicable Federal Law And Regulation .......... 4

1. No Adverse Consequences Will Necessarily Occur If The Stay Remains In Place Pending GAO's Resolution Of Erickson's Protest Because Reasonable Alternatives Exist To Provide The Forest Service With The Helicopter Firefighting Services It Needs Without The Necessity Of An Override .......... 7

2. The Benefits Of Overriding The Stay Do Not Outweigh Any Costs Of Leaving It In Place .......... 12

3. The Chief Failed To Consider The Impact Of The Override On Competition And The Integrity Of The Procurement System .......... 15

C. The Equities Favor This Court Issuing A Temporary Restraining Order And Preliminary Injunction .......... 15

1. Erickson Is Likely To Succeed On The Merits Because Defendant's Decision To Override The Automatic Stay Lacked A Rational Basis .......... 16

2. Absent Relief, Erickson Will Suffer Irreparable Harm .......... 16

3. Granting Injunctive Relief Is In The Public Interest .......... 17

4. The Balance Of The Hardships Tips Strongly In Erickson's Favor Because The Defendant Will Not Suffer Any Harm .......... 18

III. Conclusion .......... 19

## TABLE OF AUTHORITIES

**CASES** **PAGE**

Advanced Sys. Dev., Inc. v. United States,
72 Fed. Cl. 25 (2006) ... *passim*

Alion Science v. United States,
69 Fed. Cl. 14 (2005) ... 7

Automation Tech., Inc.,
72 Fed. Cl. 723 (2006) ... 11, 12

Chapman Law Firm Co. v. United States ("Chapman I"),
62 Fed. Cl. 464 (2004) ... 3, 11, 12, 15

Chapman Law Firm Co. v. United States ("Chapman II"),
65 Fed. Cl. 422 (2005) ... 5

CIGNA Gov't Servs., LLC v. United States,
70 Fed. Cl. 100 (2006) ... 3, 5, 12, 13, 15

Delbert Wheeler Constr., Inc. v. United States,
39 Fed. Cl. 239 (1997), aff'd, 155 F.3d 566 (Fed. Cir. 1998) ... 4

DTH Management Group v. Kelso,
844 F. Supp. 251 (E.D.N.C. 1993) ... 16-17

FMC Corp. v. United States,
3 F.3d 424 (Fed. Cir. 1993) ... 4

Hospital Klean of Texas, Inc. v. United States,
65 Fed. Cl. 618 (2005) ... 11, 19

JWK Int'l Corp. v. United States,
49 Fed. Cl. 364 (2001) ... 16

Keeton Corrections, Inc. v. United States,
59 Fed. Cl. 753 (2004) ... 7, 15

Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.,
463 U.S. 29 (1983) ... 4

Overstreet Elec. Co., Inc. v. United States,
47 Fed. Cl. 728 (2000) ... 16

PGBA, LLC v. United States,
57 Fed. Cl. 655 (2003) ............................................................ 3, 12, 15, 16

RAMCOR Servs. Group, Inc. v. United States,
185 F.3d 1286 (Fed. Cir. 1999) ............................................................ 3

Reilly's Wholesale Produce v. United States,
73 Fed. Cl. 705 (2006) ............................................................ *passim*

Seattle Sec. Services, Inc. v. United States,
45 Fed. Cl. 560 (2000) ............................................................ 16

**STATUTES AND REGULATIONS**

5 U.S.C. § 706 ............................................................ 4

28 U.S.C. § 1491(b)(1) ............................................................ 3

28 U.S.C. § 1491(b)(2) ............................................................ 3

28 U.S.C. § 1491(b)(4) ............................................................ 4

31 U.S.C. § 3553 ............................................................ 2

31 U.S.C. § 3553(c)(1) ............................................................ 2

31 U.S.C. § 3553(c)(2) ............................................................ 2

31 U.S.C. § 3553(d) ............................................................ 16

31 U.S.C. § 3553(d)(3) ............................................................ 2

31 U.S.C. § 3553(d)(3)(c) ............................................................ 2

## I. Introduction

On April 6, 2007, the Forest Service issued a solicitation, RFP No. AG-024B-S-07-0008, for helicopter firefighting services using heavy or medium helicopters on an "exclusive use" basis. In exclusive use contracts, the parties agree up front on the dates on which a fully crewed helicopter is to be available exclusively for the needs of the Forest Service. See Ex. 2 (Decl. of L. Allmaras ¶ 10). The solicitation sought offers for the same services that the Forest Service is currently obtaining under a number of existing exclusive use contracts and Call When Needed ("CWN") contracts, including contracts with Erickson Air-Crane, Inc. ("Erickson"). See id. (¶ 7). Under the CWN contracts, the Forest Service can (but is not required to) order helicopter services and the contractor is not required to accept any orders placed. See id. (¶ 10). If the Forest Service decides to place an order and the contractor accepts, the contractor agrees to make the helicopter available for a mutually agreeable period of time or until the Forest Service releases the helicopter. See id. In this sense, once a helicopter is ordered and the order accepted, the CWN contract operates just like the exclusive use contract. See id. That is, the helicopter is then available "at a moment's notice" in the same exact manner as a helicopter under an exclusive use contract. See id. (¶ 11).

Erickson submitted a timely offer in response to the solicitation, proposing four of its helicopters for 19 of the 35 locations for which services were being solicited by the Forest Service. See Complaint ¶ 6. Each location was designated by the Forest Service as a separate contract line item number ("CLIN") in the solicitation. See id. By letter of June 13, 2007, the Forest Service notified Erickson that its proposal had been rejected as technically unacceptable

due to certain alleged deficiencies in the documentation Erickson included in the proposal. See id. ¶ 7. On June 22, 2007, Erickson filed a timely protest with the Government Accountability Office ("GAO") challenging the Forest Service's rejection of its proposal with regard to 18 of the 19 locations/CLINs for which Erickson had offered its helicopters (the exception being CLIN 25, Reno/Stead). See id. ¶ 9. The protest was docketed by GAO as B-299909. The merits of Erickson's protest to GAO challenge the Forest Service's failure to utilize relevant information bearing on Erickson's proposal that the Forest Service had close at hand and to seek clarification of clerical errors in Erickson's proposal. Had the Forest Service done so, as it was required to, it would have selected Erickson for one or more contract awards because Erickson's offer represented the best overall value to the government.

On the same day that Erickson lodged its protest, GAO provided notice to the Forest Service of the filing of Erickson's protest pursuant to the Competition in Contracting Act ("CICA"), 31 U.S.C. § 3553. This notice automatically prohibited the Forest Service from awarding any contracts under the solicitation, id. § 3553(c)(1), and from authorizing performance of any contract(s) already awarded pursuant to the solicitation, id. § 3553(d)(3). The purpose of the required CICA stay is to ensure that CICA's mandate for competition is enforced. A CICA stay remains in force during the protest period unless the head of the procuring agency, here the Chief of the Forest Service ("Chief"), takes the exceptional route of issuing a written determination to override the stay. Id. § 3553(c)(2) and (d)(3)(c).

On July 9, 2007, a full two weeks after Erickson filed its protest, the Chief of the Forest Service issued her written determination to override the stay. The Chief found that an override

was in the best interests of the United States and justified based on urgent and compelling circumstances.

Erickson has moved for a declaratory judgment invalidating the Chief's override of the stay and a temporary restraining order and preliminary injunction enjoining the Chief's override as to the 18 CLINs Erickson has protested on the grounds that the Chief's determination to override the stay is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

## II. Argument

### A. Jurisdiction And Standard Of Review

The Court of Federal Claims has jurisdiction to review the decision of a head of a procuring agency to override a CICA stay pursuant to 28 U.S.C. § 1491(b)(1). See RAMCOR Servs. Group, Inc. v. United States, 185 F.3d 1286, 1289-90 (Fed. Cir. 1999). In exercising this jurisdiction, the Court "may award any relief that the Court considers proper, including declaratory and injunctive relief. . . ." 28 U.S.C. § 1491(b)(2). This provision authorizes the Court to issue the declaratory and injunctive relief Erickson seeks. See, e.g., CIGNA Gov't Servs., LLC v. United States, 70 Fed. Cl. 100, 114 (2006); Chapman Law Firm Co. v. United States, 62 Fed. Cl. 464, 469 (2004) ("Chapman I"); PGBA, LLC v. United States, 57 Fed. Cl. 655, 656 (2003).

The Court reviews the decision of an agency head to override the automatic stay to determine whether it was arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law, pursuant to the Administrative Procedure Act, 5 U.S.C. § 706, standard of review. 28 U.S.C. § 1491(b)(4). An agency's decision is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). "In short, the Court must look to see whether the agency considered the relevant factors and made a rational decision based on those factors." Advanced Sys. Dev., Inc. v. United States, 72 Fed. Cl. 25, 30 (2006).

In order to obtain a preliminary injunction, plaintiff must demonstrate: (i) a likelihood of success on the merits; (ii) irreparable injury to plaintiff if defendant is not enjoined; (iii) the public interest is served by enjoining defendant; and (iv) the harm to plaintiff outweighs the harm to defendant. See id. (citing Delbert Wheeler Constr., Inc. v. United States, 39 Fed. Cl. 239, 251 (1997), aff'd, 155 F.3d 566 (Fed. Cir. 1998)). No one factor is dispositive to the Court's inquiry as "the weakness of the showing regarding one factor may be overborne by the strength of the others." Id. (quoting FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993)).

### B. Erickson Is Entitled To Declaratory Relief Because Defendant's Override Of The Automatic Stay Is Arbitrary, Capricious, An Abuse Of Discretion, And Otherwise Contrary To Applicable Federal Law And Regulation

The purpose of an automatic stay is "to preserve the status quo during the pendency of the protest so that an agency would not cavalierly disregard GAO's recommendations to cancel

the challenged award," thereby "preserv[ing] competition in contracting and ensur[ing] a fair and effective process at the GAO." Advanced Sys. Dev., 72 Fed. Cl. at 31. When an agency improperly decides to override a stay, this Court may restore the status quo and reinstate the stay through both declaratory and injunctive relief. As this Court has observed, declaratory relief is in some ways preferable to injunctive relief because the latter imposes unnecessary burdens of proof upon a plaintiff and is less practical and efficient than declaratory relief. See Advanced Sys. Dev., 72 Fed. Cl. at 36 (citing Chapman Law Firm Co v. United States, 65 Fed. Cl. 422, 424 (2005) ("Chapman II"); CIGNA, 70 Fed. Cl. at 114). Specifically, this Court has held that a plaintiff should not be required to prove anything more than that an agency's override decision is unreasonable:

> Congress did not require any evaluation of injunctive relief factors as a prerequisite to a stay of contract performance upon the filing of a protest with the GAO. Thus, it would be contrary to the legislative scheme to impose such an additional requirement, upon finding that an agency override determination lacks validity, in order to reinstate the statutory stay applicable during the GAO protest period. Declaratory relief preserves the scheme that Congress intended.

Chapman II, 65 Fed. Cl. at 424. Erickson is entitled to declaratory relief because the Forest Service's decision to override the stay was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law as demonstrated below.

In Reilly's Wholesale Produce v. United States, 73 Fed. Cl. 705 (2006), the Court surveyed its case law and listed four factors that an agency must, at a minimum, consider in making an override decision:

> (i) whether significant adverse consequences will necessarily occur if the stay is not overridden, (ii) conversely, whether reasonable alternatives to the override exist that would adequately address the circumstances presented, (iii) how the potential cost of proceeding with the override, including the costs associated with

> the potential that the GAO might sustain the protest, compare to the benefits associated with the approach being considered for addressing the agency's needs, and (iv) the impact of the override on competition and the integrity of the procurement system, as reflected in the Competition in Contracting Act.

Reilly's Wholesale, 73 Fed. Cl. at 711 (internal citations omitted) (emphases added); see id. at 711 n.10 (the rationale of the cases involving a "best interests" override applies equally to an override determination based on urgent and compelling circumstances).

Additionally, certain factors are irrelevant to the override analysis. Specifically, that the new contract would be better than the old one and that the override and continuation of the contract is otherwise simply preferable to the agency are irrelevant to the override analysis. See Reilly's Wholesale, 73 Fed. Cl. at 711 (citing Advanced Sys. Dev., 72 Fed. Cl. at 31). Nevertheless, the override determination in the present case boils down to little more than the contention that having more exclusive use contracts in place is preferable to the status quo where the Forest Service procures needed helicopter firefighting services through a few exclusive use contracts and many CWN contracts. See Ex. 1 (Determination ¶ 12(b)). There is no contention by the Chief that maintaining the status quo pending resolution of Erickson's protest would prevent the Forest Service from protecting the public this fire season because it would have to continue its long-standing practice of relying more heavily on CWN contracts than on exclusive use contracts to meet its helicopter firefighting needs.

As described more fully below, the Chief made unreasonable conclusions regarding the factors that an agency must consider in making an override decision. Specifically, she unreasonably concluded that adverse consequences would necessarily occur if the stay were to

remain in place by failing to objectively consider reasonable alternatives available to overriding the stay. She also failed to quantify the costs of proceeding with an override and any supposed benefits and therefore her determination lacked any meaningful cost-benefit analysis. Finally, she failed to consider the impact of the override on competition and the integrity of the procurement system in deciding to override the stay. By failing to properly consider the mandatory factors in overriding a stay and instead relying upon irrelevant factors, the Chief's decision lacked a rational basis and was contrary to the law. Erickson will address each of these deficiencies in turn.

**1. No Adverse Consequences Will Necessarily Occur If The Stay Remains In Place Pending GAO's Resolution Of Erickson's Protest Because Reasonable Alternatives Exist To Provide The Forest Service With The Helicopter Firefighting Services It Needs Without The Necessity Of An Override**

The Chief's determination failed to consider the reasonable alternative of extending existing exclusive use contracts in conjunction with CWN contracts to meet its helicopter firefighting services needs. The focus of the reasonable alternative analysis is (1) whether the work to be done during the stay is the same as was provided under a predecessor contract and (2) whether any contractors other than the awardee are able to perform that work. See Alion Science v. United States, 69 Fed. Cl. 14, 27-28 (2005); Keeton Corrections, Inc. v. United States, 59 Fed. Cl. 753, 758 (2004).

As noted, the helicopter firefighting services the Forest Service solicited under the subject solicitation are the same helicopter firefighting services that Erickson and other contractors already provide to the Forest Service under existing contracts. See Ex. 2 (Decl. of L.

Allmaras ¶ 7). The solicitation did not seek to procure new work but rather to procure the same helicopter firefighting services that the Forest Service was then and still is being provided through existing contracts. The existing contracts are of two types: exclusive use contracts and CWN contracts. The subject solicitation sought offers only for exclusive use contracts.

The difference between exclusive use and CWN contracts for helicopter firefighting services has to do with the nature of the parties' contractual relationship, not with the type of helicopter firefighting services provided. Under both types of contracts, the helicopter firefighting services required are the same. See id. Under both types of contracts, the contractor provides one or more technically-capable, approved helicopters and experienced crews to fight forest fires. See id. In fact, the helicopters Erickson proposed in response to the subject solicitation are all included in Erickson's existing CWN contract with the Forest Service. Id. (¶ 9). On information and belief, the helicopters proposed by the other offerors are included in those offerors' CWN contracts with the Forest Service. Id. (¶ 23).

The Forest Service has CWN contracts with approximately 70 helicopter companies, including Erickson, which can be used to meet its need for helicopter firefighting services. See Ex. 2 (Decl. of L. Allmaras ¶ 23). Under these CWN contracts, the Forest Service has approximately 250 helicopters available to it to meet its firefighting needs. See id. While the Chief pointed out that over 241 helicopters were available under CWN contracts at the beginning of the 2006 season, she stated that only about 40% of these helicopters were available for firefighting use. Ex. 1 (¶ 12(b)). Apparently, based on this, the Forest Service determined that it was advantageous to seek a larger number of exclusive use contracts in 2007 than it had in

previous years. Yet even using the Chief's own stale 2006 data, there are still 96 helicopters (40% of 241) available for firefighting use – a number far in excess of the 18 helicopters that would be required during a reinstated stay pending GAO's decision on the merits of Erickson's protest. Additionally, although the Chief claimed that the Forest Service generally uses its CWN contracts to provide helicopter services for only a single incident, Ex. 1 (¶ 12(b)), she failed to consider that the Forest Service has in the past used its CWN contracts to procure helicopter firefighting services for more than a single incident. Ex. 2 (Decl. of L. Allmaras ¶ 11). There is no reason why the Forest Service could not continue to use its CWN contracts for more than a single incident while Erickson's protest is pending at GAO.

Additionally, as the Chief indicated in the override decision, a number of existing exclusive use contracts also remain in force. See Ex. 1 (¶ 12). She stated that 28 helicopters (four heavy lift helicopters and 24 medium lift helicopters) are available under exclusive use contracts for the remainder of the 2007 fire season. The Chief claims that the 24 medium lift helicopters are unavailable for use by the Forest Service because they are "budgeted for and managed by the [Forest Service] regions (as opposed to nationally) and they are reserved for use in local initial attacks." Id. How the Forest Service has chosen to budget for and manage these 24 helicopters does not affect the actual availability of them to meet the Forest Service's "national" helicopter firefighting needs. Moreover, the Chief does not explain why the Forest Service's choice to "reserve" these 24 helicopters for local initial attacks prevents the Forest Service from deploying these helicopters wherever needed for initial attacks while using existing CWN contracts or other means to meet "local" needs. Nor does the Chief offer any explanation for her contention that assigning these helicopters for "national" use would actually deplete any

local resources. See id. (¶ 12(b)). Since Erickson is protesting only 18 locations, the 28 helicopters under existing exclusive use contracts are more than adequate to cover the Forest Service's helicopter firefighting needs during the stay.

Moreover, Erickson is ready, willing, and able to continue providing helicopter firefighting services to the Forest Service. Erickson was under contract to the Forest Service to provide exclusive use heavy lift helicopter services under contract no. AG-024B-C-05-9096 until July 7, 2007, when the Forest Service notified Erickson that it was terminating that contract (although the Chief seems to believe that this contract was still in place on July 9, 2007). At present, another alternative to the override would be to reinstate and extend the term of Contract 9096. See Ex. 2 (Decl. of L. Allmaras ¶ 13).

As a further means for the Forest Service to meet its needs during the pendency of the stay, under section C-33 of Contract 9096, the Forest Service can order additional helicopter services from Erickson. See id. (¶ 15). The Forest Service has ordered such additional helicopter firefighting services throughout the course of that contract. See id. (¶ 16). Additionally, on information and belief, other helicopter operators are in a similar position to provide additional helicopters to the Forest Service in accordance with clause C-33 of their exclusive use contracts. The Chief failed to consider the availability of additional helicopter services under these exclusive use contracts in her alternatives analysis. See Ex. 1 (¶ 12).

In conducting her alternative means analysis, the Chief also appears to have unreasonably assumed that the Forest Service was limited to relying upon only one alternative to meet all of its

helicopter firefighting needs. For example, the Chief failed to consider obtaining the requisite services by both extending the existing exclusive use contracts and ordering additional helicopters under those contracts and obtaining additional helicopter firefighting services under the CWN contracts. By using a blend of the existing exclusive use and CWN contracts, the Forest Service can obtain the requisite number of helicopters needed to meet its firefighting needs. See Chapman I, 62 Fed. Cl. 467 (finding that there was no reason justifying an override when the changes clause in existing contracts allowed the agency to require the performance of new work).

By availing itself of the reasonable alternatives to overriding the stay outlined above, the Forest Service can meet its helicopter firefighting needs with no adverse consequences to keeping the stay in place. See Hospital Klean of Texas, Inc. v. United States, 65 Fed. Cl. 618, 624 (2005) (when the government has alternate means of obtaining needed services, there can be no harm from enforcing a stay). Just as the Forest Service has relied upon the existing contracts to meet its firefighting needs for years, it can continue to rely upon these contracts to meet its firefighting needs during the protest period. Neither life nor property will be placed at risk by keeping the automatic stay in place because the Forest Service can procure all needed services under its existing contracts. As such, the Chief lacked any rational basis for her override determination. See Automation Tech., Inc., 72 Fed. Cl. 723, 730 (2006).

### 2. The Benefits Of Overriding The Stay Do Not Outweigh Any Costs Of Leaving It In Place

As part of determining whether to override a stay, an agency is required to conduct a comprehensive and balanced cost-benefit analysis. A mere naked assertion that the benefits of an override outweigh its costs cannot support an override decision. See CIGNA, 70 Fed. Cl. at 112. An agency also may not consider only the negative consequences of maintaining the stay; the agency must also recognize the benefits of doing so. Specifically, an agency must attempt to quantify the potential costs that it would incur were it to authorize the awardee to perform under the new contract only to have GAO sustain the protest. See Automation Tech., Inc., 72 Fed. Cl. at 728-29; see also CIGNA, 70 Fed. Cl. at 111; Chapman I, 62 Fed. Cl. at 468.

While overriding a stay may have certain benefits, one "benefit" that an agency may not consider in its cost-benefit analysis is that the new contract is better than the existing contracts. See Reilly's Wholesale, 73 Fed. Cl. at 711. As the Court has observed: "[The new contract] will almost always be an improvement over the old. To allow a best interests determination to rest on such a common ground would permit the override exception to swallow the Congressionally mandated rule that stays are automatic." Advanced Sys. Dev., 72 Fed. Cl. at 31 (citations omitted); accord PGBA, 57 Fed. Cl. at 662 (holding the justification is also insufficient in the context of urgent and compelling circumstances). Yet, as noted, upon close examination that is really the only justification that the Chief relied upon.

The Chief did not properly consider the costs that the Forest Service would incur should Erickson prevail upon its protest. Though the Chief acknowledged that the GAO may hold the

Forest Service liable for the Erickson bid preparation and protest costs, including attorneys' fees, she failed to even attempt to quantify those costs. Rather, the Chief merely concluded that the "risks that would result from not overriding the stay . . . outweigh the ramifications of any sustained bid protests." Ex. 1 (Determination ¶ 13). "This is the type of 'naked' assertion that, standing alone, does not support an agency's override decision." CIGNA, 70 Fed. Cl. at 111-12. The Chief could not have balanced the override's costs and benefits without having made a reasonable attempt to determine the weight of each. On its face, then, the determination reveals the Chief's failure to consider an important factor in making an override decision.

Additionally, any contention that going forward with the override is necessary to prevent loss of life and property and to assure helicopter availability "at a moment's notice" is not borne out by the facts. As noted, once a contractor accepts a Forest Service order under a CWN contract, that contractor is obligated to keep that helicopter available for use by the Forest Service. That helicopter, like a helicopter under an exclusive use contract, is then available "at a moment's notice." At any time during the past two weeks, the Forest Service could have placed orders under its CWN contracts to meet its firefighting needs this season. Indeed, during the last two weeks while the stay has been in place, the Forest Service has ordered helicopter services under its CWN contracts as part of its firefighting mission to prevent loss of life and property and to assure helicopter availability at a moment's notice. See Ex. 2 (Decl. of L. Allmaras ¶ 22). And during years past, the Forest Service has met these needs through a combination of exclusive use and CWN contracts with greater reliance on the CWN contracts. Id. at ¶ 11. The Forest Service can continue to meet these needs in the same manner this season. Nowhere in her determination does the Chief assert that the Forest Service will be unable to provide necessary

helicopter firefighting services this season if the stay remains in place pending resolution of Erickson's protest. Based on its experience over the years ordering helicopter services under its CWN contracts, the Forest Service knew or should have known that it could meet its needs in this way, rather than taking the extraordinary step of overriding a CICA stay. Instead, it arbitrarily chose not to follow that readily available route.

In place of a proper cost-benefit analysis, the Chief based her determination only upon the improper "newer is better" justification. Primarily, the Chief states that the awarded exclusive use contracts will provide a better guarantee of availability compared to the existing CWN contracts. However, even if the new contracts are more advantageous to the Forest Service than the existing CWN contracts, that is no basis to justify an override. Advanced Sys. Dev., 72 Fed. Cl. at 31. The Chief never quantified the purported advantages in her determination or offered any support for her bald assertion that the Forest Service cannot obtain guaranteed helicopter availability under its existing exclusive use and CWN contracts. Nor did the Chief specify exactly how the Forest Service's firefighting efforts would be adversely impacted by continuing its decades-long reliance primarily upon CWN contracts as the means of meeting its firefighting needs. See Ex. 1 (¶ 12(b)). Moreover, though the Chief baldly asserted that the awarded contracts offer "a lower cost" to the Forest Service than continued primary reliance on CWN contracts, again the Chief never quantified this claimed cost savings. In short, not only did the Chief base her determination on the irrelevant factor that the new contracts are more advantageous than the existing ones, she failed to note any support for her assertions that such is the case.

### 3. The Chief Failed To Consider The Impact Of The Override On Competition And The Integrity Of The Procurement System

The Chief utterly failed to consider whether overriding the stay would serve or undermine the congressional goal of competition embodied in CICA and the integrity of the procurement system. "[T]he best interests of the United States . . . necessarily include weighing the benefits Congress obviously felt were furthered bolstering the bid protest process." PGBA, 57 Fed. Cl. at 663. Her override determination was unreasonable as a result.

For all the reasons above, the Chief's decision to override the stay on the 18 CLINs Erickson has protested was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law. Erickson is therefore entitled to relief in the form of a declaration of the Court invalidating the override determination. See, e.g., Advanced Sys. Dev., 72 Fed. Cl. at 36-37; see also CIGNA, 70 Fed. Cl. at 114; Chapman I, 62 Fed. Cl. at 468-69; Keeton 59 Fed. Cl. at 759.

### C. The Equities Favor This Court Issuing A Temporary Restraining Order And Preliminary Injunction

Though declaratory relief is more efficient and better matches the intent of CICA in preserving a stay, Erickson is also entitled to injunctive relief in the form of a temporary restraining order and preliminary injunction restraining the defendant from continuing in its override of the automatic stay.

### 1. Erickson Is Likely To Succeed On The Merits Because Defendant's Decision To Override The Automatic Stay Lacked A Rational Basis

Erickson is likely to succeed on the merits of its challenge of the Forest Service's decision to override the automatic stay. As discussed above, the Forest Service made unreasonable conclusions regarding the adverse consequences that would allegedly occur were the stay to remain in place, failed to objectively consider reasonable alternatives available to overriding the stay, and unreasonably determined that overriding the stay would be more advantageous than leaving it in place. By failing to properly consider the mandatory factors in overriding a stay, the Chief's decision lacked a rational basis and was contrary to the law.

### 2. Absent Relief, Erickson Will Suffer Irreparable Harm

Absent an injunction, Erickson will suffer irreparable harm because it does not have an adequate remedy at law. The only other available relief – the potential for recovery of bid preparation and protest pursuit costs – would not compensate it for its loss of valuable business on this contract. See Seattle Sec. Services, Inc. v. United States, 45 Fed. Cl. 560, 571 (2000). It is well-established that a lost opportunity to compete constitutes irreparable harm. See, e.g., Reilly's Wholesale, 73 Fed. Cl. at 717; Overstreet Elec. Co., Inc. v. United States, 47 Fed. Cl. 728, 744 (2000); Seattle Sec. Services, Inc, 45 Fed. Cl. at 571; see also JWK Int'l Corp. v. United States, 49 Fed. Cl. 364, 369 (2001). Moreover, Congress enacted the automatic stay provisions of 31 U.S.C. § 3553(d) on the premise that failure of an agency to stay performance could result in a competitive disadvantage that might not be remedied, thereby causing a contractor to lose an important business opportunity. See Reilly's Wholesale, 73 Fed. Cl. at 717 (citing PGBA, 57 Fed. Cl. at 664; DTH Management Group v. Kelso, 844 F. Supp. 251, 254-55

(E.D.N.C. 1993)). As this Court has explained, "[CICA] gives presumptive weight to the otherwise required showing[] of irreparable harm. . . ." Advanced Sys. Dev., 72 Fed. Cl. at 36.

Here, by overriding the stay, the Forest Service will deny Erickson an opportunity to compete. The solicitation called for performance of the helicopter firefighting services only during the 90 to 180 days fire season, which generally lasts from April to November, depending on location. GAO has 100 days to decide the protest. Unless GAO places Erickson's protest on an expedited schedule, its decision will not be due until October 1, 2007. By that time nearly all of the work for 2007 will have been completed. If the override were to be sustained, then Erickson's eventual victory before GAO will be a hollow one. An injunction is necessary to preserve the status quo and thereby ensure that Erickson can actually compete for the work being solicited.

### 3. Granting Injunctive Relief Is In The Public Interest

"[T]he public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid. . . . [T]he public's interest likewise lies in preserving the integrity of the competitive process--such, indeed, clearly was Congress' view in providing that, except in [certain] circumstances, the automatic stay should prevail." Reilly's Wholesale, 73 Fed. Cl. at 716 (internal quotes and citations omitted). CICA, therefore, "gives presumptive weight to the otherwise required showing[] of . . . public interest." Advanced Sys. Dev., 72 Fed. Cl. at 36. In the present case, the Forest Service unreasonably determined that Erickson's offer was technically unacceptable, as Erickson will demonstrate to GAO, where the merits of Erickson's protest will be adjudicated.

Had the Forest Service evaluated Erickson's proposal in accordance with the stated evaluation criteria, Erickson would have been selected for one or more contract awards as having offered the best value to the government.

Under the present circumstances, it is in the public interest to prevent defendant from allowing contract award and performance to go forward in order to ensure that the bid protest filed by Erickson at GAO is not rendered a nullity. By upholding the override, the Forest Service would learn that in the case of short-term contracts, it can be as unreasonable as it desires in competing those contracts and have its decisions be effectively unreviewable. "[T]he public at large [has] a long-term interest in ensuring that the new contract represents the best overall value to the government. Given the fact that there is no real indication that reinstituting the stay will impair services to a significant extent, . . . these long-term interests are paramount here and are best served by issuing the proposed injunction." Reilly's Wholesale, 73 Fed. Cl. at 716.

### 4. The Balance Of The Hardships Tips Strongly In Erickson's Favor Because The Defendant Will Not Suffer Any Harm

Defendant will not suffer any real injury by the Court granting the injunctive relief plaintiff requests. As discussed above, reasonable alternatives exist to overriding the stay that provide the Forest Service with the same helicopter firefighting services it needs. Were this Court to issue the requested injunction, the Forest Service could readily procure the needed helicopter firefighting services by extending existing exclusive use contracts, ordering additional helicopters under them, and ordering services under its existing CWN contracts. No harm can inure to the government or to third parties where, as here, the government has alternative

contractual means available through which it can continue to receive the needed services uninterrupted. See Hospital Klean, 65 Fed. Cl. at 624. Because the helicopter firefighting services that the Forest Service can and does receive under these existing contracts are the same that it will receive from the awardees, any impact on the Forest Service is de minimis.

In contrast, as described above, Erikson would suffer irreparable harm were the Court to deny injunctive relief. As the only party threatened with any real injury, the balance of the hardships necessarily tips in Erickson's favor and the Court should therefore issue the injunctive relief requested.

## III. Conclusion

For the foregoing reasons, Erickson respectfully requests that the Court declare the Chief's decision to override the automatic stay of the 18 CLINs in RFP No. AG-024B-S-07-0008 that are the subject of Erickson's protest before the GAO arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law. Erickson further requests that the Court grant a temporary restraining order and preliminary injunction enjoining the defendant from overriding of the automatic stay and authorizing contract performance.

Respectfully submitted,

Alan I. Saltman
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiff

OF COUNSEL:

Ruth G. Tiger
Eric J. Pohlner
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Dated: July 11, 2007

# EXHIBITS

USDA United States Department of Agriculture
Office of the General Counsel
Washington, D.C. 20250-1400

July 9, 2007

**VIA FACSIMILE (202-512-9749)**

Jennifer Westfall-McGrail, Esq.
Procurement Law Control Group
Office of the General Counsel
U.S. General Accounting Office
441 G. Street, N.W.
Washington, DC 20548

RE: Protest of Erickson Air-Crane, Inc., B-299909
Protest of Superior Helicopter LLC, B-299909.2
Protest of Rainier Heli-Lift, Inc., B-299909.3

Dear Ms. Westfall-McGrail:

Enclosed are the findings and determinations of Abigail R. Kimbell, Chief, USDA Forest Service, with respect to the continued performance of Contract No. AG-024B-S-07-0008 in the face of the above-referenced bid protests.

Sincerely,

for Elin M. Dugan
General Law Division

cc: Gilbert J. Ginsburg, Counsel for Superior Helicopter LLC and Rainier Heli-Lift, Inc. (by fax 202-776-7773)
Alan Saltman, Counsel for Erickson Air-Crane, Inc. (by fax 202-775-8217)
Frank Gomez, USDA FS Contracting Officer (by fax 208-387- 5384)
John J. Todor, U.S. Department of Justice (by fax 202-307-0972)

**Ex. 1**

**FINDINGS TO OVERRIDE THE AUTOMATIC STAY AND CONTINUE WORKING AFTER AWARD IN THE FACE OF A PROTEST**
**RFP AG-024B-S-07-0008 Heavy or Medium Helicopter Services**

**Background**

1. The U.S. Department of Agriculture (USDA), Forest Service (FS) issued a Request for Proposals (RFP) AG-024B-S-07-0008 Helicopter Services for 35 contract line items. These helicopter services are part of the National Aviation resources providing critical initial and extended attack capability in wildland fire suppression efforts.

The RFP AG-024B-S-07-0008 was issued on April 6, 2007. A formal pre-proposal conference was conducted on April 18, 2007 discussing in depth the requirements of the above referenced solicitation. Offers were received by close of business on May 10, 2007.

2. On June 13, 2007, successful offerors were notified that the Forest Service was proceeding with awards for 35 helicopters. Eighteen vendors were awarded contracts for 35 bases. On June 13 and 14, 2007, unsuccessful offerors were notified that awards would not be made to them.

**Bid Protests**

3. On June 22, 2007, Erickson Air-Crane, Inc., protested to the GAO the award of 18 of the 35 items awarded under this contract (B 299909). These 18 contract line items being protested are:

> 1) Cadillac/Ely/Jeffco, 2)Prescott/Coeur d'Alene, 3)Albuquerque/Helena, 4)Sierra Vista/Grangeville, 5) Cedar City, 6) Lucky Peak, 7) San Bernardino, 8) San Bernardino, 10) Hemet, 11) Casitas, 12) Van Nuys, 15) Ely/Jeffco, 16) Phoenix, 17) McCall, 19) Westover, 20)Orland, 22) Mariposa, 23) Santa Maria.

Erickson Air-Crane is not protesting the awards for the remaining 17 contract line items.

The basis of Erickson's protest is that their interpretation of the information required to be submitted in their proposal for evaluation of their aircraft was minor in nature and that the agency should have requested clarification. The information required to be submitted was defined in the solicitation and was required for proper technical aircraft evaluation. Specifically, information as to the aircraft weight and balance, equipment list and correct helicopter load calculation is essential for determining efficiency of the aircraft and were critical components of the source selection decision.

4. On June 29, 2007, Superior Helicopter LLC protested to the GAO the award of 34 of the 35 contract line items awarded under this contract (B 299909.2). The protest excludes contract line item 9 (Chuchupate). The basis of Superior's protest is the Government's determination that failure to use the manufacturer's rotorcraft flight manual supplement in calculating the hover out of ground effect (HOGE) payload and non-conformance of its equipment lists were not in compliance with the solicitation was unfounded and contrary to the RFP requirements. The information required to be

submitted was defined in the solicitation and was required for proper technical aircraft evaluation. Computation of the HOGE payload based on the manufacturer's rotorcraft flight manual is essential for determining efficiency of the aircraft and was a critical component of the source selection decision.

5. On June 29, 2007, Rainier Heli-Lift, Inc., protested to the GAO the award of 34 of the 35 contract line items awarded under this contract (B 299909.3). The protest excludes Item 9 (Chuchupate). The basis of Rainier's protest is the Government's determination that failure to use the manufacturer's rotorcraft flight manual supplement in calculating the hover out of ground effect (HOGE) payload were not in compliance with the solicitation was unfounded and contrary to the RFP requirements. The information required to be submitted was defined in the solicitation and was required for proper technical aircraft evaluation. Computation of the HOGE payload based on the manufacturer's rotorcraft flight manual is essential for determining efficiency of the aircraft and was a critical component of the source selection decision.

**Basis for Override of Automatic Stay**

6. The Competition in Contracting Act (CICA), 31 U.S.C. §§ 3551-3556, and the implementing regulations impose an automatic stay post award of a contract pending resolution of a protest for any protest filed within 10 days of contract award or five days after an award debriefing. 31 U.S.C. § 3553(d)(3)(C); 48 CFR 33.104(c). The Forest Service agrees that the CICA stay is in effect and contracts cannot continue until the HCA overrides the stay or resolution of the protest. Accordingly, the HCA will authorize performance of the contracts pursuant to 31 U.S.C. § 3553 (d)(3)(C)(i)(I) and (d)(3)(C)(i)(II), as explained below.

7. As cited in 31 U.S.C. § 3553(d)(3)(C) and 48 CFR 33.104(c), CICA provides that:

> The head of the procuring activity may authorize the performance of the contract (notwithstanding a protest of which the Federal agency has notice under this section) –
>
> (i) upon a written finding that –
>
> (I) performance of the contract is in the best interests of the United States; or
>
> (II) urgent and compelling circumstances that significantly affect the interests of the United States will not permit waiting for the decision of the Comptroller General concerning the protest; and
>
> (ii) after the Comptroller General is notified of that finding.

**Nature and Purpose of Contract**

8. It is critical that performance under the awarded contracts, specifically 34 of the 35 total contract line items contained in the solicitation, continue in the face of a protest. (Item 9 of the solicitation is specifically excluded from the protests.) The national helicopters are critical aviation resources needed for support of national fire suppression

efforts, specifically initial attack and large fire support. These 35 helicopters are contracted for the exclusive use of the Forest Service and its National Wildfire Coordinating Group partners in the Department of Interior and the National Association of State Foresters. These helicopters are part of a national contingent of resources and are moved wherever needed on federal and state jurisdictional fires.

9. Under exclusive use contracts, such as the one that is the subject of the protests, the contractor is obligated to provide and station a helicopter and crew during mandatory availability periods as defined in the contract. The contractor is paid a daily availability rate for that helicopter and crew during those mandatory availability periods; higher "flight rates" are paid when the helicopter is performing fire suppression missions.

10. In contrast, helicopters under Call-When-Needed (CWN) contracts may be ordered by the Government if a specific need for them exists; however, the contractor is not obligated to accept those orders and, often, they do not, because the helicopter is not available due to other commitments the contractor might have. There is no availability rate paid or other guarantee that the Government will order that helicopter, and no requirement for the contractor to accept any orders under CWN contracts

<u>2007 Fire Activity</u>

11. Significant fire potential in July is expected to be higher than normal over much of the West, western Great Lakes, the Ohio River and Tennessee Valleys, the central and southern Appalachians, and localized portions of southern Alaska. Fire potential in the West is expected to spread northward in August. Dryness of fuels in many western states is setting historic maximums. This will contribute to fire ignitions and spread from lightning and human sources. (National Interagency Coordination Center – Predictive Services – July 2, 2007.)

http://www.nifc.gov/nicc/predictive/outlooks/monthly_seasonal_outlook.pdf

<u>Alternatives to the Stay Override</u>

12. The Forest Service considered alternatives to requesting an override of the automatic stay, which are listed below, but determined that those alternatives were not in the best interest of the United States. These 35 medium and heavy lift helicopters -- plus six other medium lift helicopters under exclusive use contracts -- comprise the national fleet of exclusive use medium and heavy lift helicopters. There are no other existing contracts for national medium and heavy lift helicopters that can be considered for extension beyond those mentioned in item a) below.

a) <u>Extension of existing contracts</u>: There are only 4 heavy lift helicopters currently under contract. These contracts are in the second and final option year of contracts awarded in 2005. The option for 2007 was exercised with a contingency that the renewal will terminate upon award of the contracts under the subject solicitation. These could be available for the remainder of the 2007, but would be the only four helicopters available. Four helicopters are an insufficient resource for this season's anticipated fire activity.

In addition to these 4 helicopters, there are 24 medium lift helicopters under exclusive use contracts in the FS regions. However, these helicopters are unavailable for use in the *national* fleet, because they are budgeted for and managed by the regions (as opposed to nationally) and they are reserved for use in local initial attacks. To use them as an alternative to the override would deplete local resources.

b) Substitution of CWN contracts for the exclusive use contract: The contingent of helicopters under current CWN contracts has been depleted, with vendors committing to work in the private sector and not having helicopters for guaranteed use by the Forest Service and its partners in firefighting efforts. In addition, these helicopters when ordered are funded by and directly support a single incident, and cannot be easily moved to different assignments as they are under the control of the incident commander for specific needs of that incident, and generally not available to meet a strategic objective supporting more than one incident. At the beginning of the 2006 season, there were over 241 helicopters under CWN contracts with the Forest Service for interagency use; only about 40% of them were available for firefighting use and the actual numbers fluctuated. The FS determined it was advantageous to offer a larger number of exclusive use contracts in 2007 to guarantee a consistent availability throughout the season at a lower cost than the typical CWN resource and to manage them strategically.

c) Bridge/interim contracts: Establishing another series of contracts to provide these helicopters in the interim would require a significant effort given the extent of competition available. Alternatively, it would require the award of multiple sole source contracts, based on a determination of urgent and compelling need under 41 U.S.C. 253(c)(2). Although the Forest Service believes that other than full and open competition would be justified under the circumstances, it would have the same effect as the stay override and is, therefore, not actually an "alternative" to the override.

The reason that the award of sole source, short-term bridge contracts would be the same as a stay override, is that the Forest Service already has narrowed the pool of competitors in this procurement by eliminating unacceptable proposals (including those of the protesters). The remaining, acceptable proposals are those of the awardees. Therefore, the Forest Service would simply be replacing this suspended contract with identical bridge contracts to the exact same contractors, pending GAO's decision. Not only would bridge contracts fail to accomplish the goals of CICA with respect to the automatic stay, but they also would result in a higher cost to the Forest Service (because they would be for a shorter duration), for the same services that are now stayed.

d) Use of planes or other resources in place of helicopters: If contract performance continues in the face of these protests, 35 heavy and medium lift helicopters will be exclusively available to firefighting agencies to support initial attack and large fires. Helicopters are particularly effective in missions that are highly repetitive over short distances with a greater degree of accuracy of water and retardant drops, particularly in the wildland urban interface. In addition, these helicopters are used to carry and deliver pumps, hoses and related equipment directly to the firefighters on the ground. Other fixed wing aircraft, such as single engine air tankers, can't match the accuracy in delivery of water and retardant drops as well as the equipment delivery that

these helicopters can provide, can't land at other than airports, and can generally only be used for a single purpose. Helicopters can operate anywhere that a safe helispot can be established, and can pump water into tanks or buckets out of any approved source of water such as rivers, lakes, etc. In large fire support, helicopters are an effective resource and their use allows the heavy fixed wing air tankers to be used more often and more effectively in initial attack assignments, preventing small fires from becoming large ones. The number of exclusive use helicopters was increased to help supplement the drop in the number of large air tankers in past years.

**Risks of Staying Performance v. Overriding Stay**

13. The Forest Service has considered the ramifications of the protest(s) being sustained by GAO after performance on the contract continues. If performance continues and the protest(s) are sustained, it is likely the FS will pay proposal preparation costs and the costs of pursuing the protest, possibly including attorneys' fees. In addition, the Forest Service would offer to not renew the contract and to conduct a new procurement for helicopters in the 2008 season and beyond. However, the significant risks that would result from not overriding the stay -- *i.e.*, the inability to guarantee helicopter availability and therefore to prevent loss of life and property -- outweigh the ramifications of any sustained bid protests.

14. If performance is not continued, the Forest Service and its interagency partners (including states) will not have 35 medium and heavy helicopters available for their exclusive use for initial attack and large fire support, that have been inspected, approved for use, and stationed at designated locations with pilots and crews ready to deploy at a moment's notice. While some of these helicopters might be available under the call-when-needed contracts, there is no guarantee that enough of them will be available and in a state of readiness to deploy at a moment's notice when they are most urgently needed.

**Determination**

15. As of the date of this determination, there are 15 wildfires over 500 acres in size in the United States. So far this year, there have been 47,779 fires burning over 1.9 million acres. Just last month, about 200 homes were destroyed in the Angora Fire at South Lake Tahoe. Based on the above findings, I have determined that continuation in the face of a protest is justified in the best interests of the United States and based on urgent and compelling circumstances and will protect the public interest by ensuring the guaranteed availability of helicopter resources at the national level in suppression of wildfires, in the height of the wildfire season, particularly in the wildland urban interface.

for [signature] Date 7/9/07

Abigail R. Kimbell, Chief, USDA Forest Service

# UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ERICKSON AIR-CRANE, INC., Plaintiff, | ) | No. ________ |
| v. | ) | Bid Protest |
| UNITED STATES OF AMERICA, Defendant. | ) | |

## DECLARATION OF LANNIS ALLMARAS

I declare under penalty of perjury that the following is true and correct:

1. I am currently the North America and Australia Firefighting Program Manager for Erickson Air-Crane, Inc. I have held this position since 1997. Previously, I was employed by the United States Forest Service and the United States Department of the Interior beginning in 1965. I have over 42 years of experience in wildfire and prescribed fire programs within the public and private sectors. For 39 years, my focus has been on the aviation aspects of fire programs specifically related to helicopter operations and management. A copy of my resume is attached to this Declaration as Ex. A.

2. Part of my duties and responsibilities involve the positioning and dispatch of helicopters by Erickson to meet the Forest Service's firefighting needs. I also provide on-site and remote field assistance and liaison during periods of firefighting activities. I am responsible for the day-to-day administration of Erickson's contracts with the Forest Service. In this



Ex. 2

capacity, I have frequent dealings with the Forest Service personnel responsible for firefighting, including the contracting personnel and the on-the-ground personnel who direct Erickson's helicopter firefighting activities.

3. Erickson has provided helicopter firefighting services to the Forest Service throughout its 37-year existence.

4. Erickson has had an excellent working relationship with the Forest Service and has always tried to accommodate the Forest Service's firefighting needs. This is reflected in the excellent performance reviews that Erickson routinely has received from the Forest Service.

5. Until July 7, 2007, Erickson was under contract to the Forest Service to provide exclusive use helicopter services under contract no. AG-024B-C-05-9096.

6. Erickson is currently under contract to the Forest Service to provide Call When Needed (CWN) helicopter services under contract no. AG-024B-C-05-9007.

7. The helicopter services provided under the exclusive use and CWN contracts are the same. Under both types of contracts the contractor provides the services of one or more technically-capable helicopters, fully operated by qualified personnel and equipped for use in the protection of public lands from wildfire. The services Erickson provided the Forest Service under its exclusive use contract, Contract 9096, and is currently providing under its existing CWN contract, Contract 9007, are the same services being solicited by the Forest Service under the subject solicitation.

8. Erickson's crews have performed the same helicopter services under both its exclusive use and CWN contracts.

9. Additionally, Erickson has provided helicopter firefighting services using the same model of helicopter, the S-64 helitanker, under both its exclusive use and CWN contracts

with the Forest Service. The four helicopters Erickson has proposed under the subject solicitation are all this same S-64 model. All four of the helicopters Erickson proposed under the subject solicitation can also be made available to the Forest Service under Erickson's current CWN contract.

10. Exclusive use and CWN contracts differ in the mechanics of how the Forest Service orders helicopter services. In an exclusive use contract, the parties agree up front on the dates for which the contractor will keep a helicopter available for the Forest Service's use. The CWN contract, as its name suggests, authorizes the Forest Service to order helicopter services but does not guarantee the placement of any orders by the Forest Service. Once the Forest Service decides it needs helicopter services, it places an order with the contractor. In accepting the order, the contractor agrees to make the helicopter available for a mutually agreeable period of time or until the Forest Service releases the helicopter. After the contractor accepts an order under its CWN contract, the CWN contract operates just like the exclusive use contract. Under both types of contracts the Forest Service pays the contractor a daily rate for keeping a helicopter available for the Forest Service's use.

11. Based on my experience with Erickson's CWN contracts and first-hand knowledge of both the helicopter firefighting industry and the Forest Service's helicopter firefighting and firefighting contracting practices, I know that the Forest Service has used CWN contracts as the principal contractual mechanism for acquiring Type I helicopter firefighting services for many years. Under these contracts the Forest Service has routinely ordered helicopter services before its actual needs arose in order that it would have helicopters available for immediate dispatch. I also know that the Forest Service has ordered helicopter services under

its CWN contracts that were not restricted to a particular fire incident. There is no real reason why these practices could not continue.

12. Based on my experience with Erickson's CWN contracts and first-hand knowledge of both the helicopter firefighting industry and the Forest Service's helicopter firefighting and firefighting contracting practices, I know that the CWN contracts currently in place are available to meet the Forest Service's helicopter firefighting needs this season. While the Forest Service's desire to move away from the CWN contract as the principal contractual mechanism for acquiring helicopter firefighting services may be well intentioned, there is no real reason why the Forest Service cannot meet its firefighting needs this season through use of the CWN contracts currently in place.

13. Erickson held its exclusive use contract, no. 9096, from July 6, 2005 through July 7, 2007. The contract had an initial term of one year and provided for two one-year option periods. The Forest Service exercised the first renewal option but with our agreement only exercised its second renewal option through May 30, 2007 rather than for the full one-year renewal term. In response to the Forest Service's subsequent request to further extend the term of the contract, Erickson agreed to extend the term of Contract 9096 on a day-by-day basis. That contract remained in force until July 7, 2007 when the Forest Service notified us that it had terminated the contract. Erickson would be willing to consider reinstating and extending the term of Contract 9096 until the protest is resolved or for the full one-year option period, which would result in an adjusted termination date of that contract of April 30, 2008.

14. The terms of Contract 9096 are substantially the same as the terms of the draft contract included in the subject solicitation. Both Contract 9096 and the draft contract are based on a standard form contract prepared by the Forest Service.

15. Like section C-33 of the draft contract in the solicitation, section C-33 of Contract 9096 permits the Forest Service to order additional helicopters subject to the terms and conditions of that contract.

16. On several occasions during the term of Contract 9096, the Forest Service ordered and Erickson quickly provided additional helicopters to the Forest Service in accordance with clause C-33. Just last year, the Forest Service twice ordered additional helicopters under Contract 9096. Erickson was able to respond to the Forest Service's orders within a few days.

17. Based on my experience with Contract 9096 and first-hand knowledge of both the helicopter firefighting industry and the Forest Service's helicopter firefighting and firefighting contracting practices, I know that the Forest Service had similar exclusive use contracts with a number of other helicopter operators and that the Forest Service had also ordered additional helicopters in accordance with clause C-33 of those contracts. I also know that other operators had agreed with the Forest Service to extend the terms of their exclusive use contracts similar to the extension Erickson agreed to with the Forest Service on Contract 9096.

18. If the Forest Service were to reinstate Contract 9096 and request Erickson to provide additional helicopters in accordance with clause C-33 of that contract today, Erickson could be in a position to provide two helicopters to the Forest Service within a few days. Additional helicopters may be available depending on the work commitments of those helicopters, something which can change frequently.

19. Based on my first-hand knowledge of the helicopter firefighting industry, I have reason to believe that other helicopter operators would be in a similar position to provide additional helicopters to the Forest Service in accordance with clause C-33 of their exclusive use contracts.

20. Of course, each helicopter operator's particular situation is unique but based on my knowledge of the industry, I have no doubt that other operators have helicopters that they can and would be willing to make available to the Forest Service for exclusive use in accordance with clause C-33 of their exclusive use contracts when needed by the Forest Service for firefighting.

21. Erickson has held its current CWN contract, no. 9007, since April 26, 2005 and has held CWN contracts for many years before that. That contract was for an initial one-year period with two one-year option periods. The Forest Service exercised both of its one-year renewal options and the contract is not scheduled to terminate until April 30, 2008.

22. Just a few weeks ago, the Forest Service ordered helicopter services from Erickson under its CWN contract to help fight the Angora fire in Lake Tahoe. Erickson provided the ordered helicopter services to the Forest Service for two days until the Forest Service released the helicopter. Even more recently, the Forest Service ordered helicopter services from Erickson under its CWN contract to help fight a fire near Yellowstone National Park. Almost immediately after that helicopter was released from Yellowstone, the Forest Service ordered the helicopter to work on a fire in the Black Hills of South Dakota, where it is currently working.

23. Based on my experience with Erickson's CWN contracts and first-hand knowledge of both the helicopter firefighting industry and the Forest Service's helicopter firefighting and firefighting contracting practices, I know that the Forest Service has similar CWN contracts for heavy or medium helicopters (Type I or Type II) with about 70 other helicopter operators and has about 250 heavy or medium helicopters (Type I or Type II) available to it to meet its firefighting needs under the CWN contracts. These other CWN

contracts, like Erickson's current CWN contract, are for the same helicopter services being solicited by the Forest Service under the subject solicitation.

24. Based on my experience with Erickson's Contract 9096, its CWN contracts, and first-hand knowledge of both the helicopter firefighting industry and the Forest Service's helicopter firefighting and firefighting contracting practices, I know that the Forest Service can obtain the requisite number of helicopters under its exclusive use and CWN contracts to meet its firefighting needs. The Forest Service does not need to go forward with award of the 18 contracts we are protesting to meet these needs.

Dated: July 10, 2007

Lannis Allmaras

**LANNY ALLMARAS**
3919 G Street
Vancouver, WA 98663
(360) 696-9032

**BACKGROUND:**

Mr. Allmaras has over 42 years of experience in wildfire and prescribed fire programs within the public and private sectors. Thirty-nine years were specifically devoted to the aviation aspects of the fire programs, such as, helicopter operations and management.

**EXPERIENCE:**

1997 - Present Erickson Air-Crane Inc.
North America & Australia Fire Fighting Program Manager

1965 - 1997 United States Forest Service and
United States Department of Interior

Mr. Allmaras has an extensive and well rounded fire-fighting background through the various management positions he held with the federal government. From the beginning of his career, he was closely involved with the Helicopter Program, and he assisted in the development of virtually all the helicopter training programs used today. As the team leader, he directed, developed, and implemented numerous area and national level aviation training programs. As well as the training programs, Mr. Allmaras also developed and implemented various helicopter programs. Three of the most prominent programs are: (1) Helicopter Rappelling, (2) Aerial Ignition Systems, and (3) Search and Rescue. As a function of Mr. Allmaras' duties as the National Aerial Attack Systems Specialist, he managed and directed the United States Forest Service's Helicopter Operations Program, Air Attack Program, and Smoke Jumper Operations. Mr. Allmaras was also a successful training instructor for all fire-related courses which he participated. The following positions summarize his experience:

- National Aerial Attack Systems Specialist
- National Aviation Management Training Officer
- Fire Management Officer
- Regional Helicopter Operations Specialist
- Forest Aviation and Training Officer
- Fuels Management Specialist
- Helitack Manager
- Asst. Fire Management Officer
- Suppression Crew Manager
- Fire Fighter

**EDUCATION & TRAINING:**

1979 - 1985 - University of Southern California
Graduate of the Aviation Safety Program

U.S. Interagency Wildfire Communities - Completed all Fire Suppression courses

**CERTIFICATE OF SERVICE**

I hereby certify that on this 11th day of July 2007, I caused to be served via hand delivery, a copy of the foregoing **PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS EMERGENCY REQUEST FOR DECLARATORY JUDGMENT, MOTION FOR A TEMPORARY RESTRAINING ORDER, AND MOTION FOR PRELIMINARY INJUNCTION** on counsel for defendant, John Todor, Esq., U.S. Department of Justice, Commercial Litigation Branch, Civil Division, Attn: Classification Unit, 1100 L Street, N.W., Room 8012, Washington, D.C. 20530.

Beverly J. Rector

Beverly J. Rector