GILBERT J. GINSBURG
ATTORNEY AND COUNSELOR AT LAW
1250 24TH STREET, N.W., SUITE 350
WASHINGTON, D.C. 20037
(202) 776-7772
FAX: (202) 776-7773
E-MAIL: gilgins@aol.com
www.profgilginsburg.com

B-299909.2

[redacted] 2007 JUN 29 PM 4:46 RECEIVED USGAO

June 29, 2007

Anthony Gamboa, Esq.
General Counsel
U.S. Government Accountability Office
441 G Street, N.W.
Washington, D.C. 20548

ATTN: Procurement Law Control Group

Re: Protest Against The Rejection Of Superior Helicopter LLC's Proposal Under Request For Proposals No. AG-024B-S-07-0008

Dear Mr. Gamboa:

Superior Helicopter LLC, 2794 Foothill Blvd., Grants Pass, OR 97628 ("Superior"), has asked us to file this protest against the rejection of its proposal by the U.S. Forest Service ("USFS") under Request For Proposals No. AG-024B-S-07-0008 (the "RFP") for Heavy to Medium Helicopter Services. Superior was advised of the rejection of its proposal in a June 13, 2007 letter from the USFS Contracting Officer.[1] Upon its receipt of the letter, Superior immediately submitted a written request for a debriefing, which was conducted on Monday, June 25, 2007. Accordingly, this protest is timely filed pursuant to § 21.2(a)(2) of the GAO's Bid Protest Regulations. (4 C.F.R. § 21.2(a)(2)).

1 The USFS Contracting Officer is Mr. Frank Gomez, National Interagency Fire Center, 3833 South Development Avenue, Boise, ID 83705. Mr. Gomez's telephone number is (208) 387-5347; his fax number is (208) 387-5384; and his e-mail address is fgomez@fs.fed.us.

As detailed more fully below, Superior contends that the USFS's rejection of its proposal was unreasonable and improper because the USFS erroneously applied the RFP's helicopter specifications and the RFP's evaluation criteria to Superior's proposal.

## I. FACTUAL BACKGROUND

### A. The RFP

The RFP, issued on April 6, 2007 as a commercial item acquisition, required offerors to submit business and technical proposals for helicopter services based upon 35 line items, each covering specified National Forest locations. The RFP contemplated the award of contracts for a base year and two one-year option periods. The contract duration for each year ranges from 90-180 days of paid standby depending on the line item, plus flight hours. A pre-proposal conference was held on April 18, 2007, and the RFP was subsequently amended three times with Amendment NIFC-02 replacing the RFP in its entirety. Proposals were due on May 10, 2007.

RFP Section C-1 described the scope of the contract as follows:

> The intent of this solicitation and any resultant Contract is to obtain (limited use) Standard or Restricted category helicopter services for all items except Item 9 (Chuchupate), Item 9 will **require a Standard Category helicopter**, fully operated by qualified and proficient personnel and equipped to meet specifications contained herein for offered aircraft used in the administration and protection of Public Lands. (Emphasis in the original).

The helicopter services will be primarily used for firefighting purposes on public lands, although Section C-1 provides that the furnished helicopters may also be used for project work

and may be dispatched under FS interagency and cooperative agreements with Federal and State agencies and private landholders.

For each line item, offerors were required to identify the proposed helicopter by make, model number, series, and N Number, and to provide the helicopter equipped weight, the approved HOGE (Hover Out of Ground Effect) performance data, and the relief crew costs per person.. With respect to the approved HOGE performance data, the RFP included the following for each line item:

> Note: Only approved Basic Flight Manual HOGE Performance Charts, Flight Manual Supplement HOGE Performance Charts, or Supplement Type Certificate (STC) HOGE Performance Data approved for the aircraft by serial number shall be used to compute the Interagency Helicopter Load Calculation during the contract period.

RFP Section B.3, entitled "Aircraft Performance Specifications (Minimum)," stated as follows:

> Performance shall be based on minimum engine specification. Aircraft performance capabilities shall be determined by using the Standard Interagency Helicopter Load Calculation Method. (Exhibit 13, Interagency Helicopter Load Calculation)
>
> Use (Exhibit 13, Interagency Helicopter Load Calculation) and (Exhibit 12, Hourly Flight Rates, Fuel consumption, and Weight Reduction Chart) per aircraft type and the appropriate Hover Ceiling Charts (HOGE) and (HIGE) from the approved Rotorcraft Flight Manual.

Further, Section B.3 specified the capability of HOGE "[a]t 5,000 feet pressure altitude and 30°C with . . . jettisonable Payload of 2300 pounds for all bases except Chuchupate, as determined by Exhibit 13, Standard Interagency Load Calculation form, using a standard pilot weight of 200

pounds and fuel for one hour and 30 minutes (01+30) as determined by Exhibit 12, Hourly Flight Rates, Fuel consumption, and Weight Reduction Chart." (Emphasis in the original).

As pertinent to this protest, RFP Section C-5, "Aircraft Maintenance," stated the following at subsection A.16:

> A list of equipment installed in the aircraft at the time of weighing shall be compiled. The equipment list shall include the name of each item installed. Items that may be easily removed or installed for aircraft configuration changes (seats, doors, radios, cargo hook, baskets, special mission equipment, etc.) shall also be listed including the name, weight, and arm of each item. Each page of the equipment list shall identify the specific aircraft by serial and registration number. Each page of the equipment list shall be dated indicating the last date of actual weighing or computation. The weight and balance shall be revised each time equipment is removed or installed.

RFP Section E-2 provided the instructions for the preparation of business and technical proposals. In the business/cost proposal, offerors were required to provide for each line item the information described above (Equipped Weight, Approved HOGE Performance Data, and Relief Crew Costs) and the Daily Availability Rate for each contract period. For each line item in the schedule, offerors were required to propose a unit price (Daily Availability Rate) and a total price based on the offered unit price multiplied by the specified quantity stated in number of days.

The technical proposal was required to consist of three sub-parts: (1) Aircraft Technical Capability; (2) Past Performance; and (3) Organizational Experience. With respect to the "Aircraft Technical Capability" sub-part, offerors were required to provide specified information for each proposed aircraft, including the following: (a) helicopter Make, Model and

Variant, and Aircraft "N" Number; (b) an Interagency Helicopter Load calculation for each aircraft as per Exhibit 13 (referencing Section B-3, Aircraft Performance Specifications); and (c) copies of specified certificates and other information, including "a current aircraft equipment list for each aircraft offered."

RFP Section E-3 described the evaluation criteria, as follows:

> (a) The Government will award a contract to the responsible offeror on the basis of price and other facts including Aircraft Technical Capability, Past Performance and Organizational Experience.
>
> The Government will evaluate "Price" of offers for award purposes by adding the price for the base year plus 2 option periods and adding the specified flight rate times the estimated flight hours to determine overall price being offered. The price proposals shall be evaluated to determine reasonableness and to determine the demonstrated understanding of the level of effort needed to successfully perform the services. Prices will also be evaluated using the "Best Value Formula index provided in exhibit E-8."
>
> The nonprice factors - Aircraft Capability, Past Performance, Organizational Experience - when combined, are significantly more important than Price.
>
> (b) Offeror's proposal shall include Two Separate Parts – Part 1 is a Business/Cost proposal and Part 2 is the Technical Proposal. The evaluation factors [Aircraft Technical Capability, Past Performance, and Organizational Experience] are listed in descending order of importance. All subfactors listed are equal in importance.

***

RFP Section B-4, "Contract Award," stated that: "Awards will be made to those offerors whose proposals are technically acceptable and whose technical/price relationships are the most

advantageous to the Government. The Government reserves the right to award any combination of items or number of items.

B. Superior's Proposal And The USFS's Rejection

Superior submitted its business and technical proposals in a timely manner. Superior proposed three K1200 Kmax Type 1 helicopters, manufactured by Kaman Aerospace, on 34 of the line items. Pertinent to this protest, Superior utilized the Standard Interagency Load Calculation Method to calculate HOGE payload, using the approved basic flight manual HOGE performance charts approved for the aircraft by serial number. As described fully in Section II.A below, this was allowed by the RFP and as the result of pre-RFP communications with, and conduct by, the USFS. In addition, Superior's proposal included a current aircraft equipment list for each aircraft offered, as required by Section B-2 of the RFP.

In the Contracting Officer's June 13 letter, the USFS informed Superior that its "offer was determined to be unacceptable due to deficiencies with your proposal." The letter described the alleged deficiencies as follows:

> The requirements for accurate information is critical to evaluation of overall aircraft performance capability in respect to meeting contract performance requirements.
>
> Section B-3 "Aircraft Performance Specifications (Minimum)" states that performance shall be based on minimum engine specification. Section E, Sub-Part 1(b)(6) states that Flight Manual Supplement HIGE and/or HOGE Performance Charts will be used to compute the Interagency Helicopter Load Calculation. The K-1200 Rotorcraft Flight Manual (RFM) Supplement No. 1 provides aircraft performance information to be used when operating under USFS fire fighting operations and therefore should have been used to compute the gross weight for the load

> calculation. Your proposal used the standard RFM charts for performance which did not allow for proper evaluation.
>
> Figure S1-5 (Power Available @ Takeoff Power vs. Temperature) on page S1-8 of the USDA Forest Service Fire Fighting Supplement shows that at 5000' and 30 degrees Centigrade, engine torque is 51.5 PSI. Figure S1-8 on page S-11 (Power Required OGE Hover [104%Nr] shows that at 51.5 PSI and 7900'DA, the gross weight is 10,800 pounds. This is the weight that should have been entered on line 7b (computed gross weight) of the helicopter load calculation.
>
> In addition, the equipment list that you submitted did not conform to Section C5.16 and did not allow for proper evaluation.

The June 13 letter also enclosed a list of the successful offerors, which included only one company that operates Kmax helicopters.

C. The June 25 Debriefing

The June 25 debriefing was held at the National Interagency Coordination Center aviation contracting office in Boise, Idaho, and was attended by Superior representatives and, at Superior's invitation with USFS approval, by representatives of Rainier Heli-Lift and Mountain West Helicopters. Rainier and Mountain West had also proposed Kmax helicopters and their proposals were rejected by the USFS because of their alleged incorrect HOGE payload calculations. Attending the debriefing for the USFS were Mr. Frank Gomez, Contracting Officer, Mr. Chuck Taylor, National Helicopter Aviation specialist, and Mr. John Grogan, Helicopter Maintenance Specialist.

Mr. Gomez stated that the three proposals were rejected on technical grounds because they did not utilize the Rotorcraft Flight Manual Supplement No. 1 ("USFS Supplement #1") to calculate the gross payloads. He was asked why the USFS did not mandate which chart was to

be used since there are two charts for the Kmax aircraft, and Mr. Gomez replied that it was USFS policy to use the USFS Supplement #1 and it was the operators' responsibility to know this. Mr. Gomez asked the Superior and other representatives why they did not bring up the issue at the pre-proposal conference and Mr. Andy Mills, Superior's Director of Aviation Operations, replied that it was the operators' view that this issue was settled three years ago and no operator had used the USFS Supplement #1 chart since that time for any USFS load calculations. The chart was expressly created to demonstrate that the Kmax met minimum criteria for a Type 1 helicopter for CALL-WHEN-NEEDED ("CWN") contracts, and was done because the USFS threatened to not renew the Kmax operators' CWN contracts if they did not produce such a chart. *See* Section II.A below. Mr. Mills asked Mr. Gomez where in the RFP's performance-based requirements it specified use of the USFS Supplement #1 chart and he responded that the minimum engine specification in the RFP required use of the chart.

Mr. Mills asked Mr. Gomez why the USFS did not reject the Kmax proposals on technical grounds with respect to two Exclusive Use procurements in 2005 even though all the Kmax operators submitted exactly the same load calculations, responding to exactly the same specification wording in the solicitations. Mr. Gomez responded that the 2005 procurements were a less formalized contract process (although the two Exclusive Use solicitations were virtually identical to the subject RFP), and that this time the process was more formalized and the USFS had more bidders and were held to different standards. Mr. Gomez had no response to Mr. Mills' query whether the USFS had a responsibility to inform the operators that, due to

the change to a more formalized contract process, the use of particular performance charts was being required with respect to the subject RFP.

It was the position of the technical group headed by Mr. Taylor that the Kmax operators should have entered 10,800 lbs. on line 7b of the RFP schedule, instead of the approximately 11,700 lbs. that the operators submitted. This figure represents what the USFS considered the minimum load for the Kmax at the required altitude and temperature. At this juncture, Mr. Mills pointed out to the USFS officials that under USFS Supplement #1 charts, operators are also entitled to add available power back in to the calculation, albeit not as much as using the standard FAA-approved flight charts. Mr. Mills then demonstrated to the USFS officials that even utilizing the USFS Supplement #1 charts, and adding available power back in, the aircraft still reached the requisite 58 PSI maximum threshold and therefore the 11,700 lb. figure submitted by the Kmax operators was correct in any event. *See* Exhibit A hereto (narrative explaining the comparison of load calculations using the standard chart and the USFS Supplement #1 chart). The USFS officials appeared to be quite surprised by Mr. Mills' demonstration.

Mr. Taylor agreed that utilizing the USFS Supplement #1 chart with the power available did result in the 11,700 lbs. gross weight. The USFS position in the past was that the USFS did not want power available added back in to the chart because the USFS was trying to achieve a "level playing field" among aircraft types. Mr. Mills stated that this was a good goal, but because of the way the Kmax was certified, the operators must add power back in to their baseline in order to get to the same level playing field as other aircraft, and the example of a 5-

61 or S-64 engine using all available sea-level shaft horsepower in the charts was mentioned. Mr. Gomez at this point asked Mr. Taylor if this was true, and if so whether the same gross weight rating would result with either chart, and Mr. Taylor confirmed that this was probably correct.

Mr. Gomez then asked the operators why they did not bring these points out before, and Mr. Mills replied that the operators had been very consistent on this issue and referred him to the correspondence between the operators and the USFS over the last few years addressing this same issue. *See* Section II.A below. Mr. Mills also pointed out that the operators had been submitting load calculations and dispatch performance criteria using the standard charts all along with the USFS technical group's blessing. Mr. Gomez's only response was that that practice was different from the submittal of load calculations in a procurement situation.

In response to Mr. Gomez's question regarding which chart they submitted, the operators stated that they submitted the standard charts, and not the USFS Supplement #1 charts, with their proposals as the supporting documentation graphics. Mr. Gomez stated that that was wrong. When asked whether the USFS rejected the proposals because the wrong graphics were used, as opposed to entering the wrong gross weight as stated in the rejection letters, Mr. Gomez responded "no." The culmination of the discussions about the load calculation issue was that, even though the USFS officials provided no clear response to the fact that the operators' gross weight number in the proposals was correct, it was the USFS's policy that the operators were required to use the USFS Supplement #1 chart, even though that policy

was not stated in the RFP and regardless of the fact that even with the USFS Supplement #1 the number was correct.

With respect to the alleged deficiency with Superior's equipment lists identified in the USFS's rejection letter, Mr. Mills requested specific clarification as to why the equipment lists did not comply with RFP Section C-5.16. Mr. Grogan, the head of the group that evaluated the proposal, replied that the USFS wanted to see a weight and arm for removable items on the aircraft equipment list. Mr. Mills pointed out to Mr. Grogan that the section actually states that only items that are easily removable or re-configurable on the aircraft need a weight and arm listed separately. Mr. Mills showed him Superior's equipment list, and explained that the only easily removable or re-configurable item was the snorkel, and the weight and arm were listed on the balance sheet. Mr. Mills also pointed out that Superior submitted two separate weight and balance sheets for the fire tank because it is part of the aircraft when installed and is part of the basic aircraft weight. Mr. Grogan responded that Superior may have put all the correct information in its proposal, but the USFS had received 70 aircraft bids to evaluate and perhaps had not easily found the information in the proposal. Mr. Grogan reiterated that Superior's proposal may very well have been compliant in this area, and he was not willing to say the proposal was deficient. Mr. Grogan mentioned the weight of a survival kit; he was then asked whether Superior's proposal was rejected because it did not list the weight of the survival kit, which Superior always leaves in the aircraft. Mr. Grogan responded it was not. Mr. Gomez then stated unequivocally that Superior's proposal was not rejected because of the equipment

lists, but it was identified in the rejection letter "for clarification purposes." He stated that the basis for rejection was the load calculation issue.

The final issue discussed at the debriefing related to pricing. Mr. Mills stated that, based on the abstract of winning prices provided by the USFS, Superior would have been competitive on a minimum of three contracts from a price standpoint. Mr. Gomez responded that the USFS did not evaluate Superior's prices because its proposal was rejected on technical grounds prior to price consideration or performance evaluations.

## II. PROTEST GROUNDS

Superior contends that the two stated bases for the rejection of its proposal, *i.e.*, failure to use the USFS Supplement #1 to calculate the HOGE payload and non-conformance of its equipment lists, are unfounded and contrary to the RFP requirements. Thus, it was improper for the USFS to reject Superior's proposal. These two issues are addressed in turn.

### A. Superior's HOGE Payload Calculation Was Compliant With The RFP

As explained above, the USFS did not refute at the debriefing the validity of Superior's position that the HOGE payload figure in its proposal for each aircraft was correctly calculated using either the standard chart or the USFS Supplement #1 chart. Moreover, Superior's use of the Standard Interagency Load Calculation Method to calculate the HOGE payload for its proposed Kmax helicopters was proper under the terms of the RFP and consistent with pre-RFP communications with USFS officials. In order to demonstrate this, it is necessary to explain in detail the background related to this issue.

Anthony Gamboa, Esq.
June 29, 2007
Page 13

Firefighting helicopters are divided into three Type classifications for firefighting by the federal government based on payload capacity. Type 3 helicopters are small helicopters with payloads of about 1000 lbs. Type 2 helicopters are all helicopters lifting a minimum of 2300 lbs. at 5000' elevation and 30° C – HOGE (Hover Out of Ground Effect). Type 1 helicopters are primarily used for water dropping and are considered heavylift helicopters: the minimum specification for a Type 1 aircraft is a payload of 4800 lbs. at 5000' and 30°C HOGE. The typing is important in the current USFS firefighting scheme because helicopters are requested from firebase managers to the national dispatch center based on Type (*e.g.*, a fire manager on a fire in Utah might submit a request for two Type 1 aircraft to the national dispatch center in Boise and they would check their list of available Type 1 aircraft and then dispatch helicopters based on performance and location and price). The Kmax helicopter flown by Superior is a Type 1 helicopter.

In 2004, the USFS contracting office informed the U.S. Kmax operators, including Superior, that the USFS did not feel the Kmax met Type 1 specifications using a minimum engine calculation and threatened to withhold renewal of the operators' contracts for CWN (call-when-needed) national firefighting contracts as a Type 1, which would have had serious economic repercussions for the whole operator group. The USFS took the position that the previously accepted method of calculating payload using FAA-approved performance charts from the operator's flight manual was not correct and did not reflect minimum engine specification baselines. The USFS took this position despite the fact that the Kmax aircraft easily and repeatedly demonstrated that it surpassed the Type 1 minimum performance and in fact is

one of the most high performance altitude helicopters in the available commercial firefighting fleet. In a letter to the USPS Chief Contracting Officer, dated May 4, 2004, Superior detailed its response to, and disagreement with, the USPS position. *See* Exhibit B attached hereto.

Subsequent to several discussions and meetings with USPS officials, the USPS took the position that if the operators could supply a "minimum engine chart" that showed the Kmax could still lift a Type 1 load even with a 0 degree performance engine, then the USPS would retain the Type 1 rating for the Kmax helicopters. At great expense to the Kmax operator group (over $40,000 per operator), the manufacturer, Kaman Aerospace (Kaman), undertook the writing, benchtesting, and FAA approval of a USPS Supplement #1 chart to be an addendum to the approved flight manual. Due to liability and engine life cycle restrictions, Kaman produced this chart utilizing data for a minimum engine specification below that of any engine currently flown by any Kmax and certified a chart showing a Kmax lifting 4560 lbs HOGE even with this "zero performance min. spec" engine. This was done to demonstrate to the USPS that the aircraft meets the Type specification even without utilizing the standard approved flight charts originally certified for the aircraft and approved by the USPS, which allows the operators to add "available power" from a second chart back in to the engine depending on temperature.

No other helicopter type had to commission and produce an FAA supplement just for the USPS to verify this minimum performance. The Kmax, as certified, requires a two-part chart calculation in order to produce the HOGE payload figure, including adding in available power at a predetermined rate if the engine makes a minimal level of power as determined by power assurance checks. Mr. Chuck Taylor, the USPS national Helicopter Technical Specialist,

however, took the position that adding in available power gave unfair advantage to the aircraft weight rating, but this is the method which was certified by the manufacturer and FAA for this aircraft. Other helicopter types use a single-step chart process that already assumes a certain amount of available shaft horsepower added to the engine as long as it passes a power assurance check. They are different methods to arrive at a similar end calculation. However, the Kmax operator group agreed to provide a chart with no available power added back in to satisfy the USFS that the aircraft still made the Type 1 category even *without* utilizing all available manufacturer specified power.

The USFS accepted the chart as proof the Kmax met the minimum threshold criteria and renewed the Kmax CWN contracts as Type 1 aircraft. However, the USFS also indicated they would use this minimum chart as part of their load criteria in performance evaluations for dispatching aircraft. A standard Kmax will actually lift about 5450 lbs. at this elevation using the standard charts, or more depending on aircraft weight, etc. This means the USFS wanted to utilize a chart for performance evaluations with a load criteria over 900 lbs. less than what a standard Kmax lifts with a standard engine.

Superior representatives had a series of discussions with USFS national contract office personnel regarding the unfairness of this situation. No other firefighting helicopter was required to supply a USFS-only engine chart, particularly one that did not reflect the real-world performance of the aircraft. As a follow-up to a meeting with USFS officials on February 8, 2005, Superior described its position in a letter to USFS officials dated February 18, 2005. *See* Exhibit C attached hereto (sixth numbered issue). Subsequent to this meeting and letter, the

USFS's Mr. Taylor contacted Superior and stated that if the Kmax operator group would supply him with a letter certifying that all Kmax operators fly engines in excess of a minimum +34 specification, then the National Interagency Fire Center ("NIFC") would allow the operators to use their standard performance charts for USFS performance tables and dispatch purposes.. The requested letter was supplied to Mr. Taylor by Superior on behalf of all the operators on March 24, 2005. *See* Exhibit D attached hereto. The March 24 letter appeared to satisfy all parties, since the Kmax operators were allowed to use the actual FAA flight power charts that provided true aircraft performance figures and the USFS had a separate specification chart that showed all Kmax aircraft met the Type 1 threshold criteria regardless of actual engine performance.

Since that time in early March 2005, all Kmax operators have utilized the standard FAA approved engine charts to calculate HOGE payload for firefighting. This has been used for actual payload calculations in the field, and has been used for dispatch purposes of Kmax aircraft by the USFS national dispatch center in Boise, with USFS permission. It was understood by the operators that the USFS Supplement #1 chart was produced to legally demonstrate to the USFS that the aircraft met the threshold criteria for the Type 1 category regardless of available engine power, and was not used for any other application.

As stated in Section I above, Superior utilized the Standard Interagency Load Calculation Method exactly as it had been doing for the USFS for the last several years to calculate HOGE payload. Superior utilized the approved basic flight manual HOGE performance charts approved for the aircraft by serial number. This calculation with these approved charts allows Superior to arrive at a payload figure which can be considered <u>the</u>

minimum aircraft payload with the aircraft being flown in the prescribed manner as dictated by the manufacturer and FAA approved flight manual. Superior did not use the USFS supplement #1 chart because it does not reflect accurate payloads of any Kmax flying with a standard engine, and because the contract did not specify that offerors must use one flight chart in favor of another.

The subject RFP did not require Kmax operators to demonstrate a minimum Type 1 threshold criteria for the aircraft, which is what the USFS Supplement #1 was designed to do. The RFP incorporates performance-based criteria, and Superior submitted its minimum payload information based on the FAA charts it uses to calculate payload for every commercial application and for performance reporting to the Government. To do otherwise would be incorrect and would artificially devalue Superior's (Kmax) performance by over 900 pounds of payload on a total of 5400 pounds of lift, which would be a drastic understatement of performance in a competitive contract. In addition, as clearly demonstrated by Superior at the debriefing, the same load calculation is properly made using the USFS Supplement #1 chart and the USFS essentially conceded this point during the debriefing.

The USFS current position on this issue is also inconsistent with its prior conduct. In May 2005, an Exclusive Use RFP was issued by the USFS[2] requesting Type 1 helicopters for exclusive (dedicated) firefighting contracts. Superior and other Kmax operators competed on

[2] Although at the debriefing the contracting officer attempted to distinguish the 2005 procurement as a "less formalized contract process" than the subject procurement, it is unclear to Superior as to why that is the case and how the alleged difference diminishes the import of the USFS's inconsistent conduct regarding the load calculations.

this 2005 procurement. Superior was unsuccessful due to price, but its proposal was not rejected as technically unacceptable. Significantly, the language in Section B-3 of the 2005 RFP regarding minimum engine performance was identical to the wording in the subject RFP. Superior submitted payload figures in its proposal on the 2005 RFP for the Kmax aircraft which were identical to the aircraft proposed for the subject RFP, based on the same FAA payload charts. Superior's proposal was not rejected for any technical reasons, although the submitted payload information was identical for each aircraft to its current payload information.

It is also significant that at the April 18, 2007 pre-proposal conference held with respect to the subject RFP that was attended by Superior personnel, the issue of utilizing a different performance flight chart than the standard chart Kmax operators had been using for the past 2 ½ years was never brought up by the USFS.

The USFS's conduct with respect to this issue has been inconsistent and prejudicial to Kmax operators. From 1995 to 2004, Kmax aircraft flew with submitted HOGE payloads taken from standard approved charts. In 2004, the USFS demanded a minimum specification engine chart that unfairly penalized the Kmax operator group since no other aircraft type was forced to submit a USFS-only engine chart that undervalued aircraft performance. Then in March 2005, the USFS agreed with the operators that this undervalued the Kmax performance and allowed operators to use standard charts to calculate HOGE payloads because they were more accurate. Now in 2007, the USFS has arbitrarily rejected Superior's and other Kmax operators' technical proposals for failure to utilize the USFS Supplement #1, even though the USFS did not indicate verbally or in writing that this was an RFP requirement.

In sum, the USFS's rejection of Superior's technical proposal because it did not utilize the USFS Supplement #1 to calculate the HOGE payload was contrary to the RFP requirements and inconsistent with the USFS's pre-RFP communications and conduct regarding this issue. Moreover, as demonstrated at the debriefing, using the USFS Supplement #1 chart would properly result in the same load calculation that was submitted with Superior's proposal based on the standard charts. Superior has been severely prejudiced by the USFS's actions because Superior would be in line for award of at least two contracts, worth at a minimum approximately $1.5 million per aircraft per year, had the USFS properly evaluated its proposal.

B. Superior's Proposal Included Compliant Equipment Lists

Superior contends that the USFS's rejection of its proposal due to its alleged non-compliant equipment lists was unreasonable and contrary to the RFP's requirements in Sections C-5.16 and E-2. The USFS rejection letter did not explain in what way(s) Superior's proposal failed to comply with section C-5.16 and, in fact, it appears from the USFS representative's statements at the debriefing that Superior's equipment lists were not a cause for rejection. In any event, Superior provided all requisite information regarding the equipment for its proposed Kmax aircraft in Part II, Subpart 1 - Aircraft Technical Capability, of its proposal.

Specifically, Superior's proposal included a standard equipment list of items that are installed on the proposed aircraft in standard configuration at time of weighing. The equipment list for each aircraft was identified by registration number and serial number on the front page and by registration number on each succeeding page. In addition, a weight and balance helicopter record for each aircraft was included that showed aircraft weight and the

name, weight and arm of items easily removed or not considered part of the basic configuration. All items were weighed on the same day for each aircraft and the date is noted in the upper left corner of the balance record.

The Kmax is a single purpose, external load-only aircraft and does not carry passengers, internal cargo, or have other special mission equipment. Thus, the only two configurations for the Kmax for firefighting are single pilot with attached longline bucket or single pilot with external firetank system mounted with snorkel. The only aircraft available with the external mount tank system (N267KA) was submitted with two weight and balance sheets, one configured with standard load beam and one configured with attached tank and snorkel with weights shown. No arm is shown for the tank because it is considered part of the aircraft and is non-jettisonable, and because it is mounted directly to the load beam of the aircraft at the center loading point and has no arm. The snorkel is listed separately with weight and arm.

No other equipment is listed with separate weight or arm (such as seats, doors, special mission equipment, etc.) because the aircraft is not easily reconfigurable with any of these items and none of these items are removed or reconfigured with this aircraft.

Under Section A of Subpart 1 in Superior's technical proposal, entitled "Superior Firemax Tank and Snorkel System," the separate weight of the tank is listed, and the weight of the standard bambi bucket and line is listed, even though the bucket is not considered part of the aircraft because it is a jettisonable load. This weight is included in the Equipped Weight figure required in RFP Section B, which requires the helicopter weight including bucket and line.

Superior's proposal provided all of the information required under section C-5.16 with the aircraft configured for firefighting. If the USFS required a different format or listing than that which Superior provided, it did not specify such in the RFP. Moreover, the equipment information supplied by Superior was virtually identical to that supplied in previous Exclusive Use and CWN proposals, none of which have ever been rejected by the USFS, and all of which were based on USFS RFPs having an equipment list specification identical to that in the subject RFP. Accordingly, the USFS's rejection of Superior's proposal due to its alleged deficient equipment lists was unreasonable and contrary to the RFP requirements.

## III. STAY OF CONTRACT PERFORMANCE

Superior has filed this protest within five business days of its requested and required debriefing. Thus, performance of the awarded contracts must be stayed pursuant to 31 U.S.C. § 3553(d)(3)(A)(i) and (d)(4)(B) during the pendency of this protest. *See also* FAR 33.104(c)(1). Moreover, the agency does not have a need to seek to override the stay since there are presently a fleet of helicopters under call-when-needed ("CWN") contracts which can be utilized by the Government until such time as this protest is resolved.

## IV. REQUEST FOR PROTECTIVE ORDER

Pursuant to § 21.4(a) of the GAO's Bid Protest Regulations, Superior requests that a protective order be issued because the record will include proprietary and source selection sensitive information relating to Superior's proposal and the USFS's evaluation thereof.

## V. REQUEST FOR DOCUMENTS

Pursuant to § 21.1(d) of the GAO's Bid Protest Regulations, Superior requests that the USPS produce the following documents:

(a) the Acquisition Plan and the Source Selection Plan for the subject procurement;

(b) all documents reflecting the evaluation of Superior's proposals and the USPS's determination to reject Superior's proposal;

(c) all documents reflecting and/or supporting the USFS's determination that USFS Supplement #1 must be used by proposing Kmax operators to calculate the HOGE payload for offered aircraft;

(d) all documents reflecting and/or supporting the USFS's determination that Superior's equipment lists did not comply with RFP Section C-5.16; and

(e) all other documents or records relevant to the protest grounds.

The requested documents are relevant to this protest for purposes of determining the reasonableness and propriety of the USFS's evaluation of Superior's proposal.

## VI. REQUEST FOR RELIEF

For the reasons stated above, Superior respectfully requests that the Comptroller General issue a ruling sustaining this protest on the grounds that the USFS's evaluation of Superior's technical proposal and the USFS's determination to reject Superior's proposal as unacceptable, were unreasonable and inconsistent with the RFP's requirements. Superior further requests that the Comptroller General direct the USFS to: (1) perform a proper evaluation of proposals based on the RFP's requirements, and make contract award decisions

Anthony Gamboa, Esq.
June 29, 2007
Page 23

based on the RFP's evaluation criteria, including awarding at least two contracts to Superior; (2) reimburse Superior for the costs of filing and pursuing this protest; and (3) provide all such other relief as the Comptroller General deems appropriate.

Anthony Gamboa, Esq.
June 29, 2007
Page 24

Please direct all communications and correspondence to the attention of the undersigned.

Respectfully submitted,

Gilbert J. Ginsburg
Attorney & Counselor-At-Law
1250 24th Street N.W.
Suite 350
Washington, DC 20037
Phone: (202) 776-7772
Fax: (202) 776-7773
Email: Gilgins@aol.com

By: Gilbert J. Ginsburg
Principal

Katherine S. Nucci
Of Counsel

Attorneys for
Superior Helicopter, LLC.

cc: Mr. Frank Gomez
Contracting Officer
U.S. Forest Service
National Interagency Fire Center
3833 S. Development Ave.
Boise, ID 83705-5354
(208) 387-5347 (tel.); (208) 387-5384 (fax)
fgomez@fs.fed.us (e-mail)

Enclosures – Exhibits A - D

# CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this 29th day of June, 2007 one copy of the Protest Against The Rejection Of Superior Helicopter LLC's Proposal Under Request For Proposals No. AG-024B-S-07-0008 to the Area Office were hand delivered and faxed to:

Anthony Gamboa, Esq.
General Counsel
U.S. Government Accountability Office
441 G Street, N.W.
Washington, D.C. 20548

Copies were mailed to:

Mr. Frank Gomez
Contracting Officer
U.S. Forest Service
National Interagency Fire Center
3833 S. Development Ave.
Boise, ID 83705-5364
(208) 387-5347 (tel.); (208) 387-5384 (fax)
fgomez@fs.fed.us (e-mail)

Cheryl Marie Coney