UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| ERICKSON AIR-CRANE, INC., Plaintiff, | |
| v. | No. 07-519C (Lettow) |
| UNITED STATES OF AMERICA, Defendant. | Bid Protest |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION AND REQUESTS FOR DECLARATORY JUDGMENT AND PERMANENT INJUNCTIVE RELIEF**

Alan I. Saltman
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiff

OF COUNSEL:

Ruth G. Tiger
Eric J. Pohlner
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Dated: July 26, 2007

# TABLE OF CONTENTS

**PAGE**


Table of Authorities ........................................ iii

I. Statement of the Case ........................................ 1

II. Argument ........................................ 4

A. Jurisdiction And Standard Of Review ........................................ 4

B. Erickson Is Entitled To Declaratory Relief Because Defendant's Override Of The Automatic Stay Is Arbitrary, Capricious, An Abuse of Discretion, And Otherwise Contrary To Applicable Federal Law And Regulation ........................................ 6

1. No Adverse Consequences Will Occur If The Stay Remains In Place Pending GAO's Resolution Of Erickson's Protest Because Reasonable Alternatives Exist To Provide The Forest Service With The Helicopter Firefighting Services It Needs Without The Necessity Of An Override ........................................ 9

2. The Benefits Of Overriding The Stay Do Not Outweigh Any Costs Of Leaving It In Place ........................................ 14

3. The Chief Failed To Consider The Impact Of The Override On Competition And The Integrity Of The Procurement System ........................................ 17

4. Nothing In the Administrative Record Supports The Chief's Contention That Performance Of The Exclusive Use Contracts Is Necessary To Meet The Forest Service's Firefighting Needs ........................................ 18

C. The Equities Favor This Court Issuing Injunctive Relief Sought ........................................ 21

1. Erickson Succeeds On The Merits Because Defendant's Decision To Override The Automatic Stay Lacked A Rational Basis ........................................ 21

2. Absent Relief, Erickson Will Suffer Irreparable Harm ........................................ 21

3. Granting Injunctive Relief Is In The Public Interest .................................24

4. The Balance Of The Hardships Tips Strongly In Erickson's Favor Because The Defendant Will Not Suffer Any Significant Harm .....................................................................25

D. Consolidation Of This Case With Superior Helicopter Would Be Inappropriate Because Consolidation Would Create A Conflict Of Interest For Erickson's Counsel .........................................................26

III. Conclusion ..........................................................................................................27

**TABLE OF AUTHORITIES**

**CASES** **PAGE**

Advanced Sys. Dev., Inc. v. United States,
72 Fed. Cl. 25 (2006) ........ *passim*

Alion Science v. United States,
69 Fed. Cl. 14 (2005) ........ 5, 9

Automation Tech., Inc. v. United States,
72 Fed. Cl. 723 (2006) ........ 14, 15

Chapman Law Firm Co. v. United States ("Chapman I"),
62 Fed. Cl. 464 (2004) ........ 5, 13, 15, 21

Chapman Law Firm Co. v. United States ("Chapman II"),
65 Fed. Cl. 422 (2005) ........ 6, 7

CIGNA Gov't Servs., LLC v. United States,
70 Fed. Cl. 100 (2006) ........ 5, 6, 14, 15, 21

Dairy Maid Dairy, Inc. v. United States,
837 F.Supp. 1370, 1381 (E.D. Va. 1993) ........ 22

Delbert Wheeler Constr., Inc. v. United States,
39 Fed. Cl. 239 (1997), aff'd, 155 F.3d 566 (Fed. Cir. 1998) ........ 6

DTH Management Group v. Kelso,
844 F. Supp. 251 (E.D.N.C. 1993) ........ 22

FMC Corp. v. United States,
3 F.3d 424 (Fed. Cir. 1993) ........ 6

Hospital Klean of Texas, Inc. v. United States,
65 Fed. Cl. 618 (2005) ........ 14, 25

JWK Int'l Corp. v. United States,
49 Fed. Cl. 364 (2001) ........ 22

Keeton Corrections, Inc. v. United States,
59 Fed. Cl. 753 (2004) ........ 9, 21

Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.,
463 U.S. 29 (1983) ........ 5

Overstreet Elec. Co., Inc. v. United States,
47 Fed. Cl. 728 (2000) ........................................................................................22

PGBA, LLC v. United States,
57 Fed. Cl. 655 (2003) ........................................................................5, 15, 18, 22

RAMCOR Servs. Group, Inc. v. United States,
185 F.3d 1286 (Fed. Cir. 1999)............................................................................4

Reilly's Wholesale Produce v. United States,
73 Fed. Cl. 705 (2006) ........................................................................7, 15, 22, 24

Seattle Sec. Services, Inc. v. United States,
45 Fed. Cl. 560 (2000) ...................................................................................21, 22

Superior Helicopter LLC and Rainier Heli-Lift, Inc. v. United States ("Superior Helicopter"),
No. 07-518C (Fed. Cl. filed July 11, 2007) .....................................................3, 4, 26, 27

**STATUTES AND REGULATIONS**

5 U.S.C. § 706...........................................................................................................5

28 U.S.C. § 1491(b)(1) ..............................................................................................4

28 U.S.C. § 1491(b)(2) ..............................................................................................5

28 U.S.C. § 1491(b)(4) ..............................................................................................5

31 U.S.C. § 3553.........................................................................................................3

31 U.S.C. § 3553(c)(1)................................................................................................3

31 U.S.C. § 3553(c)(2)................................................................................................3

31 U.S.C. § 3553(d) ..................................................................................................22

31 U.S.C. § 3553(d)(3) ...............................................................................................3

31 U.S.C. § 3553(d)(3)(c) ...........................................................................................3

**MISCELLANEOUS**

Award Abstract for RFP-AG-024B-S-07-0008 ....................................................................1

D.C. Rules of Professional Conduct Rule 1.7...................................................................26

R.C.F.C. 42(a)..................................................................................................................26

R.C.F.C. 65(a)(2) ...............................................................................................................4

## I. Statement of the Case

On April 6, 2007, the Forest Service issued a solicitation, RFP No. AG-024B-S-07-0008, for helicopter firefighting services using heavy or medium helicopters[1] on an "exclusive use" basis. In exclusive use contracts, the parties agree up front on the dates on which a fully crewed helicopter will be made available exclusively for the needs of the Forest Service. See Ex. 1 (First Decl. of L. Allmaras ¶ 10). The solicitation sought offers for the same services that the Forest Service is currently obtaining under a number of preexisting exclusive use contracts and Call When Needed ("CWN") contracts, including contracts with Erickson. See id. (¶ 7). Under the CWN contracts, the Forest Service can (but is not required to) order helicopter services and the contractor is not required to accept any orders placed. See id. (¶ 10). If the Forest Service decides to place an order and the contractor accepts, the contractor agrees to make the helicopter available for a mutually agreeable period of time or until the Forest Service releases the

---

[1]Heavy and medium helicopters are also designated as Type I and Type II helicopters, respectively. All of the helicopters of Erickson Air-Crane, Inc. ("Erickson") are heavy, or Type I, helicopters. Erickson's helicopters are model S-64E, also known as the Aircrane. See TRO Hr'g Tr. 82:1-4. Erickson is the sole manufacturer of the S-64E, following its purchase of the type certificate and manufacturing rights from Sikorsky. See id. Under Sikorsky, the helicopter model was S-64 and known as the Skycrane. Id. at 81:24-25.

The Erickson Aircrane is the civilian version of the United States' Army CH-54, id. at 82:10-14, which is no longer in production. The FAA designates the CH-54 as a "restricted" category helicopter. See id. at 82:13-15. Restricted category helicopters cannot carry passengers for hire and cannot operate over populated areas. Id. at 95:5-12. In contrast, the FAA has designated the Erickson Aircrane a "standard" category helicopter. See id. at 82:16-17, 95:25-96:1. This certificate requires stricter maintenance and operating guidelines, thereby allowing the aircraft to operate with passengers and over populated areas. See id. at 95:12-14

The Forest Service awarded 1 contract under the solicitation to an offeror that proposed an S-64E helicopter (contract line item number ("CLIN") 10) and 8 contracts to two offerors that proposed CH-54 helicopters (CLINs 1-8). Award Abstract, http://fs1.fbo.gov/EPSData/USDA/Synopses/10431/RFP-AG-024B-S-07-0008/FBOAwardAbstract.pdf.

helicopter. See id. In this sense, once a helicopter is ordered and the order accepted, the CWN contract operates just like the exclusive use contract. See id. That is, the helicopter is then available "at a moment's notice" to the Forest Service in the same manner as a helicopter under an exclusive use contract. See id. (¶ 11).

Erickson submitted a timely offer in response to the solicitation, proposing four of its S-64E helicopters for 19 of the 35 locations for which services were being solicited by the Forest Service. See Complaint ¶ 6. Each location was designated by the Forest Service as a separate contract line item number ("CLIN") in the solicitation and each offeror could submit an offer for any or all of the 35 CLINs. See id. By letter of June 13, 2007, the Forest Service notified Erickson that its proposal had been rejected as technically unacceptable due to certain alleged deficiencies in the documentation Erickson submitted with its proposal. See id. (¶ 7). On June 22, 2007, Erickson filed a timely protest with the Government Accountability Office ("GAO") challenging the Forest Service's rejection of its proposal with regard to 18 of the 19 locations/CLINs for which Erickson had offered its helicopters (the exception being CLIN 25, Reno/Stead). See id. (¶ 9). The protest was docketed by GAO as B-299909. The merits of Erickson's protest to GAO challenge the Forest Service's failure to utilize relevant information bearing on Erickson's proposal that the Forest Service had close at hand and to seek clarification of clerical errors in Erickson's proposal. Had the Forest Service done so, as it was required to, it would have selected Erickson for one or more contract awards because Erickson's offer represented the best overall value to the government.

On the same day that Erickson lodged its protest, GAO provided notice to the Forest Service of the filing of Erickson's protest pursuant to the Competition in Contracting Act ("CICA"), 31 U.S.C. § 3553. This notice automatically prohibited the Forest Service from awarding any contracts under the solicitation, id. § 3553(c)(1), and from authorizing performance of any contract(s) already awarded pursuant to the solicitation, id. § 3553(d)(3). The purpose of the CICA stay is to ensure that CICA's mandate for competition is enforced. A CICA stay remains in force during the protest period unless the head of the procuring agency, here the Chief of the Forest Service ("Chief"), takes the exceptional route of issuing a written determination to override the stay. Id. § 3553(c)(2) and (d)(3)(c).

On July 9, 2007, a full two weeks after Erickson filed its protest, the Chief issued a written determination to override the stay. The Chief found that an override was in the best interests of the United States and was justified based on urgent and compelling circumstances. On July 10, 2007, Erickson filed a complaint with this Court, challenging the override determination on the grounds that it is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law. Concurrently, Erickson moved for an emergency declaratory judgment invalidating the override of the stay and a temporary restraining order and preliminary injunction enjoining the override as to the 18 CLINs Erickson has protested.

On July 12, 2007, the Court held a hearing on Erickson's application for a temporary restraining order ("TRO") in conjunction with a similar TRO application that had been filed by Superior Helicopter and Ranier Heli-Lift. Superior Helicopter LLC and Rainier Heli-Lift, Inc. v. United States ("Superior Helicopter"), No. 07-518C (Fed. Cl. filed July 11, 2007). At the

hearing, the Court emphasized that it was addressing only the TRO applications and not Erickson's (or Superior's) motion for declaratory and injunctive relief. TRO Hr'g Tr. 5:17-22, July 12, 2007. Although the Court found the matter a "close case," it denied Erickson's TRO application without prejudice to its request for relief on the merits of its challenge to the override determination. Id. 120:10-19; see Docket No. 10 (Order of July 13, 2007). One of the principal reasons the Court denied Erickson's TRO application was the absence of the administrative record: "if this were a preliminary injunction request and the Court had the record before it and the record would essentially provide the factual basis that the Court has today, the Court would grant the preliminary injunction." TRO Hr'g Tr. 120:15-19. The defendant filed the administrative record on July 18, 2007.

Pursuant to Rule 65(a)(2) of the Rules of the Court of Federal Claims, the Court consolidated consideration of Erickson's motion for a preliminary injunction with trial and argument on the merits of Erickson's request for a declaratory judgment and permanent injunctive relief. See Docket No. 10 (Order of July 13, 2007). The Court also ordered the parties to address whether this case should be consolidated with that of Superior Helicopter. Id.

## II. Argument

### A. Jurisdiction And Standard Of Review

The Court of Federal Claims has jurisdiction to review the decision by a head of a procuring agency to override a CICA stay pursuant to 28 U.S.C. § 1491(b)(1). See RAMCOR Servs. Group, Inc. v. United States, 185 F.3d 1286, 1289-90 (Fed. Cir. 1999). In exercising this jurisdiction, the Court "may award any relief that the Court considers proper, including

declaratory and injunctive relief. . . ." 28 U.S.C. § 1491(b)(2). This provision authorizes the Court to issue the declaratory and injunctive relief Erickson seeks. See, e.g., CIGNA Gov't Servs., LLC v. United States, 70 Fed. Cl. 100, 114 (2006); Chapman Law Firm Co. v. United States, 62 Fed. Cl. 464, 469 (2004) ("Chapman I"); PGBA, LLC v. United States, 57 Fed. Cl. 655, 656 (2003).

The Court reviews the decision of an agency head to override the automatic stay to determine whether it was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, pursuant to the Administrative Procedure Act, 5 U.S.C. § 706, standard of review.[2] 28 U.S.C. § 1491(b)(4). An agency's decision is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). "In short, the Court must look to see whether the agency considered the relevant factors and made a rational decision based on those factors." Advanced Sys. Dev., Inc. v. United States, 72 Fed. Cl. 25, 30 (2006).

[2]This standard of review is the same whether the override was based on the best interests of the United States or on urgent and compelling circumstances. See Advanced Sys. Dev., Inc. v. United States, 72 Fed. Cl. 25, 31 (2006) (disagreeing with an earlier case to the extent that it advocates a lesser standard for a best interests justification); Alion Science v. United States, 69 Fed. Cl. 14, 22 n.5, 25 (2005) (describing the government's repeated argument of a distinction in the standard of review as being not "warmly received by this court in other cases" and applying the arbitrary and capricious standard to both bases).

In order to obtain a preliminary or permanent injunction, plaintiff must demonstrate: (i) success (or in the case of a preliminary injunction, a substantial likelihood of success) on the merits; (ii) irreparable injury to plaintiff if defendant is not enjoined; (iii) the public interest is served by enjoining defendant; and (iv) the harm to plaintiff outweighs the harm to defendant. Id. (citing Delbert Wheeler Constr., Inc. v. United States, 39 Fed. Cl. 239, 251 (1997), aff'd, 155 F.3d 566 (Fed. Cir. 1998)). No one factor is dispositive to the Court's inquiry as "the weakness of the showing regarding one factor may be overborne by the strength of the others." Id. (quoting FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993)).

### B. Erickson Is Entitled To Declaratory Relief Because Defendant's Override Of The Automatic Stay Is Arbitrary, Capricious, An Abuse Of Discretion, And Otherwise Contrary To Applicable Federal Law And Regulation

The purpose of an automatic stay is "to preserve the status quo during the pendency of the protest so that an agency would not cavalierly disregard GAO's recommendations to cancel the challenged award," thereby "preserv[ing] competition in contracting and ensur[ing] a fair and effective process at the GAO." Advanced Sys. Dev., 72 Fed. Cl. at 31. When an agency improperly decides to override a stay, this Court may restore the status quo and reinstate the stay through both declaratory and injunctive relief. As this Court has observed, declaratory relief is in some ways preferable to injunctive relief because the latter imposes unnecessary burdens of proof upon a plaintiff and is less practical and efficient than declaratory relief. See Advanced Sys. Dev., 72 Fed. Cl. at 36 (citing Chapman Law Firm Co v. United States, 65 Fed. Cl. 422, 424 (2005) ("Chapman II"); CIGNA, 70 Fed. Cl. at 114). Specifically, this Court has held that a plaintiff should not be required to prove anything more than that an agency's override decision is unreasonable:

> Congress did not require any evaluation of injunctive relief factors as a prerequisite to a stay of contract performance upon the filing of a protest with the GAO. Thus, it would be contrary to the legislative scheme to impose such an additional requirement, upon finding that an agency override determination lacks validity, in order to reinstate the statutory stay applicable during the GAO protest period. Declaratory relief preserves the scheme that Congress intended.

Chapman II, 65 Fed. Cl. at 424. Erickson is entitled to declaratory relief because the Forest Service's decision to override the stay was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law as demonstrated below.

In Reilly's Wholesale Produce v. United States, 73 Fed. Cl. 705 (2006), the Court surveyed its case law and listed four factors that an agency must, at a minimum, consider in making an override decision:

> (i) whether significant adverse consequences will necessarily occur if the stay is not overridden, (ii) conversely, whether reasonable alternatives to the override exist that would adequately address the circumstances presented, (iii) how the potential cost of proceeding with the override, including the costs associated with the potential that the GAO might sustain the protest, compare to the benefits associated with the approach being considered for addressing the agency's needs, and (iv) the impact of the override on competition and the integrity of the procurement system, as reflected in the Competition in Contracting Act.

Reilly's Wholesale, 73 Fed. Cl. at 711 (internal citations omitted) (emphases added); see id. at 711 n.10 (the rationale of the cases involving a "best interests" override applies equally to an override determination based on urgent and compelling circumstances).

Additionally, in determining whether to issue an override, it is irrelevant that the new contract would be more advantageous to the government than the old contract or that the performance of the new contract is otherwise simply preferable to the agency. See Reilly's Wholesale, 73 Fed. Cl. at 711 (citing Advanced Sys. Dev., 72 Fed. Cl. at 31). The rationale for

the override determination in the present case boils down to little more than the contention that having more exclusive use contracts in place is preferable to the status quo where the Forest Service procures needed helicopter firefighting services through a few exclusive use contracts and many CWN contracts. See AR at 10 (Determination & Findings ("D&F") ¶ 12(b)). There is no contention in the override determination that maintaining the status quo, where the Forest Service would have to continue its long-standing practice of relying more heavily on CWN contracts than on exclusive use contracts, pending resolution of Erickson's protest would prevent the Forest Service from protecting the public or natural resources this fire season.

As described more fully below, the Chief made unreasonable conclusions in the override determination and the administrative record fails to demonstrate otherwise. Specifically, the Chief unreasonably concluded that adverse consequences would necessarily occur if the stay were to remain in place by failing to objectively consider reasonable alternatives available to overriding the stay. She also failed to quantify the costs of proceeding with an override and any supposed benefits and therefore her determination lacked any meaningful cost-benefit analysis. Finally, she failed to consider the impact of the override on competition and the integrity of the procurement system in deciding to override the stay. By failing to properly consider the mandatory factors in overriding a stay and instead relying upon irrelevant factors, the override decision lacked a rational basis and was contrary to the law. Erickson will address each of these deficiencies in turn.

**1. No Adverse Consequences Will Occur If The Stay Remains In Place Pending GAO's Resolution Of Erickson's Protest Because Reasonable Alternatives Exist To Provide The Forest Service With The Helicopter Firefighting Services It Needs Without The Necessity Of An Override**

The override determination failed to include consideration of the reasonable alternative of extending preexisting exclusive use contracts in conjunction with CWN contracts to meet the Forest Service's helicopter firefighting services needs. The focus of the reasonable alternative analysis is (1) whether the work to be done during the stay is the same as was provided under a predecessor contract and (2) whether any contractors other than the awardee are able to perform that work. See Alion Science v. United States, 69 Fed. Cl. 14, 27-28 (2005); Keeton Corrections, Inc. v. United States, 59 Fed. Cl. 753, 758 (2004).

As noted, the helicopter firefighting services the Forest Service solicited under the subject solicitation are the same helicopter firefighting services that Erickson and other contractors already provide to the Forest Service under existing contracts. See Ex. 1 (First Decl. of L. Allmaras ¶ 7). The solicitation did not seek to procure new work but rather to procure the same helicopter firefighting services that the Forest Service was then and still is being provided through existing contracts. The existing contracts are of two types: exclusive use contracts and CWN contracts. The subject solicitation sought offers only for exclusive use contracts.

The difference between exclusive use and CWN contracts for helicopter firefighting services has to do with the nature of the parties' contractual relationship, not with the type of helicopter firefighting services provided. Under both types of contracts, the helicopter firefighting services required are the same. Id. Under both types of contracts, the contractor

provides one or more technically-capable, approved helicopters and experienced crews to fight forest fires. Id. In fact, the helicopters Erickson proposed in response to the subject solicitation are all included in Erickson's existing CWN contract with the Forest Service. Id. (¶ 9). On information and belief, the helicopters proposed by the other offerors are included in those offerors' CWN contracts with the Forest Service. Id. (¶ 23).

The contract awardees are not the only operators that can provide helicopter firefighting services to the Forest Service during the period of the stay. The Forest Service has CWN contracts with approximately 70 helicopter companies, including Erickson, which can be used to meet its need for helicopter firefighting services. See id. While the Chief pointed out that over 241 helicopters were under CWN contracts at the beginning of the 2006 season, she stated that only about 40% of these helicopters were available for firefighting use.[3] AR at 10 (D&F ¶ 12(b)). Yet, even assuming the Forest Service's figures are correct, that would still leave 96 helicopters (40% of 241) available for use at the beginning of the 2006 season – a number far in excess of the 18 helicopters that would be required during a reinstated stay pending GAO's decision on the merits of Erickson's protest. Nothing in the administrative record supports the Chief's apparent contention that there are an insufficient number of CWN helicopters available

[3]Testimony at the TRO hearing suggested that these figures from 2006 included light, Type III, helicopters in addition to heavy and medium, Type I and Type II, helicopters and that the Forest Service only has about 60 heavy and medium helicopters under CWN contracts. See TRO Hr'g Tr. 74:9-75:22. Erickson's understanding, however, is that the Forest Service has approximately 250 heavy and medium helicopters under CWN contracts. Ex. 1 (First Decl. of L. Allmaras ¶ 23). In any event, the administrative record does not address the number of heavy and medium helicopters available to the Forest Service under CWN contracts at the time of the Chief's override determination on July 9, 2007.

to meet the Forest Service's firefighting needs during the pendency of Erickson's protest at GAO.

Similarly, the administrative record does not support the Chief's further assertion that the contingent of helicopters under CWN contracts had been depleted at the time of the override. AR at 10 (D&F ¶ 12(b)). Only the UTF report included in the administrative record appears to be in any way related to this assertion, but as discussed in section II.B.4, infra, the UTF report includes unfilled orders under both exclusive use and CWN contracts and contains no data upon which the Chief could have reasonably relied to conclude that there were an insufficient number of CWN helicopters available to meet the Forest Service's firefighting needs for the 18 CLINs being challenged by Erickson while GAO decides Erickson's protest.

The Chief also claimed that the Forest Service generally uses its CWN contracts to provide helicopter services for only a single incident, AR at 10 (D&F ¶ 12(b)), though she failed to consider that the Forest Service has in the past used its CWN contracts to procure helicopter firefighting services for more than a single incident. First Decl. of L. Allmaras ¶ 11; see also TRO Hr'g Tr. 46:8-49:7 (describing the Forest Service assigning one of Superior's helicopters to a succession of fires over a 40-day period in 2006). There is no reason why the Forest Service could not continue to use its CWN contracts for more than a single incident while Erickson's protest is pending at GAO.

Besides the availability of helicopters under CWN contracts, as the override decision indicates, a number of preexisting exclusive use contracts also remain in force. See AR at 9-10

(D&F ¶ 12(a)). Specifically, it states that 28 helicopters (four heavy lift helicopters and 24 medium lift helicopters) were then available under exclusive use contracts for the remainder of the 2007 fire season. The Chief claims that the 24 medium lift helicopters are unavailable for use by the Forest Service because they are "budgeted for and managed by the [Forest Service] regions (as opposed to nationally) and they are reserved for use in local initial attacks." Id. How the Forest Service has chosen to budget for and manage these 24 helicopters does not affect the actual availability of them to meet the Forest Service's "national" helicopter firefighting needs. Moreover, the Chief does not explain why the Forest Service's choice to "reserve" these 24 helicopters for local initial attacks prevents the Forest Service from deploying these helicopters wherever needed for initial attacks while using existing CWN contracts or other means to meet "local" needs. The Chief also does not offer any explanation for her contention that assigning these helicopters for "national" use would actually deplete any local resources. See AR at 9-10 (D&F ¶ 12(a)). Nothing in the administrative record provides any such explanation. Since Erickson is protesting only 18 locations, the 28 helicopters under preexisting exclusive use contracts are more than adequate to cover the Forest Service's helicopter firefighting needs during the stay.

Moreover, Erickson is ready, willing, and able to continue providing helicopter firefighting services to the Forest Service. Erickson was under contract to the Forest Service to provide exclusive use heavy lift helicopter services under contract no. AG-024B-C-05-9096 until July 7, 2007, when the Forest Service notified Erickson that it was terminating that contract. At present, another alternative to the override would be to reinstate and extend the term of Contract 9096. See Ex. 1 (First Decl. of L. Allmaras ¶ 13).

As a further means for the Forest Service to meet its needs during the pendency of the stay, under section C-33 of Contract 9096, the Forest Service can order additional helicopter services from Erickson. See id. (¶ 15). The Forest Service has ordered such additional helicopter firefighting services throughout the course of that contract. See id. (¶ 16). Additionally, on information and belief, other helicopter operators are in a similar position to provide additional helicopters to the Forest Service in accordance with clause C-33 of their exclusive use contracts. Indeed, the Forest Service recently relied upon clause C-33 in the contracts awarded under the subject solicitation to order additional helicopters. Ex. 2 (Sec. Dec. of L. Allmaras ¶ 9). The Chief failed to consider in her alternatives analysis the availability of additional helicopter services under the exclusive use contracts that had been in place prior to the override determination. See AR at 9-11 (D&F ¶ 12).

In conducting her alternative means analysis, the Chief also appears to have unreasonably assumed that the Forest Service was limited to relying upon only one alternative to meet all of its helicopter firefighting needs. For example, the Chief failed to consider obtaining the requisite services by both extending the preexisting exclusive use contracts and ordering additional helicopters under those contracts and obtaining additional helicopter firefighting services under the CWN contracts. By using a blend of the preexisting exclusive use and CWN contracts, the Forest Service can obtain the requisite number of helicopters needed to meet its firefighting needs. See Chapman I, 62 Fed. Cl. 467 (finding that there was no reason justifying an override when the changes clause in existing contracts allowed the agency to require the performance of new work).

By availing itself of the reasonable alternatives to overriding the stay outlined above, the Forest Service can meet its helicopter firefighting needs with no adverse consequences natural resources or the public. See Hospital Klean of Texas, Inc. v. United States, 65 Fed. Cl. 618, 624 (2005) (when the government has alternate means of obtaining needed services, there can be no harm from enforcing a stay). Just as the Forest Service has relied upon the existing contracts to meet its firefighting needs for years, it can continue to rely upon these contracts to meet its firefighting needs during the protest period. Nothing has changed between previous years and this year other than the Forest Service's decision that using exclusive use contracts is preferable to replying principally upon CWN contracts. See AR at 10 (D&F ¶ 12(b)). Neither life nor property will be placed at risk by keeping the automatic stay in place because the Forest Service can procure all needed services under its existing contracts. As such, the Chief lacked any rational basis for her override determination. See Automation Tech., Inc., 72 Fed. Cl. 723, 730 (2006).

**2. The Benefits Of Overriding The Stay Do Not Outweigh Any Costs Of Leaving It In Place**

As part of determining whether to override a stay, an agency is required to conduct a comprehensive and balanced cost-benefit analysis. A mere naked assertion that the benefits of an override outweigh its costs cannot support an override decision. See CIGNA, 70 Fed. Cl. at 112. An agency also may not consider only the negative consequences of maintaining the stay; the agency must also recognize the benefits of doing so. Specifically, an agency must attempt to quantify the potential costs that it would incur were it to authorize the awardee to perform under

the new contract only to have GAO sustain the protest. See Automation Tech., Inc., 72 Fed. Cl. at 728-29; see also CIGNA, 70 Fed. Cl. at 111; Chapman I, 62 Fed. Cl. at 468.

While overriding a stay may have certain benefits, one "benefit" that an agency may not consider in its cost-benefit analysis is that the new contract is better than the existing contracts. See Reilly's Wholesale, 73 Fed. Cl. at 711. As the Court has observed: "[The new contract] will almost always be an improvement over the old. To allow a best interests determination to rest on such a common ground would permit the override exception to swallow the Congressionally mandated rule that stays are automatic." Advanced Sys. Dev., 72 Fed. Cl. at 31 (citations omitted); accord PGBA, 57 Fed. Cl. at 662 (holding the justification is also insufficient in the context of urgent and compelling circumstances). Yet, as noted, upon close examination that is really the only justification that the Chief relied upon.

The Chief did not properly consider the costs that the Forest Service would incur should Erickson prevail upon its protest. Although the Chief acknowledged that the GAO may hold the Forest Service liable for Erickson's bid preparation and protest costs, including attorneys' fees, she failed to even attempt to quantify those costs. Rather, the Chief merely concluded that the "risks that would result from not overriding the stay . . . outweigh the ramifications of any sustained bid protests." AR at 11 (D&F ¶ 13). "This is the type of 'naked' assertion that, standing alone, does not support an agency's override decision." CIGNA, 70 Fed. Cl. at 111-12. The Chief could not have balanced the override's costs and benefits without having made a reasonable attempt to determine the "weight" of each. On its face, then, the determination reveals the Chief's failure to consider an important factor in making an override decision.

Additionally, any contention that going forward with the override is necessary to prevent loss of life and property and to assure helicopter availability "at a moment's notice" is not borne out by the facts. As noted, once a contractor accepts a Forest Service order under a CWN contract, that contractor is obligated to keep that helicopter available for use by the Forest Service. That helicopter, like a helicopter under an exclusive use contract, is then available "at a moment's notice." At any time during the past five weeks, the Forest Service could have placed orders under its CWN contracts to meet its firefighting needs this season. Indeed, during the two weeks the stay initially was in place, the Forest Service ordered helicopter services under its CWN contracts as part of its firefighting mission to prevent loss of life and property and to assure helicopter availability at a moment's notice. See Ex. 1 (First Decl. of L. Allmaras ¶ 22). And during years past, the Forest Service has met these needs through a combination of exclusive use and CWN contracts with greater reliance on the CWN contracts. Id. (¶ 11). The Forest Service can continue to meet these needs in the same manner this season. Nowhere in her determination does the Chief assert that the Forest Service will be unable to obtain necessary helicopter firefighting services this season if the stay is reinstated pending resolution of Erickson's protest. Based on its experience over the years ordering helicopter services under its CWN contracts, the Forest Service knew or should have known that it could meet its needs in this way, rather than taking the extraordinary step of overriding a CICA stay. Instead, it arbitrarily chose not to follow that readily available route.

In place of a proper cost-benefit analysis, the Chief based her determination only upon the improper "newer is better" justification. Primarily, the Chief states that the awarded exclusive use contracts will provide a better guarantee of availability compared to the existing

CWN contracts. The Chief apparently based this conclusion on the unsupported claim that only 40% of helicopters were available under CWN contracts at the start of the 2006 season. See AR at 10 (D&F ¶ 12(b)). However, even if the new contracts are more advantageous to the Forest Service than the existing CWN contracts, that is no basis to justify an override. Advanced Sys. Dev., 72 Fed. Cl. at 31. The Chief never quantified the purported advantages in her determination or offered any support for her bald assertion that the Forest Service cannot obtain guaranteed helicopter availability under its existing exclusive use and CWN contracts. Nor did the Chief specify exactly how the Forest Service's firefighting efforts would be adversely impacted by continuing its decades-long reliance primarily upon CWN contracts as the means of meeting its firefighting needs. See AR at 10 (D&F ¶ 12(b)). Moreover, though the Chief baldly asserted that the awarded contracts offer "a lower cost" to the Forest Service than continued primary reliance on CWN contracts, again the Chief never quantified this claimed cost savings. Notably, the administrative record contains no evidence supporting the conclusion that helicopter availability cannot be guaranteed with CWN contracts or any document reflecting the costs of relying upon CWN contracts during the stay as compared to the 18 newly-awarded exclusive use contracts. In short, not only did the Chief base her determination on the irrelevant factor that the new contracts are more advantageous than the existing ones, she failed to note any support for her assertions that such is the case.

### 3. The Chief Failed To Consider The Impact Of The Override On Competition And The Integrity Of The Procurement System

The Chief utterly failed to consider whether overriding the stay would serve or undermine the congressional goal of competition embodied in CICA and the integrity of the

procurement system. "[T]he best interests of the United States . . . necessarily include weighing the benefits Congress obviously felt were furthered bolstering the bid protest process." PGBA, 57 Fed. Cl. at 663. However, nothing in the override or in the administrative record indicates that the Chief considered such an important factor. Her override determination was unreasonable as a result.

#### 4. Nothing In The Administrative Record Supports The Chief's Contention That Performance Of The Exclusive Use Contracts Is Necessary To Meet The Forest Service's Firefighting Needs

Nothing in the administrative record supports the Chief's determination that only the exclusive use contracts awarded under the subject solicitation can provide the helicopter firefighting services the Forest Service needs while GAO considers the merits of Erickson's protest. Most of the documents included in the administrative record, such as the solicitation and protests, are not relevant to the propriety of the override determination. AR at 82-763 (Tabs 8-14). Others are not substantive and were prepared after the override determination. AR at 20-81 (Tabs 6-7). For others, either they or their substance were already before the Court at the TRO hearing. AR at 7-11 (D&F); id. at 1-6 (facsimile of D&F to GAO). What remains of the administrative record does not support the purported basis of the override. AR at 12-19 and 764-67 (Tabs 3-5, 15).

Three administrative record documents reflect only the current and forecasted fire situation. The Fire Potential Outlook states that fire potential in the West for July is expected to be higher than normal, with the area facing potential fire activity increasing into August. AR at

12-17 (Tab 3). A letter from the Assistant Director of Wildland Fire Operations to the contracting officer for the subject solicitation states that several areas are expected to have a high risk of fire for the foreseeable future and requests that the contracting officer allow performance of the contracts awarded under the subject solicitation. AR at 18 (Tab 4). Neither document offers any support or explanation for why existing exclusive use contracts or CWN contracts would not be capable of fighting any forest fires that could develop during the pendency of Erickson's protest at GAO. See id. The National Incident Information Center Report, though not mentioned in the override determination, provides data on the fire activity in the United States and the resources committed to fighting them. AR at 764-67 (Tab 15). The Incident Report neither states nor suggests that the Forest Service is having difficulty meeting its needs for helicopter firefighting services. See id. While these documents all support the Chief's determination that there is a significant fire potential this summer, none of these documents support the conclusion that an override was necessary to respond to the expected fire activity or that alternative means for meeting the Forest Service's helicopter firefighting needs were infeasible.

Only the UTF Count Report included in the administrative record appears to be in any way related to the Chief's assertion that only the exclusive use contracts awarded under the subject solicitation could meet the Forest Service's firefighting needs. AR at 19. But the UTF report is not mentioned in the override determination and its meaning and substance are not explained in the administrative record. The UTF report apparently is a count of the number of requests for helicopters from the field that are pending at the National Interagency Coordination Center ("NICC"). Ex. 2 (Sec. Dec. of L. Allmaras ¶ 4). Importantly, the UTF report does not

distinguish between requests for exclusive use and CWN contract helicopters. Ex. 2 (Sec. Dec. of L. Allmaras ¶ 4). Also, the UTF report reflects only a snapshot in time. Ex. 2 (Sec. Dec. of L. Allmaras ¶ 5). Helicopters become available as they are released or reassigned and the NICC's database is not necessarily updated immediately to reflect demand and actual field conditions as orders are filled or cancelled. Ex. 2 (Sec. Dec. of L. Allmaras ¶ 5). Thus, the data contained in the UTF report is not probative of the current availability of CWN helicopters and therefore provides no support for the Chief's conclusion that the fleet of CWN helicopters had been depleted and an override was needed to guarantee helicopter availability to prevent the loss of life and property.

Nothing in the administrative record alters any of the facts presented to the Court at the TRO hearing. See generally TRO Hr'g Tr. 120:15-19. Indeed, not only does the administrative record not change the factual basis underlying the override, it further demonstrates that there was no reasonable basis for the Chief's determination. There is no meaningful evidence in the administrative record on which the Chief could determine that continued performance of the 18 exclusive use contracts awarded under the subject solicitation was necessary to provide the Forest Service with the helicopter firefighting services it required. The override determination was decided in an arbitrary and capricious manner and should be invalidated.

For all the reasons above, the Chief's decision to override the stay on the 18 CLINs Erickson has protested was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law. Erickson is therefore entitled to relief in the form of a declaration of the Court invalidating the override determination. See, e.g., Advanced Sys. Dev., 72 Fed. Cl. at 36-

37; see also CIGNA, 70 Fed. Cl. at 114; Chapman I, 62 Fed. Cl. at 468-69; Keeton 59 Fed. Cl. at 759.

### C. The Equities Favor This Court Issuing Injunctive Relief Sought

Although declaratory relief is more efficient and better matches the intent of CICA in preserving a stay, Erickson is also entitled to injunctive relief enjoining the defendant from continuing its override of the automatic stay.

#### 1. Erickson Succeeds On The Merits Because Defendant's Decision To Override The Automatic Stay Lacked A Rational Basis

As demonstrated herein and at the TRO hearing, the Chief made unreasonable and unsupported conclusions regarding the adverse consequences that would allegedly occur were the stay to remain in place, failed to objectively consider reasonable alternatives available to overriding the stay, and unreasonably determined that overriding the stay would be more advantageous than leaving it in place. By failing to reasonably consider the mandatory factors in overriding a stay, the Chief's decision lacked a rational basis and was contrary to the law.

#### 2. Absent Relief, Erickson Will Suffer Irreparable Harm

Absent an injunction, Erickson will suffer irreparable harm because it does not have an adequate remedy at law. The only other available relief – the potential for recovery of bid preparation and protest pursuit costs – would not compensate Erickson for its loss of valuable business under this contract. See Seattle Sec. Services, Inc. v. United States, 45 Fed. Cl. 560, 571 (2000). It is well-established that a lost opportunity to compete constitutes irreparable harm.

See, e.g., Reilly's Wholesale, 73 Fed. Cl. at 717; Overstreet Elec. Co., Inc. v. United States, 47 Fed. Cl. 728, 744 (2000); Seattle Sec. Services, Inc, 45 Fed. Cl. at 571; see also JWK Int'l Corp. v. United States, 49 Fed. Cl. 364, 369 (2001). Moreover, Congress enacted the automatic stay provisions of 31 U.S.C. § 3553(d) on the premise that failure of an agency to stay performance could result in a competitive disadvantage that might not be remedied, thereby causing a contractor to lose an important business opportunity. See Reilly's Wholesale, 73 Fed. Cl. at 717 (citing PGBA, 57 Fed. Cl. at 664; DTH Management Group v. Kelso, 844 F. Supp. 251, 254-55 (E.D.N.C. 1993)). As this Court has explained, "[CICA] gives presumptive weight to the otherwise required showing[] of irreparable harm . . . ." Advanced Sys. Dev., 72 Fed. Cl. at 36.

By overriding the stay the Forest Service will deny Erickson two opportunities to compete. The first is the opportunity to compete for the 18 CLINs that are the subject of Erickson's protest before the GAO. The solicitation called for performance of the helicopter firefighting services only during the 90 to 180 days fire season, which generally lasts from April to November, depending on location. GAO has 100 days to decide the protest. GAO's decision is not due until October 1, 2007. By that time nearly all of the work for 2007 will have been completed. If the override were to be sustained, then Erickson's eventual victory before GAO will be a hollow one. See Dairy Maid Dairy, Inc. v. United States, 837 F.Supp. 1370, 1381 (E.D. Va. 1993) (finding irreparable harm where, absent a permanent injunction, protestor would lose chance to perform short-term bridge contract while Army's award of that contract to another bidder was protested to GAO). An injunction is necessary to preserve the status quo and thereby ensure that Erickson can actually compete for the work being solicited.

The second opportunity to compete Erickson will lose if the stay remains in place is orders for helicopters under Erickson's CWN contract and/or its exclusive use contract if reinstated. The 18 exclusive use contracts that are the subject of Erickson's protest before the GAO obviate the Forest Service's need to order 18, if not more, helicopters under Erickson's exclusive use or CWN contracts. Ex. 2 (Sec. Dec. of L. Allmaras ¶ 10-11). First, by overriding the stay and allowing performance to continue on the 18 exclusive use contracts, the Forest Service is denying Erickson 18 opportunities to be offered a CWN order to provide helicopter firefighting services for one or more of the 18 home locations covered by their associated CLINs while Erickson's protest remains pending before GAO. Ex. 2 (Sec. Dec. of L. Allmaras ¶ 10). These 18 opportunities exist only during the protest period but will be lost forever if the Chief is permitted to continue to override the stay. Second, with the newly-awarded exclusive use contracts in place, the Forest Service has less reason to order CWN helicopters overall. For example, if an exclusive use helicopter becomes idle at its home location, the Forest Service will move that helicopter to another location to fight fire rather than order a CWN helicopter. Ex. 2 (Sec. Dec. of L. Allmaras ¶ 11). Moreover, by using clause C-33 of the new exclusive use contracts, the Forest Service can order additional exclusive use helicopters and forego ordering some additional CWN helicopters altogether. Ex. 2 (Sec. Dec. of L. Allmaras ¶ 11). The continued performance of the 18 exclusive use contracts therefore takes away not only opportunities for CWN work at the 18 home locations, but also opportunities for CWN work outside of those locations. While enjoining the Chief from continuing to override the stay will not guarantee that the Forest Service will order CWN services from Erickson, an injunction will guarantee that Erickson recovers its lost opportunities to compete for those orders.

### 3. Granting Injunctive Relief Is In The Public Interest

"[T]he public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid. . . . [T]he public's interest likewise lies in preserving the integrity of the competitive process--such, indeed, clearly was Congress' view in providing that, except in [certain] circumstances, the automatic stay should prevail." Reilly's Wholesale, 73 Fed. Cl. at 716 (internal quotes and citations omitted). CICA, therefore, "gives presumptive weight to the otherwise required showing[] of . . . public interest." Advanced Sys. Dev., 72 Fed. Cl. at 36. In the present case, the Forest Service unreasonably determined that Erickson's offer was technically unacceptable, as Erickson will demonstrate to GAO, where the merits of Erickson's protest will be adjudicated. Had the Forest Service evaluated Erickson's proposal in accordance with the stated evaluation criteria, Erickson would have been selected for one or more contract awards as having offered the best value to the government.

Under the present circumstances, it is in the public interest to prevent defendant from allowing contract performance to continue in order to ensure that the bid protest filed by Erickson at GAO is not rendered a nullity. By upholding the override, the Forest Service would learn that in the case of short-term contracts, it can be as unreasonable as it desires in competing those contracts and have its decisions be effectively unreviewable. "[T]he public at large [has] a long-term interest in ensuring that the new contract represents the best overall value to the government. Given the fact that there is no real indication that reinstituting the stay will impair services to a significant extent, . . . these long-term interests are paramount here and are best served by issuing the proposed injunction." Reilly's Wholesale, 73 Fed. Cl. at 716.

**4. The Balance Of The Hardships Tips Strongly In Erickson's Favor Because The Defendant Will Not Suffer Any Significant Harm**

Neither the defendant nor the public will suffer any real injury if the Court grants the injunctive relief plaintiff requests because the government has alternative contractual means available through which it can continue to receive the needed services. See Hospital Klean, 65 Fed. Cl. at 624. If this Court issues the requested injunction, the Forest Service can readily procure all necessary helicopter firefighting services by extending preexisting exclusive use contracts, ordering additional helicopters under them, and ordering helicopters under its existing CWN contracts. As the Court itself observed, the Forest Service's claim that only the awarded exclusive use contracts can provide a guaranteed availability of helicopters is "disingenuous." TRO Hr'g Tr. 120:20. For example, the Forest Service can place CWN orders for 18 heavy and medium helicopters, position them in the same locations listed in the subject solicitation, and not release them until GAO issues its decision in Erickson's protest. See Ex. 2 (Sec. Dec. of L. Allmaras ¶ 7). Indeed, the government conceded as much at the TRO hearing. See TRO Hr'g Tr. 115:5-16 (agreeing with the Court that the Forest Service can order helicopters and pre-position them in locations before the outbreak of a fire). Because the helicopter firefighting services that the Forest Service can and does receive under these existing contracts are the same that it will receive from the awardees, any impact on the Forest Service is de minimis.

In contrast, Erikson would suffer irreparable harm were the Court to deny injunctive relief. As the only party threatened with any real injury, the balance of the hardships necessarily tips in Erickson's favor and the Court should therefore issue the injunctive relief requested.

### D. Consolidation Of This Case With Superior Helicopter Would Be Inappropriate Because Consolidation Would Create A Conflict Of Interest For Erickson's Counsel

Ordinarily, consolidation is appropriate when two or more actions involve a common question of law or fact and unnecessary cost or delay will be avoided. See RCFC 42(a). Here, even though this case and Superior Helicopter share common questions of law and fact, consolidation would be inappropriate because it would create a conflict of interest for Erickson's counsel that does not currently exist. Under the bar of the District of Columbia's Rules of Professional Conduct Rule 1.7(a), an attorney is forbidden from representing a client when "representation of another client will be or is likely to be adversely affected by such representation." Id. Here, several of the successful offerors of the subject solicitation are clients of Erickson's counsel. The CLINs under which these other clients were awarded contracts are not the 18 CLINs that are the subject of Erickson's protest before GAO or its request for declaratory and injunctive relief from this Court. Thus, Erickson's proceedings before GAO and this Court have no bearing on the award and performance of the contracts for these other clients of Erickson's counsel and currently Erickson's counsel has no conflict of interest.[4]

In contrast, Superior's and Rainier's protests to GAO and their requests for injunctive relief in this Court involve 34 of the 35 CLINs of the subject solicitation, including the CLINs for which Erickson's counsel's other clients received contracts. Should this Court grant the injunctive relief Superior and Rainier request, Erickson's counsel's clients would no longer receive work under the exclusive use contracts and there is no guarantee that the Forest Service

[4]Counsel has notified these other clients of its pursuit of the protest on behalf of Erickson and none have objected to the current scope of the representation.

would order CWN helicopter firefighting services from them during the stay. Therefore, consolidation would create a conflict of interest for Erickson's counsel that does not exist currently. Consolidation could force Erickson's counsel to have to withdraw from this case to avoid the appearance of advocating against the interests of its other clients. Delay would ensue if Erickson were required to obtain new counsel, eliminating any efficiency gained from consolidation. Under these circumstances, both efficiency and the interests of justice would be better served by not consolidating this case with that of Superior Helicopter.

## III. Conclusion

For the foregoing reasons, Erickson respectfully requests that the Court declare the Chief's decision to override the automatic stay of the 18 CLINs in RFP No. AG-024B-S-07-0008 that are the subject of Erickson's protest before the GAO arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law. Erickson further requests that the Court enjoin defendant's override of the automatic stay.

Respectfully submitted,

s/Alan I. Saltman
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiff

OF COUNSEL:
Ruth G. Tiger
Eric J. Pohlner
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Dated: July 26, 2007