# In the United States Court of Federal Claims

Nos. 07-518C & 07-519C

(Filed: August 30, 2007)

| | |
|---|---|
| **SUPERIOR HELICOPTER LLC and RANIER HELI-LIFT, INC.,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**UNITED STATES,**<br><br>**Defendant.**<br><br>**ERICKSON AIR-CRANE, INC.,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**UNITED STATES,**<br><br>**Defendant.** | Override determination by Forest Service of stay arising with post-award bid protests; 31 U.S.C. §3553(d)(3)(C); helicopter firefighting services; "exclusive use" contracts; "call when needed" contracts; motions for judgment on the administrative record; trial on equitable issues; declaratory relief |

Gilbert J. Ginsburg, Washington, D.C., for plaintiffs Superior Helicopter LLC and Ranier Heli-Lift, Inc. With him on the briefs and at trial were Timothy Sullivan and Katherine S. Nucci, Thompson Coburn LLP, Washington, D.C.

Ruth G. Tiger, Saltman & Stevens, P.C., Washington, D.C., for plaintiff Erickson Air-crane, Inc. With her on the briefs and at trial were Alan I. Saltman and Eric J. Pohlner, Saltman & Stevens, P.C., Washington, D.C.

John J. Todor, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Peter D. Keisler, Assistant Attorney General, Civil Division, Jeanne E. Davidson, Director, and Franklin E. White, Jr., Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. Of counsel were Elin M. Dugan and Benjamin Young, Office of General Counsel, United States Department of Agriculture.

**OPINION AND ORDER**

LETTOW, Judge.

These bid-protests involve a solicitation issued by the Forest Service (the "Service"), a component of the United States Department of Agriculture, for exclusive-use contracts for helicopter services to support firefighting efforts. Three unsuccessful bidders for awards – Superior Helicopter LLC ("Superior"), Ranier Heli-Lift, Inc. ("Ranier"), and Erickson Air-Crane, Inc. ("Erickson") – filed bid protests with the Government Accountability Office ("GAO"), triggering an automatic stay under the Competition in Contracting Act, 31 U.S.C. §§ 3551-56, of the contracts awarded in the procurement. After the Forest Service acted on July 9, 2007 under 31 U.S.C. § 3553(d)(3)(C) to override the stay based on findings of exigent circumstances and the best interests of the government, the three helicopter operators filed suit in this court on July 11, 2007, seeking a temporary restraining order, a declaratory judgment, and preliminary and permanent injunctive relief from the Forest Service's decision to override the stay.

The following day, on July 12, 2007, the court held a hearing on plaintiffs' applications for a temporary restraining order, denying plaintiffs' applications for such an order without prejudice to the consideration of injunctive relief on the merits.[1] On July 13, 2007, the court adopted an expedited schedule for filing the administrative record in accord with Rule 52.1 of the Rules of the Court of Federal Claims ("RCFC") and for subsequent submission of cross-motions for judgment on the administrative record. The government filed the administrative record on July 18, 2007. On August 8, 2007, the court heard argument on cross-motions for judgment on the administrative record and held a trial on equitable issues.[2] On August 10, 2007, the

---

[1]To accelerate future proceedings, the court acted under Rule 65(a)(2) of the Rules of the Court of Federal Claims to consolidate plaintiffs' motions for preliminary injunction with the hearing and resolution of the case on the merits.

In addition, at the request of the parties, the court did not consolidate the case brought by Superior and Ranier (No. 07-518C) with that brought by Erickson (No. 07-519C), but rather issued a common schedule for proceedings in the two cases.

[2]"AR __" refers to the administrative record filed with the court in accord with RCFC 52.1(a). "Hr'g Tr.__" refers to the transcript of the hearing on plaintiffs' applications for a temporary restraining order, held July 12, 2007. "Tr. __" refers to the transcript of the trial on equitable issues, held August 8, 2007. "DX __" refers to exhibits submitted by defendant.

government and Erickson each filed notices supplementing the record with information about the Forest Service's currently effective call-when-needed ("CWN") contracts for helicopter services to fight fires. On August 20, 2007, the government filed a motion further to supplement the administrative record with the CWN contracts of Superior, Ranier, and Erickson, as well as an explanatory declaration from Mr. Ronald Hooper, Director of Acquisition Management for the Service. That motion was granted on August 22, 2007.[3] The cases are now ready for disposition.

**FACTS**

On April 6, 2007, the Forest Service's National Interagency Fire Center ("Fire Center" or "NIFC")[4] issued Solicitation No. AG-024B-S-07-0008, which sought the services of up to 35 medium ("Type II") or heavy ("Type I") helicopters for firefighting duty. AR 368, (Solicitation,

---

[3]Superior, Ranier, and Erickson each currently have CWN contracts with the Forest Service. *See* Contract No. AG-024B-C-05-9007 (Apr. 26, 2005) (Erickson's CWN Contract); Superior and Ranier Mem. of Points and Authorities in Support of Application for a Temporary Restraining Order and Mot. for a Prelim. Inj. ("Superior and Ranier TRO Mem.") at 6. Although the merits of the Forest Service's decision to reject plaintiffs' proposals are not before the court at this stage of the proceedings, the court notes the seeming inconsistency between the Forest Service's decision, on the one hand, to reject plaintiffs' exclusive-use contractual proposals on technical grounds and, on the other hand, to permit plaintiffs to continue to provide helicopters to the Service under CWN contracts that contain comparable technical criteria.

During the hearing and trial, the court requested that the government supplement the administrative record with a representative CWN contract and granted plaintiffs leave to respond to the government's submission if they believed the contract submitted to the court was not representative. Tr. 349:4 to 350:22; *see also infra*, at 14 (comparing exclusive-use and CWN contracts). In response, the government filed a solicitation for CWN contracts issued in early 2005, Def.'s Notice of Filing of Suppl. to the Administrative Record (Solicitation No. RFP 49-05-08 (Feb. 28, 2005)) ("CWN Solicitation"), for contracts to be effective for three years, *i.e.*, 2005, 2006, and 2007. Erickson responded by filing what it identified as its CWN contract signed with the Forest Service in April 2005. Erickson Notice of Filing Regarding Def.'s Suppl. to the Administrative Record ("CWN Contract") at 1-2, Attach. 2 (Standard Form 1449, Contract No. AG-024B-C-05-9007 (Apr. 26, 2005)). Although Erickson's filing included the signed contract (*i.e.*, a signed Standard Form 1449), it was incomplete because among other things, Section B of the solicitation (incorporated into the contract) was not included. The government's further supplementation of the administrative record on August 20, 2007 provided the pertinent complete CWN contracts for each of the three plaintiffs.

[4]The Fire Center, located in Boise, Idaho, is "the nation's support center for wildland firefighting." About NIFC - Mission and History, http://www.nifc.gov/about_nifc/mission_history.htm (last visited Aug. 27, 2007).

Standard Form 1449 § B (Apr. 6, 2007)).[5] The solicitation included 35 separate contract line items ("CLIN"), each of which specified a base for a helicopter and a national forest where the helicopter would or could provide firefighting services. *See, e.g.*, AR 572, 646 (Amendment NIFC-02 § B-1 (Apr. 26, 2007)) ("Am. Solicitation"). The helicopters were to be made available for the exclusive use of the government beginning on a date specified in the solicitation. AR 652, 682 (Am. Solicitation §§ C-1.C, C-25.B).[6] Such exclusive-use contracts serve purposes comparable to CWN contracts, under which the Forest Service places orders for helicopter services on a case-by-case basis but helicopter operators are not obligated to accept such orders. AR 9, ¶ 10 (Forest Service's Findings to Override the Automatic Stay and Continue Working After Award in the Face of a Protest (July 9, 2007)) ("Override Findings").

The Forest Service amended the solicitation three times, issuing a revised version of the entire solicitation and ultimately extending the due date for submission of proposals to May 10, 2007. AR 552 (Amendment NIFC-01 (Apr. 20, 2007)), 561 (Am. Solicitation), 760 (Amendment NIFC-03 (May 1, 2007)). Superior, Ranier, and Erickson submitted timely proposals. AR 321 (Letter from Gilbert J. Ginsburg, Superior's Counsel, to Anthony Gamboa, General Counsel, GAO (June 29, 2007)) ("Superior GAO Protest"), 345 (Letter from Ginsburg, Ranier's Counsel, to Gamboa (June 29, 2007)) ("Ranier GAO Protest"); Erickson Compl. ¶ 6. Superior submitted proposals for 34 of the 35 CLINs, relying upon three K1200 K-MAX Type I heavy helicopters; Ranier bid on 34 CLINs, based upon one K1200 K-MAX; and Erickson submitted proposals for 19 CLINs, relying upon four S-64E Type I heavy helicopters. AR 321 (Superior GAO Protest), 345 (Ranier GAO Protest); Erickson Compl. ¶ 6; Hr'g Tr. 80:7-14, 81:2-7 (Test. of Andrew Mills, Superior's Director of Aviation Operations); Erickson's Mem. of Law in Support of its Mot. for Prelim. Inj. and Requests for Declaratory Judgment and

---

[5]The solicitation referred generally to the helicopter services being procured for "the administration and protection of Public Lands," AR 652 (Solicitation § C-1.A), but the key role of the Fire Center and certain requirements of the solicitation indicate that the solicitation was aimed at procuring helicopters for firefighting. *See*, *e.g.*, AR 7, ¶ 1 (Forest Service's Findings to Override the Automatic Stay and Continue Working After Award in the Face of a Protest (July 9, 2007)), 570-651, 653 (Solicitation, Standard Form 1449, §§ B, B-11, C-2.B.4.c).

Type I helicopters have 15 or more passenger seats or a capacity to carry 5,000 pounds of payload and 700 gallons of retardant. Type II helicopters have between 9 and 14 passenger seats or a capacity to carry 2,500 to 4,999 pounds of payload and 300 to 699 gallons of retardant. AR 694 (Solicitation § C-43).

[6]The contracts were to extend from the date of the award through March 31, 2008, with two one-year options that could be exercised at the government's discretion. AR 681 (Am. Solicitation § C-24). The 35 helicopters were to be made available to the government for varying durations, depending on the location to which the helicopter was assigned. *See*, *e.g.*, AR 575, 581 (Am. Solicitation § B-1). The so-called "Mandatory Availability Periods" ranged from 45 to 154 days for the initial contract period and from 30 to 180 days for the option years. *See* AR 575, 581, 589, 605 (Am. Solicitation § B-1).

Permanent Inj. Relief ("Erickson Mot.") at 1 n.1.[7]

On June 13, 2007, the Forest Service notified successful offerors that it would proceed with awards. AR 7, ¶ 2 (Override Findings). Eighteen offerors were awarded contracts for 35 helicopters. *Id*. On June 13 and 14, 2007, the Service notified the unsuccessful bidders, including Superior, Ranier, and Erickson. *Id*. On June 22, 2007, Erickson filed a bid protest with GAO, averring that the alleged technical deficiencies of its proposal either were not in fact deficiencies or were minor discrepancies that the Forest Service should have allowed Erickson to correct or that the Service could have resolved using information already in its possession. AR 87-88, 90, 92-94 (Letter from Alan I. Saltman, Erickson's Counsel, to General Counsel, GAO (June 22, 2007)) ("Erickson GAO Protest").[8] GAO's decision on that protest is due October 1, 2007. Def.'s Mot. for Judgment on the Administrative Record and Opp'n to Pls.' Mot. ("Def.'s Mot.") at 7.

On June 29, 2007, Superior and Ranier filed bid protests with GAO. AR 316 (Superior GAO Protest), 341 (Ranier GAO Protest). Superior claimed that the Forest Service's two reasons for rejecting Superior's bids – that Superior failed to use a flight-manual supplement to calculate the hover-out-of-ground effect ("HOGE") payload of its helicopters and that Superior submitted an equipment list that did not conform with the solicitation – were unreasonable and did not comply with the terms of the solicitation. AR 334, 336 (Superior GAO Protest). Ranier, whose proposal the Forest Service also rejected for failure to use the flight-manual supplement to calculate the HOGE payload of its helicopters, objected on similar grounds.[9] AR 357 (Ranier

---

[7]The S-64E, known as the Erickson Air-crane, is identical to the S-64, a helicopter originally manufactured by Sikorsky Aircraft and known as the Skycrane. Erickson purchased the type certificate from Sikorsky and simply changed the alpha-numeric designator of the helicopter. The S-64 and S-64E are the civilian versions of the U.S. Army's CH-54 helicopter. Hr'g Tr. 81:2 to 82:20 (July 12, 2007) (Test. of Mills); Erickson Mot. at 1 n.1.

[8]The Forest Service rejected Erickson's proposal because (1) the date of certain helicopters' equipment lists did not coincide with the date of the weight and balance data, (2) the weight and balance information for some helicopters was not determined by weighing the aircraft within 24 months of the starting date of the contract, and (3) the proposal made a particular load calculation using 6.7 pounds/gallon, rather than 7 pounds/gallon. AR 99 (Letter from Frank Gomez, Contracting Officer, Forest Service, to Lannis Allmaras, Erickson (June 13, 2007)), 85 (Erickson GAO Protest).

[9]According to Superior and Ranier, in 2004 the Forest Service raised concerns with operators of Type I K-MAX helicopters that the routine method of calculating HOGE payload for the helicopters – using the performance charts in the manufacturer's standard flight manual – did not reflect the baselines for minimum engine specifications. AR 328 (Superior GAO Protest), 351-52 (Ranier GAO Protest). To satisfy Forest Service concerns, K-MAX operators paid the helicopter's manufacturer, Kaman Aerospace, to develop a flight-manual supplement, which the Forest Service allegedly accepted as proof that the K-MAX helicopters met the minimum

GAO Protest). GAO's decision on Superior's and Ranier's protests is due October 9, 2007. Def.'s Mot. at 7.

Following Erickson's protest, filed on June 22, 2007, an automatic stay of the awards went into effect. *See* 31 U.S.C. § 3553(c)(1), (d)(3)(A); AR 8, ¶ 6 (Override Findings). On July 9, 2007, acting on behalf of Abigail Kimbell, Chief of the Forest Service, Hank Kashdan, the Service's Deputy Chief for Business Operations, acted under 31 U.S.C. § 3553(d)(3)(C) to override the stay. AR 7-11 (Override Findings); Tr. 281:23-25 (Test. of Ronald Hooper, Director of Acquisition Management, Forest Service) (identifying Kashdan's position). The Service's written findings justifying the override of the automatic stay noted that the helicopters whose services the solicitation sought were "critical aviation resources needed for support of national fire suppression efforts" and cited the "[s]ignificant fire potential" expected during 2007. AR 8-9, ¶¶ 8, 11 (Override Findings). Moreover, the Service concluded that the alternatives to overriding the stay were not in the "best interest of the United States." AR 9, ¶ 12 (Override Findings).

Specifically, the Forest Service's findings stated that there were only four Type I helicopters currently under exclusive-use contracts, and those contracts were set to be terminated upon the award of contracts under the 2007 solicitation. AR 9, ¶ 12(a) (Override Findings). Extending those contracts was not a reasonable alternative, the Service concluded, because four Type I helicopters were "insufficient" to handle the anticipated activity of the 2007 fire season. *Id.*; Superior Compl., Mills First Decl. ¶ 13(a) (noting that the findings' reference to "4 heavy lift helicopters currently under contract" was restricted to exclusive-use contracts). The Service also indicated that although 24 Type II helicopters were then under exclusive-use contracts, those helicopters were "unavailable for use in the *national* fleet, because they are budgeted for and managed by the regions (as opposed to nationally) and they are reserved for use in local initial attacks [on forest fires]." AR 10, ¶ 12(a) (Override Findings). The findings also rejected the

---

threshold criteria. *See* AR 329-30 (Superior GAO Protest), 352-53 (Ranier GAO Protest). Superior and Ranier claim that they were among a group of K-MAX operators that reached an agreement in March 2005 with the Forest Service under which the Service permitted the operators to use the standard flight manual's performance charts in exchange for a letter from the operators certifying that all of their helicopters met a certain minimum performance threshold. AR 330-31 (Superior GAO Protest), 353-54 (Ranier GAO Protest). Since March 2005, Superior and Ranier assert, K-MAX operators have used the standard flight manual's performance charts. AR 331 (Superior GAO Protest), 354 (Ranier GAO Protest). Previously in 2005, both operators bid for exclusive-use contracts using the standard charts, and their proposals were not rejected as technically deficient. AR 332-33 (Superior GAO Protest), 355-56 (Ranier GAO Protest). Moreover, the two operators aver that the solicitation did not direct offerors to use the flight-manual supplement, AR 333 (Superior GAO Protest), 357 (Ranier GAO Protest), and that, in any event, using the charts in either the supplement or the standard flight manual would have resulted in the same load calculations. AR 334 (Superior GAO Protest), 357 (Ranier GAO Protest); *see also* Superior and Ranier Compl. ("Superior Compl."), Affidavit of Andrew Mills ("Mills First Decl.") ¶¶ 5-6; Hr'g Tr. 34:25 to 36:12.

alternative of using CWN contracts instead of the planned exclusive-use contracts because

> [t]he contingent of helicopters under current CWN contracts has been depleted, with vendors committing to work in the private sector . . . . In addition, these helicopters when ordered are funded by and directly support a single incident, and cannot be easily moved to different assignments as they are under the control of the incident commander for specific needs of that incident, and generally not available to meet a strategic objective supporting more than one incident.

AR 10, ¶ 12(b) (Override Findings).[10] Further, the Service concluded that a risk of not overriding the stay – the inability of the Service to guarantee that a sufficient number of helicopters under CWN contracts would be available for service at a moment's notice – outweighed the risk that plaintiffs' protests would be sustained. AR 11, ¶¶ 13-14 (Override Findings).

Following the Forest Service's override determination, it issued notices to proceed to the awardees on July 10, 2007. AR 20-79 (Various notices to proceed (July 10, 2007)). On July 11, 2007, the three plaintiffs filed suit in this court requesting that the court set aside and enjoin the override of the automatic stay.[11]

**STANDARDS FOR DECISION**

This court has subject-matter jurisdiction under 28 U.S.C. § 1491(b)(1) to review the Forest Service's override of the automatic stay. That statute confers jurisdiction on this court over "an action by an interested party objecting to . . . any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). An "alleged violation of statute" includes an override determination by a federal agency that does not accord with law. *See RAMCOR Servs. Group, Inc. v. United States*, 185 F.3d 1286, 1288-89 (Fed. Cir. 1999); *see also OTI America, Inc. v. United States*, 68 Fed. Cl. 108, 113 (2005) (addressing other circumstances in which the so-called "third category" of the

---

[10]The Forest Service's findings also rejected two other alternatives: interim contracts and the use of fixed-wing aircraft. AR 10, ¶ 12(c), (d) (Override Findings). The Service explained that awarding a new set of interim contracts would have the same effect as an override. Because the Service had granted awards to all bidders whose proposals were deemed "acceptable," any contracts awarded on an interim basis during the GAO protest would simply be given to the same awardees. *Id*. As to the use of fixed-wing aircraft, the Service explained that helicopters' greater accuracy in water and retardant drops, as well as their ability to land at a variety of locations and deliver equipment directly to firefighters, made them preferable to fixed-wing assets. *Id*.

[11]Superior and Ranier assert that, but for the Forest Service's allegedly erroneous rejection of their proposals, Superior would have been awarded at least two contracts, and Ranier one. Superior and Ranier TRO Mem. at 2. Erickson argues that it should have been awarded four of the 35 CLINs. Erickson Compl. ¶ 15(a)-(b).

court's bid-protest jurisdiction comes into play; challenges to pre-award and post-award procurement actions by federal agencies constitute the first two categories). Superior, Ranier, and Erickson, as unsuccessful bidders, qualify as "interested parties." *See Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1352 (Fed. Cir. 2004) (the term "interested party" in 28 U.S.C. § 1491(b) has the same meaning as that term is given in 31 U.S.C. § 3551 and thus includes "actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract") (quoting *American Fed'n of Gov't Employees v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001)); *see also* 31 U.S.C. § 3551(2)(A).

Judicial review in this override case is governed by a provision of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. *See* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."). The pertinent standard requires a court to determine whether an agency's decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). *See Alion Sci. and Tech. Corp. v. United States*, 69 Fed. Cl. 14, 22-24 (2005) (discussing applicability of 5 U.S.C. § 706(2)(A) to review of agency's override decision); *Spherix, Inc. v. United States*, 62 Fed. Cl. 497, 503 (2004) (same). The court's review under the APA is limited to an evaluation of whether the agency's "decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated in part by Califano v. Sanders*, 430 U.S. 99, 105 (1977) (abrogating *Overton Park* to the extent it recognized the APA as an independent grant of subject matter jurisdiction). In conducting a review under these standards, the court may not "substitute its judgment for that of the agency," *Keeton Corrs., Inc. v. United States*, 59 Fed. Cl. 753, 755 (2004) (quoting *Overton Park*, 401 U.S. at 416), and may overturn an agency's decision only if "the procurement official's decision lacked a rational basis; or . . . the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (citing *Kentron Haw., Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)).

If a protestor succeeds in making these showings, the court "may award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs." 28 U.S.C. § 1491(b)(2). The decision whether injunctive relief should issue is governed by traditional factors, *viz.*, "(1) whether . . . the plaintiff [protestor] has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief." *PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004) (citing *Amoco Prod. Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 546 n.12 (1987)).

## ANALYSIS

### A. The Forest Service's Override of the Automatic Stay

Plaintiffs argue that the Forest Service's decision to override the automatic stay lacked a rational basis and was contrary to law. Erickson Mot. at 6; Superior's and Ranier's Compl. ¶ 18.[12] Erickson avers that the Forest Service failed to consider objectively reasonable alternatives to overriding the stay, did not conduct a meaningful cost-benefit analysis, and did not account for the impact of the override determination on the integrity of the procurement process. Erickson Mot. at 8. Similarly, Superior and Ranier assert that the Forest Service's findings "manipulated certain critical data and conveniently ignored other important facts." Corrected Initial Br. of Pls. Superior and Ranier ("Superior Mot.") at 2.[13] The government contends that the Forest Service reasonably concluded that the benefits of the override outweighed the costs of maintaining the status quo and particularly that the existing CWN contracts were not reasonable alternatives to the exclusive-use contracts awarded as a result of the solicitation. Def.'s Mot. at 13, 16.[14]

---

[12]Delegation of power to make the override was a nascent issue in this case. Section 3553(e) of Title 31 provides that "[t]he authority of the head of the procuring activity to make findings and to authorize the award and performance of contracts under subsections (c) and (d) of this section may not be delegated." Acting under Subsection (d) of Section 3553, Hank Kashdan, the Service's Deputy Chief for Business Operations, authorized and signed the override determination on behalf of Abigail Kimbell, Chief of the Forest Service. AR 11 (Override Findings); Tr. 281:23-25 (Test. of Hooper). At the initial hearing on plaintiffs' application for a temporary restraining order, counsel for Superior and Ranier alluded to the fact that Mr. Kashdan's signing of the override might constitute an improper delegation, Hr'g Tr. 20:15 to 21:18, but in their motions for judgment on the administrative record, Superior, Ranier, and Erickson did not challenge the Service's override on the basis of an improper delegation in contravention of 31 U.S.C. § 3553(e).

[13]The court treats the motions by Erickson and Superior and Ranier as motions for judgment on the administrative record under RCFC 52.1(b), coupled with requests for declaratory or injunctive relief.

[14]On August 6, 2007, Erickson filed a motion to supplement the administrative record with (1) the transcripts of the two hearings that the court held in this case and (2) two declarations made by Mr. Lannis Allmaras that were attached to Erickson's motion for judgment on the administrative record. On August 7, 2007, Superior and Ranier filed a joint motion to supplement the administrative record with (1) the transcript of the hearing on plaintiffs' applications for a temporary restraining order and (2) two affidavits each from Messrs. Andrew Mills and Richard Larew – the first set attached to plaintiffs' motion for a temporary restraining order, and the second attached to plaintiffs' reply brief on the merits.

Erickson's motion and the joint motion of Superior and Ranier to supplement the administrative record are GRANTED IN PART and DENIED IN PART. The motions are

Under the Competition in Contracting Act, an automatic stay of a federal procurement goes into effect if an unsuccessful bidder files a bid protest with GAO either within ten days after a contract award is made or within five days of an agency debriefing to the bidder, whichever is later. 31 U.S.C. § 3553(d)(3)(A), (d)(4). During the stay, "the contracting officer may not authorize performance of the contract to begin while the protest is pending." 31 U.S.C. § 3553(d)(3)(A)(I). Nonetheless, the agency may override the automatic stay under certain conditions:

> The head of the procuring activity may authorize the performance of the contract (notwithstanding a protest of which the Federal agency has notice under this section) –
>
> (i) upon a written finding that –
>
> (I) performance of the contract is in the *best interests* of the United States; *or*
>
> (II) *urgent and compelling circumstances* that significantly affect interests of the United States will not permit waiting for the decision of the Comptroller General concerning the protest; and
>
> (ii) after the Comptroller General is notified of that finding.

31 U.S.C. § 3553(d)(3)(C) (emphasis added).[15]

---

granted insofar as the transcripts of the two hearings and the declarations of Messrs. Allmaras, Mills, and Larew are incorporated into the record of this case, but not the administrative record, because the transcripts and the declarations relate to an issue (the propriety of injunctive relief) respecting which the pertinent evidentiary record was developed before the court, not the agency. *See* RCFC 52.1, Rules Committee Note, 2006 Adoption ("Cases filed in this court frequently turn only in part on action taken by an administrative agency. In such cases, the administrative record may provide a factual and procedural predicate for a portion of the court's decision, while other elements might be derived from a trial, an evidentiary hearing, or summary judgment or other judicial proceedings."); *see also Geo-Seis Helicopters, Inc. v. United States*, __ Fed. Cl. __, __ n.4, 2007 WL 2206855 at *1 n.4 (July 13, 2007); *PGBA, LLC v. United States*, 60 Fed. Cl. 567 (2004), *aff'd*, 389 F.3d 1219 (Fed. Cir. 2004). Plaintiffs' motions are denied to the extent that they request that the administrative record, which is developed before the agency, be supplemented by the transcripts and declarations. The transcripts and declarations were not before the Forest Service as it made its determination to override the automatic stay, and consequently, the administrative record may not properly be supplemented with them. *See Geo-Seis Helicopters*, __ Fed. Cl. at __ n.4, 2007 WL 2206855, at *1 n.4; *PGBA*, 60 Fed. Cl. at 567.

[15]In a pre-award protest, an automatic stay may be overridden by the procuring agency "upon a written finding that urgent and compelling circumstances which significantly affect interests of the United States will not permit waiting for the decision of the Comptroller General under this subchapter." 31 U.S.C. § 3553(c)(2)(A).

In determining whether an agency's override decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), courts have looked to the agency's consideration of various factors, including: (1) whether significant adverse consequences would occur if the agency did not override the stay, (2) whether reasonable alternatives to the override were available, (3) how the benefits of overriding the stay compared to the potential cost of the override, including the costs associated with the potential that the protestor might prevail before GAO, and (4) the impact of the override on the competition and integrity of the procurement system. *Reilly's Wholesale Produce v. United States*, 73 Fed. Cl. 705, 711 (2006), *appeal docketed*, No. 07-5114 (May 16, 2007); *see also Advanced Sys. Dev., Inc. v. United States*, 72 Fed. Cl. 25, 32 (2006) ("Nor does the override determination compare the perceived disadvantages of recognizing the stay to the potential disadvantages that might result if [the plaintiff] prevails in its protest."); *CIGNA Gov't Servs., LLC v. United States*, 70 Fed. Cl. 100, 111 (2006) ("Because the schedule clearly has two years of flexibility, [the agency's] refusal to avail itself of that flexibility to abide by a 70-day statutory stay is arbitrary and capricious."); *Alion Science*, 69 Fed. Cl. at 27 (court must determine whether agency "had a rational basis for determining that *only* [the awardee] could provide the necessary services") (emphasis added).[16] Moreover, the government's decision to override the stay may not be based simply on its view that the new contract is better than the old one or that the agency simply prefers to override the stay rather than await GAO's decision. *Reilly's Wholesale*, 73 Fed. Cl. at 711 (irrelevant that the new contract would be better than the old one); *Advanced Sys. Dev.*, 72 Fed. Cl. at 31 ("The allegation that the new contract is better than the old one in terms of cost or performance is not enough to justify a best interests determination.").

1. *Adverse consequences.*

The Forest Service most directly addressed the possible adverse consequences resulting from a failure to issue an override by stressing the threat posed by the 2007 fire season. Noting the important role helicopter services play in "support[ing] national fire suppression efforts," the Forest Service emphasized the significant potential for an active fire season in 2007 and referred to the need to prevent "loss of life and property." AR 8-9, 11, ¶¶ 8, 11, 13, 15 (Override Findings). In a letter to the contracting officer in support of the override, Karyn L. Wood, Assistant Director of Wildland Fire Operations at the NIFC pointed to an "[o]n-going drought and high temperatures" in key areas of the country and the "high risk" presented by the 2007 fire

[16]The precedents addressing these considerations deal equally with override determinations made on both "best interests" and "urgent and compelling circumstances" bases. *See Reilly's Wholesale*, 73 Fed. Cl. at 711 n.10 ("[T]he rationale employed in ['best-interests'] cases has, where indicated, application to the review of an override decision based upon urgent and compelling circumstances."); *Advanced Sys. Dev.*, 72 Fed. Cl. at 31 ("*Spherix* advocated a lesser showing for 'best interests' determinations than for 'urgent and compelling circumstances' – an approach with which we disagree."). *But see Spherix, Inc. v. United States*, 62 Fed. Cl. 497, 505 (2004) ("Failing the ability to show that urgent and compelling circumstances justify the override, the agency head can elect to make the unremarkable determination that contract performance is in the best interests of the United States.").

season. AR 18 (Mem. from Karyn L. Wood, Assistant Director of Wildland Fire Operations, NIFC, to Frank Gomez, Contracting Officer, Forest Service (June 22, 2007)). She warned of the "grave consequences to [NIFC's] capability to safely and effectively manage wildland fires" of not overriding the stay. *Id*. A report prepared by the National Incident Information Center ("NIIC") shortly thereafter, dated July 5, 2007, indicates that the NIIC was at Preparedness Level 2 on that date – with Level 5 being the highest level – and provided a summary of fires nationwide. AR 764-67 (National Incident Information Center Report (July 5, 2007)) ("NIIC Report"); DX 3 at 2 (NIFC, Fire Information – National Fire News National Preparedness Levels (Aug. 8, 2007)) (explaining the preparedness levels).[17]

The information concerning the severity of the 2007 fire season and the various fires burning in early July 2007, however, provides no explanation of why only exclusive-use contracts could grapple effectively with these challenges. Similarly, Ms. Wood's warning of the "grave consequences" of not overriding the stay was not accompanied by any indication of why only through employing exclusive-use contracts could the Service avoid those consequences. *See* AR 18 (Mem. from Wood to Gomez (June 22, 2007)).

2. *Reasonable alternatives.*

In considering the reasonable alternatives available, the Forest Service stated that the override was necessary to "protect the public interest by ensuring the *guaranteed availability of helicopter resources at the national level* in suppression of wildfires, in the height of the wildfire season." AR 11, ¶ 15 (Override Findings) (emphasis added). Embedded in that statement was the fundamental rationale for the Service's override – that CWN contracts were not as effective as exclusive-use contracts in providing guaranteed, nationally-directed helicopter support. First, the findings stated that CWN contracts could not guarantee the availability of a sufficient number of helicopters to fight fires because the supply of helicopters under those contracts "ha[d] been depleted, with vendors committing to work in the private sector" and because helicopter operators with CWN contracts were not legally obligated to accept resource orders placed by the Service for firefighting services. *See* AR 9, 10, ¶¶ 10, 12(b) (Override Findings).[18] Second, the findings asserted that CWN contracts limited the Service's flexibility because helicopters under those contracts were not national assets, but rather were "under the control of the [fire] incident commander for specific needs of that incident, and generally not available to meet a strategic objective supporting more than one incident." *See* AR 10, ¶ 12(b) (Override Findings).

---

[17]The NIIC, based in Washington, D.C., gathers information on fires and other natural disasters nationwide and disseminates that information, primarily through a publication called the Morning Report. National Incident Information Center – About Us, http://www.fs.fed.us/news/fire/about.shtml (last visited Aug. 28, 2007).

[18]The orders for service that the government places to helicopter operators holding CWN contracts are commonly called resource orders. *See*, *e.g.*, Hr'g Tr. 96:20 to 97:13 (Test. of Mills).

The Forest Service's rationale in this regard is not supported by the administrative record. First, the record contains no data to support the broad assertion that helicopter operators under CWN contracts had been "depleted" because they had opted for work in the private sector. Importantly, the Forest Service had conducted fire-suppression operations successfully during prior fire seasons, including the difficult season in 2006, primarily relying on CWN-supplied helicopters to provide needed services. Over 240 helicopters were under CWN contracts in 2006, AR 10, ¶ 12(b) (Override Findings), over 150 of which might be employed on any given day, but the Forest Service provided no data on the numbers of CWN helicopters available under CWN contracts in 2007.[19] The administrative record does include an "[Unable to Fill] Count Report," dated July 9, 2007, apparently indicating that on that date, the Service was unable to fill the resource orders of fifteen Type I helicopters and sixteen Type II helicopters. AR 19 (UTF Count Report (July 9, 2007)) ("UTF Report"); Tr. 60:18 to 62:17 (Test. of Mills) (explaining that "UTF" is an abbreviation for "Unable to Fill"). Standing alone, however, that report means little. The UTF report did not indicate how long the orders had gone unfilled nor did it indicate the comparative numbers of CWN helicopters that then were listed by their operators as "available" but which were not "called up." In addition, July is relatively early in the firefighting season, and holders of CWN contracts reportedly made more helicopters available later in the season when the need was greater.[20]

Second, although the Forest Service was correct in asserting that CWN contracts do not obligate helicopter operators to accept the resource orders placed by the government, CWN Solicitation at 28, § C-27.B ("[T]he Contractor is not obligated to accept any orders."), the Service did not explain how that fact would *preclude* it from obtaining a sufficient number of Type I and Type II helicopters during the 2007 fire season. The Service also attempted to support its findings by emphasizing that in July 2006 only 40 percent of the 241 helicopters under CWN contracts (96 helicopters) were then available for firefighting use. *See* AR 10,

---

[19]The administrative record does not indicate the number of helicopters under CWN contracts in 2007. The Forest Service has that information available to it internally through the Service's Resource Ordering Status System ("ROSS"), Tr. 258:3-7 (Test. of Hooper), but the ROSS data were not included in the administrative record. Until recently, the Forest Service had made that information publicly available. *See* Tr. 175:3-9 (Test. of Allmaras), 257:8 to 258:19 (Test. of Hooper).

[20]Statistics supplied to the court by the Forest Service indicate that in a typical year the months of August and September pose more severe fire hazards than June and July. DX 4 (National Preparedness Levels Past 10 Years (most active months) (Aug. 8, 2007)). Historically, to meet this later-emerging demand, helicopter operators shifted equipment from other jobs to fire-suppression work. *See* Hr'g Tr. 99:18-23 (Test. of Mills), Tr. 191:18 to 193:1 (Test. of Allmaras). In this respect, the Service did not provide any of the pertinent ROSS reports to the court.

¶ 12(b) (Override Findings).[21] But those data provide no indication of the availability of Type I and Type II helicopters later in 2006, when the need for fire-suppression work grew more acute. *See* DX 4 (National Preparedness Levels Past 10 Years (most active months)). Thus, there is no support for the contention that using CWN contracts would result in too few Type I and Type II helicopters available for firefighting in the 2007 fire season.

Third, the administrative record does not support the conclusion in the Forest Service's override findings that only exclusive-use contracts make helicopters available at the "national level" or for "strategic objective[s]." *See* AR 10, 11, ¶¶ 12(b), 15 (Override Findings). In this respect, comparison of exclusive-use and CWN contracts reveals little, if any, difference between the contracts. Both contracts indicate that helicopters will be used "in the adminis-tration and protection of Public Lands," that helicopters "will be used for [fire] incident support," and that helicopters may be dispatched to carry out cooperative agreements with federal and state agencies, as well as private landowners. *Compare* AR 652 (Am. Solicitation § C-1(A), (D), (E)), *with* CWN Solicitation at 5, § C-1(A)-(C). Although only the exclusive-use contracts specify a "Mandatory Availability Period" during which the helicopter "shall be made available for the exclusive use of the Government," AR 652 (Am. Solicitation § C-1(C)), the CWN contract provides that "once the Contractor accepts an order, the Contractor is obligated to perform in accordance with the terms and conditions stated herein." CWN Solicitation at 28, § C-27(B). The CWN contracts also call for "Ordered Availability Periods" during which a helicopter is fully at the disposal of the government. *See id.* § C-30 ("Helicopters and associated equipment and personnel shall be available as ordered by the C[ontracting] O[fficer] and agreed to by the Contractor. After a period of availability has begun, the helicopter will not be released at the request of the Contractor until approved by the C[ontracting] O[fficer].")

The one factual aspect of the Forest Service's findings that bears on the distinction between the "national" or "strategic" nature of exclusive-use contracts as compared to the apparently local or regional nature of CWN contracts is the explanation that helicopters under CWN contracts "cannot be easily moved to different assignments as they are under the control of the incident commander for specific needs of that incident, and generally not available to meet a strategic objective supporting more than one incident." *See* AR 10, ¶ 12(b) (Override Findings). This finding, however, is undermined by provisions of the CWN contracts. The CWN contracts specify that the "Assigned Work Location(s)" "will be determined at the time the order for services is placed," CWN Solicitation at 28, § C-29, thus implying that more than one work location could be specified in a resource order. That helicopters under CWN contracts are purely local assets is also undercut by Paragraph C-26 of the CWN solicitation: "The National Interagency Coordination Center (NICC), located at the National Interagency Fire Center (NIFC) in Boise, Idaho is the only office authorized to place orders under the Contract. Contractors shall not accept orders from any other source." *Id.* § C-26.

---

[21]The figure of 241 helicopters apparently included light helicopters, whose services were not sought in the solicitation. AR 367-68, 440 (Solicitation, Standard Form 1449 §§ B, B.6 (Apr. 6, 2007)); Hr'g Tr. 74:22 to 75:22 (Test. of Mills).

Moreover, under exclusive-use *and* CWN contracts, the transfer of helicopters, for example, from one fire incident to another would appear to be under the control of the contracting officer, not an incident commander. The exclusive-use contract provides that "[t]he aircraft and related equipment will be available 24 hours per day and will not be removed from the designated base without the approval of the Contracting Officer." AR 682 (Am. Solicitation § C-26(A)). Similarly, the CWN contract states that "[a]fter a period of availability has begun, the helicopter will not be released at the request of the Contractor until approved by the C[ontracting] O[fficer]." CWN Solicitation at 28, § C-30. Thus, the administrative record does not support the Forest Service's claim that helicopters under exclusive-use contracts offer the advantage that they are controlled nationally, while helicopters under CWN contracts are controlled by the local incident commander. Perhaps the Forest Service in practice *manages* exclusive-use helicopters as national assets and CWN helicopters as local assets, but, if so, that is a matter of internal Forest Service policy that can be changed or modified by an operational directive. That management consideration is not a basis for rejecting a reasonable alternative to the override.[22]

Ultimately, the only material difference that the administrative record reveals between exclusive-use contracts and CWN contracts is the guaranteed availability of helicopters provided by the exclusive-use contracts. In this respect, the Service "determined it was advantageous to offer a larger number of exclusive use contracts in 2007 to guarantee a consistent availability throughout the season at a lower cost than the typical CWN resource and to manage them strategically." *See* AR 10, ¶ 12(b) (Override Findings). The guarantee might justify the override if the administrative record demonstrated that the Forest Service would not be able to acquire sufficient helicopter services if remitted to reliance on CWN contracts, but as noted *supra*, the administrative record contains no such supporting data. A finite number of heavy and medium helicopters are equipped for fire-suppression work, and during the fire season, those helicopters tend to be available to the Forest Service either under exclusive-use or CWN contracts. *See supra*, at 12-13.[23] Neither the automatic stay nor the override will increase or decrease the

---

[22]The Forest Service also put forward contradictory findings respecting "national" and "local" resources. In evaluating whether to extend the pre-existing exclusive-use contracts of Type I and Type II helicopters, the Forest Service concluded that the four Type I helicopters were too few to make a difference and that the 24 Type II helicopters were "unavailable for use in the *national* fleet, because they [were] budgeted for and managed by the regions . . . [, were] reserved for use in local initial attacks," and would "deplete local resources." AR 9-10, ¶ 12(a) (Override Findings). The inconsistency suggests that the Forest Service's refusal to extend the existing contracts appears linked to a *preference* for proceeding with the 35 new exclusive-use contracts, rather than a conclusion that those contracts are the only viable option during the period of the automatic stay. *See Advanced Sys. Dev.*, 72 Fed. Cl. at 32 (faulting agency for not explaining why it could not extend the incumbent contracts during the stay and for basing its decision on a mere preference for the new contracts).

[23]Because the daily rates applicable to a given helicopter under the CWN contracts are higher than the rates available for other work during the fire season, in prior years operators have

overall supply of such helicopters, at least during the brief period covered by the stay and override. In short, the Forest Service's conclusion that exclusive-use contracts were more "advantageous" than the CWN contracts on which it had relied in 2006 and prior years is an invalid justification for overriding an automatic stay. *See Advanced Sys. Dev.*, 72 Fed. Cl. at 31 (illegitimate for agency to justify override by claiming that the new contract is better than the old one).[24]

3. *Cost-benefit analysis.*

The Forest Service devoted one section of its findings to "Risks of Staying Performance v. Overriding Stay." AR 11, ¶¶ 13-14 (Override Findings). Although the Service did not engage in a quantitative analysis of costs and benefits, it did specifically consider that if plaintiffs prevailed before GAO, the Service would have to pay for plaintiffs' bid preparation costs and costs associated with the protest, including attorneys' fees. AR 11, ¶ 13 (Override Findings). The Service's findings focus mainly on the obverse side of this consideration, *viz*., "the significant risks that would result from not overriding the stay – *i.e.,* the inability to guarantee helicopter availability and therefore to prevent loss of life and property – [which] outweigh the ramifications of any sustained bid protests." AR 11, ¶ 13 (Override Findings). Plaintiffs object that the Forest Service did not quantify the costs of the override versus the benefits of allowing the exclusive-use contract awardees to proceed with their performance. *See, e.g.*, Erickson Mot. at 14-15. However, the Service based its decision on the effectiveness of using exclusive-use contracts for the Service's firefighting efforts, not on the *cost effectiveness* of those contracts. *See* AR 11, ¶ 13 (Override Findings); Def.'s Mot. at 14-15, 19. Moreover, the administrative record does not contain evidence that a victory by plaintiffs before GAO would result in

---

made suitably equipped helicopters available to the Forest Service under the CWN contracts.

[24]In examining reasonable alternatives to the override, the Forest Service apparently did not consider an option similar to that of extending the pre-existing contracts, namely, ordering additional helicopters from the operators already under contract. Both exclusive-use and CWN contracts explicitly provide for this contingency. The CWN contract provides: "After Contract award, aircraft with performance equal to or higher than aircraft awarded under this contract may be added at the C[ontracting] O[fficer]'s option at the same price as aircraft originally awarded. . . . All terms and conditions of the contract apply." CWN Solicitation at 31, § C-41. Similarly, the exclusive-use contract states: "When additional helicopters and/or personnel are ordered by the Government, the Contractor may furnish them, if available. All terms and conditions of this contract will apply to their use [with certain exceptions]." AR 685 (Am. Solicitation § C-33). The Forest Service's failure to evaluate an alternative provided in the contracts substantially undercuts the agency's override decision. *See Chapman Law Firm Co. v. United States*, 62 Fed. Cl. 464, 467 (2004) (faulting agency for not considering the option of exercising the 'changes' clause in a contract to add a new service); *cf. Reilly's Wholesale*, 73 Fed. Cl. at 714 (not considering certain alternatives "casts considerable doubt on the rationality of [the agency's] override decision").

substantial "termination and transition costs." *Cf. CIGNA*, 70 Fed. Cl. at 112 (faulting agency for not adequately considering costs of plaintiff's victory before GAO, including "lease termination, costs of transferring Medicare records and updating records, equipment depreciation, severance pay, and start-up bonuses"). The government points out that *even if GAO sustained plaintiffs' protests, the government "would not suffer a disruption to its work practices other than the return to the CWN arrangement*," Def.'s Mot. at 19 (emphasis added), suggesting that the detriments incurred by the government, including costs, might not be significant. Given that the Forest Service's override decision did not rely on the quantitative costs associated with that decision, that the administrative record is silent on quantitative costs generally, and that the termination and transition costs do not qualitatively appear to be significant, the fact that the Service's findings lacked quantitative calculations of costs is not itself problematic.[25]

4. *Impact on competition and integrity of the procurement system.*

The Forest Service's override findings did not seek to place its override action respecting the exclusive-use contracts within the broad context of federal procurement law. The court must do so. "The overarching goal of the [automatic] stay is to preserve competition in contracting and ensure a fair and effective process at the GAO." *Advanced Sys. Dev.*, 72 Fed. Cl. at 31; *see also Dairy Maid Dairy, Inc. v. United States*, 837 F.Supp. 1370, 1377 (E.D. Va. 1993) (stay provisions are intended to "provide effective and meaningful review of procurement challenges before the protested procurements become '*faits accomplis*'").

5. *Synopsis.*

The Forest Service's assertion that exclusive-use contracts were needed to face the significant risks posed by the 2007 fire season is misleading. No one doubts that the risks of fire this season are significant, but exclusive-use contracts would not add more resources to combat that risk. The Forest Service's overarching justification as to why the override was in the "best interests" of the United States and based on "urgent and compelling circumstances," *see* AR 11, ¶ 15 (Override Findings), was that the exclusive-use contracts were better than the CWN contracts at guaranteeing helicopter availability. But, the Service provided no data showing that more resources would be made available than were otherwise at the Federal Service's disposal under the pre-existing exclusive-use contracts and the CWN contracts upon which the Forest Service had previously relied in the immediately prior firefighting seasons. The Service's consideration of continued use of CWN contracts as an alternative was arbitrary because the Service did not credit its ability under those contracts to order helicopters for pre-positioning in places where conditions were conducive to lightening-strike induced fires, just as it wanted to do with helicopters provided under exclusive-use contracts. Finally, the Forest Service's reliance on a desire to establish a "national" base of helicopters not subject to control by the Forest Service's

[25] The government also avers that because the activity during a fire season is unpredictable and it is correspondingly difficult to estimate reliably how many helicopters would be used and for what duration, quantification of costs would have been speculative. Def.'s Mot. at 15.

regional or local managers or incident commanders is not a sufficient basis for the override. Management of all helicopters, whether supplied by contractors under exclusive-use or CWN contracts, rests with the Service's Contracting Officer. Nothing in either of those contracts bars the Forest Service from managing helicopter and other resources effectively to carry out the Service's mission and objectives. Based on this analysis along with an assessment of how the override affects competition and the integrity of the procurement system, the court concludes that the Forest Service's override determination was arbitrary and not in accordance with law. *See* 5 U.S.C. § 706(2)(A).

**B. Equitable Relief**

Plaintiffs request that the court grant them equitable relief by setting aside the Forest Service's override of the automatic stay. Superior Compl. ¶ 20; Erickson Mot. at 6, 21. Citing decisions of this court, Erickson urges the court to enter a declaratory judgment, rather than "impose[] [on Erickson] unnecessary burdens of proof" required by injunctive relief. Erickson Mot. at 6-7 (citing *Advanced Sys. Dev.*, 72 Fed. Cl. at 36; *CIGNA*, 70 Fed. Cl. at 114). The Federal Circuit, however, has explained that if a declaratory judgment and an injunction would have the same practical effect in a case, consideration of declaratory relief under injunctive relief standards is appropriate. *See PGBA*, 389 F.3d at 1228 (by declaratory judgment, plaintiff "is asking to have the award set aside, which is coercive and has the same practical effect as an injunction;" thus, trial court's analysis under injunctive relief standard was correct); *see also Samuels v. Mackell*, 401 U.S. 66, 73 (1971) ("Ordinarily . . . the practical effect of [a declaratory judgment and an injunction] will be virtually identical."). Given that plaintiffs' requested relief – a set-aside of the Forest Service's override – is, with one exception, identical whether in the form of a declaratory judgment or an injunction,[26] the court will apply the four-factor test for injunctive relief. *See PGBA*, 389 F.3d at 1228-29.

Plaintiffs have satisfied the first factor for equitable relief – success on the merits – because they have demonstrated that the Forest Service's override determination was "arbitrary" and "not in accordance with law." In determining whether plaintiffs will suffer irreparable harm if the court denies the equitable relief requested, this court begins with the question of whether Superior, Ranier, and Erickson have an adequate remedy at law. *See Magellan Corp. v. United States*, 27 Fed. Cl. 446, 447 (1993) ("The relevant inquiry . . . is whether plaintiff has an adequate remedy in the absence of an injunction."). By statute, in a bid-protest case, the court is constrained in the monetary relief it can grant. *See* 28 U.S.C. § 1491(b)(2) ("[A]ny monetary relief shall be limited to bid preparation and proposal costs."). Thus, in a bid protest, "a lost opportunity to compete on a level playing field for a contract . . . has been found sufficient to prove irreparable harm." *Seattle Sec. Servs., Inc. v. United States*, 45 Fed. Cl. 560, 571 (2000). Moreover, CICA's automatic stay provision is premised on the notion that "the failure of an

---

[26]Here, the only difference between a declaratory judgment and an injunction is that an injunction would require the Forest Service to seek the court's permission before issuing any subsequent override. *See* Tr. 35:24 to 37:11.

agency to stay performance could result in a competitive disadvantage that might not be remedied, causing a contractor to lose an important business opportunity." *Reilly's Wholesale*, 73 Fed. Cl. at 717.

In this case, plaintiffs have lost an opportunity to compete for the right to win exclusive-use contracts. With exclusive-use contracts ending no later than late November, *see*, *e.g.*, AR 585, 587 (Am. Solicitation § B-1), and GAO's decisions not due until early October, Def.'s Mot. at 7, plaintiffs argue that unless the override is set aside, any victory plaintiffs might attain on the merits before the GAO would be a hollow one. Erickson Mot. at 22. The government counters that a set-aside of the override would not result in plaintiffs being awarded exclusive-use contracts during the protest period. Def.'s Mot. at 22.

Plaintiffs' position regarding irreparable harm is undermined somewhat by the fact that, following the Forest Service's override on July 9, 2007, plaintiffs' helicopters have largely been engaged in firefighting for the Forest Service under CWN contracts. Of the three helicopters that Superior used for bidding on the exclusive-use contracts, one is working for the state of Oregon under a 75-day contract that ends in late September, and two are currently fighting fires for the Forest Service under CWN contracts. Tr. 92:22 to 95:10 (Test. of Mills). Superior's three helicopters have been flying steadily, with the two helicopters under CWN contracts having been idle only approximately five to seven days since the override was issued. Tr. 94:6 to 95:18 (Test. of Mills). The one helicopter on which Ranier relied for its bids is also currently employed by the Forest Service under a CWN contract and has worked every day since the override. Tr. 144:5-9, 150:23 to 151:8 (Test. of Richard L. Larew).[27] Similarly, three of the four helicopters on which Erickson relied for its bids are currently working for the Forest Service under CWN contracts, and the other helicopter is under an exclusive-use contract with the City of Los Angeles through December 2007. Tr. 172:22 to 173:19, 190:9 to 191:17 (Test. of Allmaras).[28] All four of Erickson's helicopters have been working consistently, particularly in the two to three weeks leading up to the August 8, 2007 trial, with only a few idle days since the Forest Service issued the override. Tr. 178:13 to 179:1 (Test. of Allmaras). Thus, not only are six of the eight helicopters that plaintiffs bid currently fighting fires under CWN contracts, but they also are earning a "daily base rate" under those CWN contracts that is typically double the rate earned under exclusive-use contracts – a premium based on the fact that CWN contracts do not guarantee operators a fixed number of days of work. *See* Tr. 116:7 to 119:15, 120:13 to 121:9 (Test. of Mills), 179:20 to 180:5 (Test. of Allmaras).[29]

---

[27]Mr. Larew is Ranier's Executive Vice President. Tr. 126:24, 127:22-23 (Test. of Larew).

[28]Mr. Allmaras, a 32-year veteran of the Forest Service, is Erickson's Firefighting Manager for North America and Australia. Tr. 164:20-21, 165:8-10 (Test. of Allmaras).

[29]Under both exclusive-use and CWN contracts, the operator is paid an identical hourly flying rate, which is based on aircraft type and is established by the Forest Service. Under both

Two countervailing considerations, however, weigh in favor of plaintiffs. Testimony at trial revealed that the Forest Service's policy and practice is to maximize the use of its exclusive-use helicopters; consequently, if a fire season moderates, helicopters on CWN contracts lose work. Tr. 319:2-13 (Test. of Ronald Hooper) ("[T]he policy is [exclusive-use helicopters] get priority on utilization."), 96:6-15 (Test. of Mills) (noting that the 2004 fire season was initially quite active, but when "the season tapered back . . . all the exclusive use ships were shuttled all over the West in order to fill the[] [Forest Service's] requirements, and the CWN ships all just sat"), 113:18-25, 119:21-25, 179:10-19 (Test. of Allmaras) ("exclusive use" helicopters are the "primary source of service"). This practice also limits the benefits of CWN contracts to an operator. Although CWN orders are more lucrative in the short term because the "daily base rate" is roughly twice that for exclusive-use contracts, exclusive-use contracts might yield greater revenues over the long term, and in any event, provide a guaranteed return. *See* Tr. 119:9-25 (Test. of Mills), 180:1-23 (Test. of Allmaras), 151:9 to 152:2 (Test. of Larew). Mr. Allmaras stated explicitly that Erickson preferred exclusive-use contracts to CWN contracts, in part because of the guaranteed income the former provided. Tr. 180:24 to 181:9, 219:7-21 (Test. of Allmaras) ("You always take the guarantee. . . . [I]t's like my reference to Las Vegas . . . . You don't gamble that much with those sorts of things."). Noting the unpredictability of fire seasons due to changing weather conditions, Mr. Allmaras also expressed doubt about the government's suggestion that, because the current long-term weather forecast indicates an active fire season through November 2007, Erickson would be likely to receive CWN resource orders throughout the remainder of the season. Tr. 173:13 to 174:5, 211:3 to 211:9 (Test. of Allmaras); *see also* Tr. 98:24 to 99:2 (Test. of Mills) (noting unpredictability of weather).

On balance, the court concludes that plaintiffs have demonstrated that they have suffered irreparable harm. Although the work plaintiffs currently are performing under CWN contracts offsets some of the harm they have suffered by not being able to compete fairly for the exclusive-use contracts, plaintiffs have nonetheless suffered irreparable harm by being deprived of assurances of work or, in two instances, accepting less remunerative state and city fire fighting contracts.

Turning to the balance of hardships among plaintiffs, the government, and the awardees, the court must weigh the potential harm to plaintiffs if equitable relief is not awarded against the

---

types of contracts, operators also are paid a "daily base rate," which contractors competitively bid. As a general matter, the "daily base rate" for CWN contracts is roughly twice the rate for "exclusive use" contracts, but CWN contract operators are not guaranteed work. *See* Tr. 116:7 to 119:15, 120:13 to 121:9 (Test. of Mills), 179:20 to 180:5 (Test. of Allmaras).

The contract for the one Superior helicopter that is working for the state of Oregon is not as lucrative as the exclusive-use contract with the Forest Service for which Superior bid. Tr. 93:14-19 (Test. of Mills). The same is probably true for the one Erickson helicopter fighting fires for the City of Los Angeles. *See* Tr. 191:8 to 193:1 (Test. of Allmaras) (noting that Erickson, if necessary, would shift around its other helicopters working under other contracts to make the helicopter in Los Angeles available to the Forest Service under a CWN contract).

potential harm to the government and awardees if such relief is granted. Testifying for the government, Mr. Ronald Hooper, the Forest Service's Director of Acquisition Management, observed that six of the eighteen awardees do not currently have CWN contracts, and, as a result, in his view, a set-aside of the override would force the Forest Service to issue a procurement for new CWN contracts. Tr. 265:4 to 266:4 (Test. of Hooper).[30] But Mr. Hooper testified that the Forest Service already had added four helicopters to the exclusive-use fleet by exercising its contractual right to request additional helicopters from exclusive-use awardees. Tr. 268:21 to 269:9 (Test. of Hooper); AR 685 (Am. Solicitation § C-33).[31] He did not explain why the Service could not further increase the number of Type I and Type II helicopters in the field by exercising this option for the CWN contract holders. *See* AR 685 (Am. Solicitation § C-33); CWN Solicitation at 31, § C-41; *see also* Tr. 171:8 to 172:7 (Test. of Allmaras) ("numerous times" the Forest Service has exercised its contractual right to request additional helicopters from Erickson under its previous exclusive-use contracts). Moreover, Mr. Mills suggested that the impact of the override on the awardees that did not also hold CWN contracts would be minimal – he suggested that under those circumstances, the Forest Service could simply ask those exclusive-use contract awardees whose helicopters were then fighting fires to sign a CWN contract to continue fighting those same fires with the same helicopters. Tr. 102:23 to 103:1 (Test. of Mills).

The government also offered conclusory testimony about a "significant decrease" in the number of helicopters of all types that were available for work under CWN contracts, implying that being forced to rely upon CWN contracts would harm the government because not enough helicopters under CWN contracts would be available for the 2007 fire season. *See* Tr. 263:7-19 (Test. of Hooper). The government, however, did not proffer any reliable evidence to substantiate that position. The testimony on the total pool of CWN helicopters and on how many of those helicopters were Type I and Type II aircraft was confusing and contradictory. *See* Tr. 263:14-16 (Test. of Hooper) (240 helicopters of all types available under CWN contracts in 2006, with 160 available in 2007), 291:10-22 (Test. of Hooper) ("[W]e have 160 *fewer* [helicopters] available in the ROSS system [under CWN contracts] this year than we had last year.") (emphasis added), 292:6-8 (Test. of Hooper) (no knowledge of how many helicopters are under CWN contracts in 2007), 263:25 to 264:2 (Test. of Hooper) (24 CWN contracts for Type I and Type II helicopters in 2006), 290:21-23 (Test. of Hooper) (45-50 CWN contracts for Type I and Type II helicopters in 2006), 175:3-13, 199:4 to 200:6 (Test. of Allmaras) (250 helicopters of all types available under CWN contracts, slightly over 100 of which are Type I and Type II helicopters). A NICC Incident Management Situation Report, dated August 7, 2007, indicated that 147 helicopters of all types were engaged in fighting fires on that date. DX 2, at 1 (NICC Situation Report); Tr. 79:13-25, 103:12-17 (Test. of Mills). Thirty-seven of those 147

---

[30]The six contractors operate a total of seven helicopters under exclusive-use contracts. Tr. 265:11-15 (Test. of Hooper).

[31]Since July 9, 2007, the Forest Service also has suspended the operations of two of the 35 helicopters awarded exclusive-use contracts. Tr. 267:13 to 268:8 (Test. of Hooper).

helicopters presumably came from those working under exclusive-use contracts.[32] In any event, Mr. Hooper conceded that the use of exclusive-use contracts does not provide an increased number of helicopters, Tr. 252:16 to 253:1 (Test. of Hooper), suggesting that replacing exclusive-use contracts with CWN contracts actually would not affect the quantity of aircraft available to fight fires. Tr. 99:23 to 100:1 (Test. of Mills) (reliance on exclusive-use contracts does not increase the number of available aircraft).

Mr. Hooper ultimately emphasized that the harm to the government from a set-aside of the override was not a reduction in the number of available aircraft, but rather a reduced ability on the part of the Forest Service to manage helicopter resources. Mr. Hooper reiterated a rationale laid out in the Forest Service's override findings – that exclusive-use contracts, because they are controlled nationally, offer advantages over CWN contracts, which typically lead to local control over helicopter assignments. Mr. Hooper testified that with helicopters under exclusive-use contracts, the Service "can allocate them to a given fire today, and pull them off and allocate them to a different fire tomorrow, when the changes in conditions change the priorities." Tr. 246:14-20 (Test. of Hooper); *see also* Tr. 252:24 to 253:7 (Test. of Hooper) ("[I]t's not the numbers that are significant; it's the means available to manage and utilize that asset that is of significance. In the CWN environment, again, we lose the ability to manage those assets as a national asset. And the ability to utilize them between incidents as effectively, from a management standpoint and a cost standpoint, as is provided by the exclusive use contract."). Mr. Hooper explained that in 2006 the Forest Service's creation of the National Incident Management Organization ("NIMO"), a team assembled during high levels of preparedness (*i.e.*, preparedness levels 4 and 5) to facilitate sharing of resources and managing of priorities on the national level, was accompanied by a policy statement indicating that all exclusive-use contracts were national assets. Tr. 334:12 to 335:17, 336:10-25, 337:17 to 338:17 (Test. of Hooper).

In contrast to exclusive-use contracts, Mr. Hooper said, CWN helicopters were "at the disposal of . . . the incident commander" and "unless [the incident commander] agrees to let that resource go, nationally we can't manage that resource." Tr. 246:21 to 247:1 (Test. of Hooper); *see also* Tr. 247:15 to 248:3 (Test. of Hooper). With the Forest Service unable to control nationally the helicopters under CWN contracts, some helicopters are underemployed, while others are "stretched well beyond their capabilities." Tr. 249:16 to 250:3 (Test. of Hooper). Mr. Hooper further explained that this inability nationally to guide deployment of helicopters partially depletes the Forest Service's "initial attack capability" – resources aimed at suppressing fires within 24 hours after they start – by forcing the Service to emphasize assigning helicopters to work on sustained fire operations. Tr. 253:23 to 255:25 (Test. of Hooper).

Mr. Hooper's explanation of the national-local distinctions between exclusive-use and CWN contracts is far more comprehensive than that in the Service's override findings, but nonetheless is unconvincing. As noted *supra*, the claim that the incident commander has the

---

[32]Of the 35 helicopters originally placed under exclusive-use contracts, two were suspended but four were added. *See supra*, at 21 & n.31.

final say in reassigning helicopters under CWN contracts does not appear consistent with the contract itself, which bestows that ultimate responsibility on the contracting officer. CWN Solicitation at 28, § C-30. Moreover, as Mr. Hooper conceded under cross-examination, incident commanders on rare occasions have released helicopters for "national" needs, and, in any event, the incident commander is ultimately responsible to the head of the Forest Service, who could order at any time that assignment policies be changed or that helicopters be reassigned. Tr. 278:20 to 280:21, 299:20 to 300:16 (Test. of Hooper);[33] *see also* Tr. 258:20 to 260:4, 262:3-15 (Test. of Hooper), 86:21 to 87:22, 106:17 to 107:6 (Test. of Mills), 218:8-22 (Test. of Allmaras) (suggesting the requirement for a new resource order to reassign a helicopter to another geographic area is a matter of internal Forest Service management), 202:6 to 203:16, 216:15-23 (Test. of Allmaras) (the Forest Service's use of exclusive-use contracts might cause the Service to deploy and provide more helicopter managers in the field, but noting that a helicopter manager was not "a functioning part of the crew" and that he or she mainly handled "administrative matters"). If the Forest Service could issue a NIMO-related policy statement declaring that exclusive-use contracts are to be managed nationally, it could do the same thing with respect to some helicopters provided under CWN contracts. In the final analysis, the Forest Service's national-versus-local rationale does not survive serious scrutiny because it reflects internal Service management policies, not a resource imperative or circumstance that would give rise to the "best interests of the United States." 31 U.S.C. § 3553(d)(3)(C); *Reilly's Wholesale*, 73 Fed. Cl. at 707 ("A decision to override the automatic CICA stay provisions is a very serious matter and requires a determination that the interests of the United States, not just the agency involved, will be significantly affected.").

Finally, the government argues that under two scenarios – pre-positioning of helicopters and reassigning helicopters from one fire to another – the freedom of operators with CWN contracts to reject resource orders creates a problem for the Forest Service. *See* Def.'s Mot. at 26; Tr. 55:10-21 (government counsel's opening statement). Mr. Hooper initially testified that only with "exclusive use" contracts could the Forest Service "strategically stage[]" helicopters "where the [fire] potential is" and that with helicopters under CWN contracts, "you don't know where they're going to be on a particular day." Tr. 257:8 to 258:19 (Test. of Hooper). But the Forest Service previously issued resource orders to helicopters under CWN contracts to pre-position the aircraft in locations where it expected their services might be needed. Tr. 66:25 to 67:12, 104:25 to 105:2, 111:14 to 112:3, 114:18 to 115:16 (Test. of Mills), 169:5-19 (Test. of Allmaras). The CWN contracts explicitly provide for this possibility. *See* CWN Solicitation at 28, § C-30 ("Ordered Availability Periods"). Moreover, Mr. Mills testified that helicopter operators, cognizant of the significant expenses they incur in ensuring that their helicopters meet the stringent standards of the Forest Service, often pre-position aircraft at their own expense near areas where they expect the Service will need them, knowing that the closer the helicopter is to a fire or potential fire, the more likely they will receive a resource order. Tr. 85:11 to 86:8, 112:4-15 (Test. of Mills); *see also* Tr. 169:20 to 170:15 (Test. of Allmaras) (confirming that

---

[33]The Incident Commander reports to the Forest Supervisor, who reports to the Regional Forester, who in turn reports to the Chief of the Forest Service. Tr. 279:25 to 280:13 (Test. of Hooper).

Erickson routinely pre-positions its helicopters near ongoing fires to increase its chances of receiving a resource order). Mr. Hooper later clarified that the Forest Service could issue resource orders to helicopter operators under CWN contracts, requesting that they pre-position aircraft at a particular location, but he stressed that those operators were not obligated to accept those orders. Tr. 260:15 to 261:3 (Test. of Hooper); *see also* Tr. 258:20 to 260:4 (Test. of Hooper) ("So there is a lag in CWN aircraft. Unless you put them in a scenario that's identical to the exclusive use contract, where . . . they're required to respond when the [fire] bell goes off."). Mr. Hooper also testified that the CWN contract required that a new resource order be issued if the Service wished to transfer a helicopter from one fire to another, and he again noted that CWN contractors could refuse to accept the order. Tr. 258:20 to 260:4 (Test. of Hooper); *see also* Tr. 86:21 to 87:22, 106:17 to 107:6 (Test. of Mills) (explaining his experience with reassignment of helicopters). However, resource orders can be phased under CWN contracts that specify service by the ordered helicopter at more than one location, *see* CWN Solicitation at 28, § C-30, and the helicopter would not be released at the request of the Contractor until approved by the "C[ontracting] O[fficer]." *Id*.

Furthermore, Mr. Hooper undercut these arguments by agreeing that operators with helicopters under CWN contracts would be "loath to turn [a resource order] down." Tr. 262:3-15 (Test. of Hooper). This testimony was reinforced by other witnesses. Mr. Mills conceded that helicopter operators under CWN contracts are not legally obligated to accept resource orders, but he gave two reasons why an order would be accepted, barring compelling circumstances. First, he explained that "at least in our commercial world, there isn't anything out there that pays more," Tr. 108:18-20 (Test. of Mills), noting that because the operators are "making $25,000 a day [to fight fires], it's not very likely they're going to turn that order down. . . . I don't personally know of any operator that would ever do that." Trial Tr. 101:22 to 102:21 (Test. of Mills). Second, on a pragmatic level, Mr. Mills said that helicopter operators do not want to "irritate or anger the people who assign aircraft on a national level" because the operators fear being given "lower marks as an operator for not being as cooperative as they like." Tr. 107:7-21 (Test. of Mills). In a similar vein, Mr. Allmaras testified that work under the CWN contracts was "lucrative" and that Erickson had "gone so far as to shut down construction jobs, logging projects, to satisfy the public's need for protection." Tr. 174:6-21 (Test. of Allmaras).[34]

Balancing the hardships between the competing claims of plaintiffs, on the one hand, and the government and the awardees on the other, the court concludes that setting aside the Forest Service's override would not cause undue hardship to the Forest Service. Testimony at trial showed that the alternatives available to the Service during the brief GAO protest period would allow the Service effectively to meet the challenges of the 2007 fire season.

---

[34]Mr. Hooper also testified that states and other federal agencies "have made strategic decisions not to acquire their own aircraft in certain areas, out of reliance on [the Forest Service's] exclusive-use aircraft," Tr. 251:24 to 252:7 (Test. of Hooper), but it is not apparent why a helicopter controlled by the Service could not just as easily be under a CWN contract.

The final factor in the court's analysis is whether granting plaintiffs' request for equitable relief would serve the public interest. The government argues that sustaining the override is in the public interest because the Forest Service's decision was made in the interest of public safety. Def.'s Mot. at 26. Plaintiffs argue that the public interest in a fair procurement process favors granting the equitable relief they request. *See, e.g.*, Erickson Mot. at 24.

In making the government's case for upholding the override on grounds of public safety, Mr. Hooper stressed the significance of the 2007 fire season. Reviewing NIFC's National Wildland Significant Fire Potential Outlook, dated August 1, 2007, Mr. Hooper stated that there was a trend of "an abnormal number of fires, and an abnormal severity of fires when they do occur" and indicated that such a trend did not "bode well for [the Service's] ability to sustain the level of [fire] suppression capability that [the Service] ha[s] today, over the long haul." Tr. 226:15 to 228:11 (Test. of Hooper); *see also* DX 1 (NIFC, National Wildland Significant Fire Potential Outlook). Mr. Hooper also emphasized that the NIFC had moved to Preparedness Level 5, the highest level, due to the occurrence of significant fires in more than one geographic area. Tr. 232:17 to 233:6 (Test. of Hooper); DX 3 at 2 (NIFC Preparedness Levels). Finally, Mr. Hooper estimated that approximately 20 of the large uncontrolled fires were currently burning at urban-wildland interface areas and "enclaves of private property in national forest land," thereby increasing the risk to private citizens and private property. Tr. 238:1-18, 239:6 to 241:1 (Test. of Hooper); DX 2 at 1 (NICC Situation Report).

Plaintiffs do not dispute the severity of the 2007 fire season, *see*, *e.g.*, Tr. 75:10-11 (Test. of Mills) ("[T]he essence of this report is that they expect fire potential to remain high."), 96:18 to 98:23 (Test. of Mills), but Mr. Hooper did not adequately explain why the Forest Service could not cope with the dangers posed by the 2007 fire season by using CWN contracts or ordering more helicopters under existing CWN or pre-existing exclusive-use contracts. The government simply has failed to make a showing that only through the use of exclusive-use contracts could the public be protected from an intense 2007 fire season. Ultimately, the public's interest in a fair, competitive federal procurement system outweighs unsubstantiated claims, even those related to the public safety. *See Reilly's Wholesale*, 73 Fed. Cl. at 716 ("[T]he public's interest . . . lies in preserving the integrity of the competitive process – such, indeed, clearly was Congress' view in providing that, except in circumstances not yet demonstrated here, the automatic stay should prevail.").

The Tucker Act provides that "[t]o afford relief in [a bid protest case], the court[] may award any relief that the court considers proper, including declaratory and injunctive relief." 28 U.S.C. § 1491(b)(2). In balancing the factors pertinent to equitable relief, the court concludes that plaintiffs are entitled to a declaratory judgment, but not an injunction. Therefore, the Forest Service's override of the automatic stay under 31 U.S.C. § 3553(d)(3)(C) will be set aside and dissolved. The automatic stay of the contracts for exclusive-use helicopter services awarded under Solicitation No. AG-024B-S-07-0008 will again bar performance of those contracts while

the bid protests of the awards remain pending before the GAO.[35]

**CONCLUSION**

For the reasons set forth, plaintiffs' motions for judgment on the administrative record are GRANTED. The government's motion for judgment on the administrative record is DENIED.

The override of the automatic stay issued by the Forest Service on July 9, 2007 is SET ASIDE and DISSOLVED.

The Clerk shall enter final judgment as specified above. No costs.

Erickson's motion and the joint motion of Superior and Ranier to supplement the record are GRANTED IN PART and DENIED IN PART. The items addressed by the motions are made part of the record before the court respecting equitable relief, but they are not made part of the administrative record, for the reasons explained *supra*, at 9-10 n.14.

It is so ORDERED.

s/ Charles F. Lettow
Judge

[35]Because the bid protests pending before GAO do not pertain to the award by the Service of a contract regarding CLIN No. 9, Chuchupate Helibase, Los Padres National Forest, that CLIN was not subject to the automatic stay and consequently is not affected by this decision.